UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:

TRIGEANT HOLDINGS, LTD., *et al.*,                    Chapter 11 Case
                                                     Case No. 14-29027-EPK
        Debtors.                                     (Jointly Administered)
_____/

DANIEL SARGEANT, JAMES SARGEANT,
AND HARRY SARGEANT II,

Plaintiffs,                                          Adv. Pro. No.

v.

HARRY SARGEANT III, BTB REFINING, LLC,
AND SILCA INVESTMENTS, LTD.,

Defendants.
_____/

**COMPLAINT FOR BREACH OF PARTNERSHIP AGREEMENT TO LIMIT THE
PAYMENT ON ACCOUNT OF THE PDVSA CLAIM TO $18.5 MILLION**

    Plaintiffs, Daniel Sargeant, James Sargeant and Harry Sargeant II, through their

undersigned attorneys, hereby sue Defendants Harry Sargeant III, BTB Refining, LLC, and Silca

Investments, Ltd. and state:

**JURISDICTION AND VENUE**

    1.    This is an adversary proceeding governed by Federal Rule of Bankruptcy

Procedure 7001, et seq.

    2.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§157 and 1334. This is a non-core proceeding.  The Court may not enter a final judgment in this

case.

## THE PARTIES

3.      Plaintiff Daniel Sargeant ("Dan") is a Swiss resident and is *sui juris*. Dan is a 29.25% partner in Trigeant Holdings, Ltd.

4.      Plaintiff James Sargeant ("James") is a Florida citizen, residing in Palm Beach County Florida, and is *sui juris*. James is a 12.25% partner in Trigeant Holdings, Ltd.

5.      Plaintiff Harry Sargeant II ("Senior") is a Florida citizen, residing in Palm Beach County Florida, and is *sui juris*. Senior is a 29.25% partner in Trigeant Holdings, Ltd.

6.      Defendant, Harry Sargeant III ("Harry") is a Florida citizen, residing in Palm Beach County, Florida, and is *sui juris*. Harry is a 29.25% partner in Trigeant Holdings, Ltd.

7.      Defendant BTB Refining, LLC ("BTB") was originally a Florida limited liability company.  On September 28, 2011, a civil Final Judgment on the Verdict was entered against Harry and his business partner, Mustafa Abu Nabaa ("Abu Nabaa") and in favor of the plaintiff, Mohammad Al-Saleh in the Circuit Court of Palm Beach in the amount of $28,800,000 (the "Al-Saleh Case").  On July 25, 2011, while the Al-Saleh Case was in the midst of trial, Harry caused BTB to change its domicile to being a Texas limited liability company.

8.      Notwithstanding the change of state of incorporation, BTB's principal place of business was and remains located at 925 South Federal Highway, Suite 375, Boca Raton, Florida.

9.      Silca Investments, Ltd. ("Silca") is a BVI business company that purports to have a registered office in Tortola, British Virgin Islands.  On information and belief, Harry owns a 50% beneficial interest in Silca, with the other 50% owned by Abu Nabaa.

10.     Harry is Senior's eldest son and as such, Harry is an insider of Trigeant Holdings, Ltd., and Trigeant, Ltd., as defined in section 101(31)(C) of the Bankruptcy Code.

2

11.     Trigeant, Ltd. is a Florida Limited Partnership.  Trigeant Holdings LLC, is a Florida Limited Liability Company and is the general partner of Trigeant Holdings, Ltd.

12.     Trigeant Holdings, Ltd. is the limited partner of Trigeant, Ltd. which owns 99% of its equity and 100% of the membership interest in Trigeant LLC.  Trigeant Holdings, Ltd. is owned 99% by Harry, Dan, James and Senior, with the remaining 1% owned by the sole general partner, Trigeant Holdings, LLC.

13.     Trigeant Holdings, LLC is entirely owned by Harry, James, Senior and Dan in the same percentages that they own Trigeant Holdings, Ltd.

## HARRY AS MANAGER OF TRIGEANT

14.     In June 2001, the Sargeants formed Trigeant, Ltd. to acquire and operate a crude processing unit (the "CPU") located in Corpus Christi, Texas.

15.     Trigeant, Ltd. has been and is ultimately controlled by the manager of Trigeant Holdings, LLC.  At all times relevant to the claims asserted herein, being from acquisition of the CPU until February 2013, Harry served as Manager of Trigeant, Ltd. and Trigeant Holdings, LLC.  During this time, Harry had full, unfettered and ultimate managerial responsibility and control over Trigeant, Ltd.'s finances and operations, and he dominated the affairs of Trigeant, Ltd. in all respects.

16.     By 2002, Trigeant, Ltd. had become a party to a supply contract with PDVSA Petroleo S.A. ("PDVSA"), which is the nationalized Venezuelan oil company, for the sale of crude oil by PDVSA to Trigeant, Ltd. for use at the CPU.

17.     Harry was the manager of Trigeant Holdings, LLC at the time that BTB attempted to foreclose on Trigeant Ltd.'s assets, as described below.

## THE PDVSA DEBT

18.     In late 2002 and early 2003, PDVSA sold Trigeant, Ltd. seven cargos of crude oil. Notwithstanding the objections made by Senior and Dan, Harry directed Trigeant, Ltd. not to pay PDVSA, instead using the proceeds of the sale of the ultimate product to acquire another business known as Trigeant EP for $38 million, and which business ultimately failed, causing Trigeant, Ltd. to lose about $30 million.

19.     After PDVSA was not paid for its cargos, it sued Trigeant, Ltd. in arbitration and obtained a $17 million award on March 10, 2006 ("First Arbitration Award").

20.     Faced with the obligation to pay the $17 million First Arbitration Award, in the late fall of 2006, Trigeant, Ltd. obtained a loan from American Capital Financial Services, Inc. ("AmCap") for $22 million to pay off the First Arbitration Award.  As consideration for the loan, AmCap received a first lien on all of Trigeant's assets, including the CPU.

21.     Had Harry as Manager of Trigeant, Ltd. and Trigeant Holdings, LLC paid PDVSA for the cargos there would have been no First Arbitration Award entered against Trigeant, Ltd., nor would it have needed to borrow $22 million from AmCap.

22.     Notwithstanding the First Arbitration Award, Harry never paid for the rest of the crude oil sold by PDVSA, leaving a remaining balance owed of approximately $18,000,000. This debt was also litigated in a second arbitration which was liquidated into an award of approximately $35.1 million, entered on August 24, 2008 (the "Second Arbitration Award").

23.     By December 2007, Trigeant, Ltd. was in default on the AmCap loan, largely resulting from another failed Trigeant, Ltd. transaction orchestrated by Harry involving an entity known as TARCO.

4

24.     At that time, AmCap was proceeding to a foreclosure sale of the CPU, and to stave off the loss of the CPU to AmCap, Harry took profits owed to Trigeant from what is commonly known as the "Jet Fuel Contracts," and on December 10, 2007, Harry formed defendant BTB as the acquisition vehicle for the CPU. Harry used Jet Fuel Contract proceeds to buy the AmCap loan documents, with BTB becoming the holder of those documents. BTB paid no consideration for the AmCap loan documents.

25.     BTB is a sham and alter ego of Harry. It was initially formed as a Florida LLC, and then was transferred into a Texas LLC to prevent creditors, particularly Mohammad Al-Saleh ("Al-Saleh"), Harry's judgment creditor, from attaching its assets. BTB was capitalized with Jet Fuel Contract profits taken from IOTC. BTB was created and in fact used for the purpose of misleading creditors and to perpetrate a fraud upon them, including Al-Saleh, PDVSA and Trigeant, Ltd.

### PDVSA SUES TO AVOID BTB'S FORECLOSURE OF THE CPU

26.     On March 4, 2008, with Trigeant being unable to pay the AmCap debt now owned by BTB, BTB foreclosed on the real estate assets of Trigeant, Ltd. (the "Foreclosure"). At the Foreclosure sale, BTB credit bid $22,565,193.55, which was the full amount of the indebtedness claimed by BTB under the AmCap loan.

27.     PDVSA did not learn about the Foreclosure until after it had occurred. With no resolution of the Second Arbitration Award, PDVSA filed <u>PDVSA Petroleo S.A. v. Trigeant, Ltd., BTB Refining, LLC and Harry Sargeant III</u>, Case No. 09-cv-00038, in the United States District Court for the Southern District of Texas (the "Fraudulent Transfer Case"). On August 7, 2012, the Court in the Fraudulent Transfer Case filed its 22 page Findings of Fact and Conclusions of Law establishing that Harry benefitted from an insider transaction and acted with

actual intent to defraud and with ultimate managerial responsibility over Trigeant in orchestrating the fraudulent transfer of the CPU from Trigeant to BTB.  The Court also found BTB intended to buy the CPU at the lowest possible price.

28.    Harry effected this fraudulent transfer to prevent: (a) a legitimate independent third party from showing up at any foreclosure sale and buying the CPU, and (b) PDVSA from executing and levying on the CPU in post-arbitration award collection proceedings.

29.    Harry sat on both sides of the lender/borrower Foreclosure.  Harry remained in complete control of Trigeant, Ltd. and Trigeant Holdings, LLC at the time of the Foreclosure and dominated the affairs of Trigeant, Ltd. and Trigeant Holdings, LLC without involvement by or consultation with Dan, Jim or Senior.  Further, Harry was the 100% owner of BTB and sole decision maker as to all BTB financial and operational decisions, and as pled herein, Harry is the alter ego of BTB.  Also, with respect to the Foreclosure, Harry concealed the foreclosure sale and the relationship between BTB and Harry from PDVSA.

## HARRY ACQUIRES PDVSA'S CLAIM AGAINST TRIGEANT

30.    On January 23, 2015, PDVSA filed Proof of Claim #6 in the underlying Trigeant related bankruptcies in the amount of $40,374,663.08 (the "PDVSA Claim").

31.    Prior thereto, both PDVSA and BTB, but not Trigeant, Ltd., appealed the Fraudulent Transfer Case decision.  During the time of the filing and briefing of that appeal, and at all times relevant hereto, Harry remained in control of Trigeant, Ltd. and continued to dominate its affairs in all respects.

32.    In May 2014, after the dismissal of the first Trigeant, Ltd. Chapter 11 bankruptcy case, and while the appeal on the Fraudulent Transfer Case appeal was pending, and with some expectation that a ruling by the Fifth Circuit Court of Appeals was imminent, BTB, Harry and

6

Silca entered into a Settlement Agreement and Mutual Release with PDVSA, a copy of which is attached as **Exhibit A** (the "PDVSA Settlement").

33.     The PDVSA Settlement provides, amongst other things, BTB and Silca "the exclusive option to purchase… the Arbitration Award… and all other claims or causes of action PDVSA has against Trigeant Ltd., Trigeant L.L.C., Trigeant Holdings Ltd., Trigeant Holdings L.L.C….."

34.     The PDVSA Settlement provides that the option strike price is $18,500,000 plus 7% interest compounded annually.

35.     Moreover, the PDVSA Settlement provides at section 9 that "[i]f, prior to the Option Expiration Date, a sale of the [CPU] is scheduled either (i) In [Trigeant, Ltd.'s] bankruptcy case (under a plan or under section 363 of the Bankruptcy Code or otherwise) or (ii) in a foreclosure sale, then PDVSA shall assign its claim to BTB and/or Silca and BTB and/or Silca shall credit bit both the [BTB claims against Trigeant, Ltd.] and the [PDVSA  Claim] at such sale, for BTB's account."

36.     The purpose of the PDVSA Settlement was to have the PDVSA Claim available to BTB and by extension, so that Harry could acquire control of the CPU.  Further, it was to provide a mechanism for Harry, through BTB and Silca, to profit off of the Trigeant entities and the Consenting Owners for damage he actually caused while controlling Trigeant, by obtaining the approximate $21.5 million spread given PDVSA's reduced $18.5 million payment under the PDVSA Settlement and the $40 million PDVSA proof of claim.

37.     At the time of the PDVSA Settlement, the Trigeant entities were each insolvent.

7

## COUNT I – DECLARATION OF HARRY AS BTB'S ALTER EGO

38.     Plaintiffs reallege and incorporate paragraphs 1-37 as if full set forth herein.

39.     BTB is 100% owned by Harry. Its manager, Kevin Kirkeide, takes all direction from Harry.

40.     BTB's affairs are comingled with many of the other entities that Harry owns and/or controls.

41.     Harry commingles and moves money in and out of BTB at his own discretion for his own purposes and without regard to the BTB corporate form.

42.     Further, BTB has been and is used to accomplish Harry's own interests and is being used to perpetrate a wrongful act to the detriment of the Trigeant entities.

43.     For all intents and purposes, Harry so dominates the activities and affairs of BTB that it is his alter ego and the corporate form of BTB must be disregarded.

44.     There is a bona fide, actual, present practical need for declaration as to the present controversy as to the matters pled herein and below, declaring Harry to be the alter ego of BTB. The rights of the Consenting Owners are dependent upon the facts as alleged and related law. The Consenting Owners have an actual interest in this matter and Harry and BTB are adverse to that interest and both parties are properly before this Court.  The Consenting Owners are not seeking relief in the form of legal advice.

45.     Upon information and belief, Silca is also the alter ego of Harry.  The Plaintiffs reserve their right to conduct discovery on this issue and amend this Complaint accordingly without prejudice to their rights.

WHEREFORE, the Consenting Owners request that this Court enter judgment determining that BTB is the alter ego of Harry Sargeant III.

## COUNT II – BREACH OF PARTNERSHIP AGREEMENT

46.     Plaintiffs reallege and incorporate paragraphs 1-37 as if full set forth herein.

47.     The Trigeant Holdings Ltd. Partnership Agreement, attached hereto as **Exhibit B**, provides at Section 5.6 that:

> Each General Partner and Limited Partner may have other business interest and may engage in other activities in addition to those relating to the Partnership, although neither the Limited Partners nor the General Partners may engage in the following businesses: asphalt refining, asphalt trading, and any other business in which the Partnership is engaged. (emphasis added).

48.     By entering into the PDVSA Settlement and acquiring the PDVSA Claim for the purpose of credit bidding the PDVSA Claim to obtain the CPU, Harry, through his alter ego BTB, has breached the Trigeant Holdings, Ltd. Partnership Agreement.

49.     Specifically, Harry through his alter ego BTB, is competing with the business of Trigeant Holdings Ltd., namely its ultimate beneficial ownership of the CPU.

50.     Additionally, Harry through BTB and his other affiliates, is presently engaged in and openly asserts that he intends to be and remain in the asphalt refining business.

51.     Both of these activities are in direct violation of the partnership agreement.

WHEREFORE, the Plaintiffs request that the Court enter judgment against Harry and his alter ego BTB, finding them to have breached the Trigeant Holdings Ltd. Partnership Agreement and as damages: (a) Allow the Trigeant entities under the Plan the right to pay PDVSA the $18.5 million "strike price" under the PDVSA Settlement; (b) Other than payment of the strike price, eliminate the PDVSA Claim to the extent that any payment above $18.5 million would be directed to BTB, Silca or Harry; (c) Award any such additional damages and relief as may be had under applicable law.

6177672 v1

## COUNT III – USURPING A CORPORATE OPPORTUNITY

52.     Plaintiffs reallege and incorporate paragraphs 1-37 as if full set forth herein.

53.      As an insider of Trigeant, Ltd., and in violation of the Trigeant Holdings, Ltd. Partnership Agreement, Harry has usurped a corporate opportunity, namely, the right to settle the PDVSA Claim for $18.5 million and profit personally through BTB and potentially, Silca, by receiving approximately $21.5 million that would otherwise not be paid in settlement and would be an asset of Trigeant Holdings, Ltd. to be paid pro rata to its owners, including the Consenting Owners.

54.     The PDVSA Settlement should have been offered to the Consenting Owners by Harry and BTB, and the failure to do so constitutes the usurping of a corporate opportunity to the detriment of the Consenting Owners.

55.     The effect of Harry's actions is that an additional $21,874,663.08 that would be available to pay other creditors and for distribution to equity of Trigeant, Ltd., is being usurped for the benefit of Harry and BTB, and potentially Silca.

56.     Trigeant, Ltd. has the wherewithal to and wishes to make the full $18.5 payment to PDVSA upon the sale of the CPU.  The Trigeant entities Plan provides that claims such as this can and should be reserved in full for resolution by the Court, post-confirmation.

WHEREFORE the Plaintiffs request that this Court enter judgment against Harry and his alter ego, BTB, determining that: (a) they have usurped the opportunity to settle the PDVSA Claim against Trigeant, Ltd. for $18.5 million; (b) such intentional act was a violation of the Partnership Agreement; (c) Upon confirmation of the Trigeant Entities Plan, PDVSA should forthwith be paid directly the $18.5 million strike price under the PDVSA Settlement; (d) require

that the balance of the PDVSA claim be paid pro rata to the Consenting Owners and owners of

Trigeant or otherwise reserve such sums as equity.

Dated: January 30, 2015    Respectfully submitted,

           BERGER SINGERMAN LLP
           *Counsel to Consenting Owners*
           350 E. Las Olas Boulevard
           Suite 1000
           Fort Lauderdale, FL 33301
           Telephone:  (954) 525-9900
           Facsimile:  (954) 523-2872

           By: */s/ Charles H. Lichtman*
             Charles H. Lichtman
             Florida Bar No. 501050
             Jordi Guso
             Florida Bar No. 863580
             Isaac M. Marcushamer
             Florida Bar No. 060373
             imarcushamer@bergersingerman.com

# EXHIBIT "A"

EXECUTION COPY

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release ("Agreement") is made and entered into as of May 31, 2014 (the "Effective Date"), by and among PDVSA Petróleo, S.A. ("PDVSA"), BTB Refining, LLC ("BTB"), Harry Sargeant, III ("Sargeant") and Silca Investments, Ltd, ("Silca") (each a "Party", and together, the "Parties").

WHEREAS, on December 15, 2006, Trigeant Ltd. ("Trigeant") entered into a credit agreement under which the Trigeant borrowed approximately $22 million from American Capital Financial Services, Inc. ("AmCap") secured by substantially all of Trigeant's assets, including a refinery located at 6600 Up River Road, Corpus Christi, TX 78409 (the "Refinery");

WHEREAS, on December 28, 2007, BTB and AmCap entered into an Assignment and Acceptance Agreement under which BTB purchased AmCap's rights and obligations with respect to Trigeant in exchange for BTB's payment of approximately $21.8 million to AmCap;

WHEREAS, on March 4, 2008, BTB obtained ownership of the Refinery through a nonjudicial foreclosure under Texas law;

WHEREAS, on September 8, 2008, BTB obtained ownership of certain of Trigeant's personal property through a nonjudicial foreclosure under Texas law;

WHEREAS, on September 24, 2008, the International Chamber of Commerce International Court of Arbitration issued an award in the case *PDVSA Petróleo, S.A. vs. Trigeant, Ltd.*, Case No. 15146/JRF in PDVSA's favor against Trigeant Ltd. (the "Arbitration Award"), which was confirmed by the United States District Court for the Southern District of Florida on November 5, 2009, as evidenced by the Abstract of Judgment recorded February 12, 2013 under document number 2013005677 in the Official Public Records of Nueces County, Texas (the "Abstract");

WHEREAS, on March 2, 2009, PDVSA commenced an action against Trigeant and BTB (and later, Sargeant) in the United States District Court for the Southern District of Texas, Corpus Christi Division (the "Texas District Court") styled *PDVSA Petróleo, S.A. v. Trigeant, Ltd., BTB Refining, LLC, and Harry Sargeant, III*, Civil Case No. 2:09-cv-00038 (the "Lawsuit") seeking to avoid the March 2008 foreclosure sale of the Refinery and certain related relief;

WHEREAS, on January 14, 2013, the Texas District Court entered a Final Judgment (the "Final Judgment"), which, among other things, (i) voided the March 2008 foreclosure sale of the Refinery to BTB (thus returning ownership of the Refinery to Trigeant), (ii) reinstated BTB's credit agreement and liens purchased from Amcap, and (iii) fixed the amount owing by Trigeant to BTB at $22,565,193.55 (such amount, the "First Lien Claim");

WHEREAS, the Final Judgment is currently on appeal in the United States Court of Appeals for the Fifth Circuit (the "Fifth Circuit"), styled *PDVSA Petróleo, S.A., Plaintiff-Appellee Cross-Appellant v. Trigeant, Limited; Harry Sargeant, III; Defendants-Cross-Appellees v. BTB Refining, LLC, Defendant-Appellant Cross-Appellee*, Case No. 13-40062 (the "Appeal"); and

WHEREAS, without any admission of liability, PDVSA and BTB and Sargeant desire to resolve and settle all claims between them that were or could have been asserted by any of them in the Lawsuit and the Appeal in the manner described in this Agreement.

NOW, THEREFORE, for and in consideration of the obligations and releases set forth in the Agreement and/or any agreements or documents ancillary to this Agreement, including without limitation those attached hereto as exhibits (this Agreement and such ancillary agreements or documents shall be referred to collectively as the "Settlement Documents"), and

-2-

BTB 01970

other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties AGREE as follows:

1. **Dismissal of Appeal.** Immediately upon execution of this Agreement, BTB, PDVSA and Sargeant shall seek dismissal of the Appeal in accordance with the Stipulation attached hereto as **Exhibit A.** Dismissal of the Appeal by the Fifth Circuit is a condition precedent to the terms and conditions of this Agreement.

2. **Option to Purchase Arbitration Award and Related Claims.** Effective upon dismissal of the Appeal, PDVSA hereby grants Silca and BTB the exclusive option (the "Option") to purchase, pursuant to the form attached hereto as **Exhibit B** (the "Claims Assignment Agreement"), (i) the Arbitration Award and the Abstract (and the judgment evidenced thereby), and all liens related thereto and (ii) all other claims or causes of action PDVSA has against Trigeant, Ltd., Trigeant, L.L.C., Trigeant Holdings Ltd., Trigeant Holdings, L.L.C. and their respective officers, managers, members and shareholders, arising from or related to the Lawsuit (but not including the Arbitration Award and the Abstract (and the judgment evidenced thereby), and all liens related thereto) (collectively, the "PDVSA Second Lien Claim").

3. **Option Strike Price.** The price payable to PDVSA to exercise the Option shall be US$18,500,000, plus interest accruing at 7% per annum (compounding annually) from and after the Effective Date through the payment date (the "Strike Price"). The Strike Price shall be paid net to PDVSA, with no U.S. withholdings, retentions, or deductions made of any kind.

4. **Option Term.** The Option shall expire and become of no further force or effect at 11:59 p.m. (ET) on the date that is three calendar years from the Effective Date (the "Option Expiration Date"). BTB and/or Silca may exercise the Option by giving notice to

-3-

BTB 01971

PDVSA at any time prior to the Option Expiration Date, and provided that PDVSA receives payment of the Strike Price within five (5) business days of such notice PDVSA will take all actions necessary to fully and completely transfer the PDVSA Second Lien Claim to BTB and/or Silca immediately upon payment.

5. **Method of Payment.** Payment of the Strike Price shall be made by wire transfer of immediately available funds to counsel for PDVSA, Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis"), in accordance with the following wire transfer instructions:

| | |
|---|---|
| Bank: | Citibank |
| Address: | 399 Park Ave |
| | New York, NY 10043 |
| ABA Routing No.: | 021-000-089 |
| Account No.: | 40585074 |
| Account Title: | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Client Name: | PDVSA Petróleo, S.A. |

6. **No Foreclosure or Sale Without Consent.** The Parties agree that until after the Option Expiration Date, they shall not, without all Parties' prior written consent: (i) commence foreclosure proceedings with respect to the Refinery, (ii) accept ownership of the Refinery in lieu of foreclosure, or (iii) consent to the sale of the Refinery under section 363 of title 11 of the United States Code, as amended (the "Bankruptcy Code") or otherwise under a plan pursuant to section 1129 of the Bankruptcy Code. The Parties further agree to take all actions reasonably requested by any other Party in furtherance of the foregoing. This paragraph 6 shall be of no further force or effect if BTB or Silca acquire the Refinery pursuant to paragraph 9.

7. **No Challenge to Claims.** The Parties agree that none of them shall assert any challenge or defense applicable to the First Lien Claim or the PDVSA Second Lien Claim in any respect (including without limitation with respect to validity, extent, amount, priority,

-4-

BTB 01972

voidability or enforceability) and will contest any such challenges or defenses asserted by third parties, except as otherwise provided in this Agreement.

        8.   **Cooperation.** If, prior to the Option Expiration Date, Trigeant becomes the subject of a voluntary or involuntary bankruptcy case, the Parties will use reasonable best efforts to either dismiss the case or cause the trustee or debtor-in-possession to defer the sale (under a plan or under Section 363 of the Bankruptcy Code or otherwise) of the Refinery until such time as the sale value of the Refinery can be maximized, in the reasonable and good faith business judgment of the Parties. The Parties shall cooperate in a Trigeant bankruptcy case in all other respects to implement the provisions of this Settlement Agreement.

        9.   **Sale or Foreclosure Obligations.** If, prior to the Option Expiration Date, a sale of the Refinery is scheduled either (i) in Trigeant's bankruptcy case (under a plan or under Section 363 of the Bankruptcy Code or otherwise) or (ii) in a foreclosure sale, then PDVSA shall assign its claim to BTB and/or Silca and BTB and/or Silca shall credit bid both the First Lien Claim and the PDVSA Second Lien Claim at such sale, for BTB's account. If BTB and/or Silca is the successful bidder at such sale, BTB and/or Silca shall become jointly and severally obligated to PDVSA in the amount of the PDVSA Second Lien Claim (secured by the liens, security interests and mortgages set forth in Section 10 of this Agreement), as the purchase price for the PDVSA Second Lien Claim ("Second Lien Purchase Price") which amount shall become due and payable on the Option Expiration Date; provided, however, that during the period prior to the Option Expiration Date, BTB and/or Silca will retain the right to satisfy the Second Lien Purchase Price and all liens held by PDVSA that secure payment of the Second Lien Purchase Price by paying PDVSA the Strike Price. In the event that BTB and/or Silca is not the successful purchaser of the Refinery, then any funds paid to or for the benefit of BTB or Silca as holder of

BTB 01973

the PDVSA Second Lien Claim shall be placed in an interest-bearing escrow account established with a third party for the benefit of PDVSA prior to the Option Expiration Date; if BTB and/or Silca does not pay the Strike Price to PDVSA prior to the Option Expiration Date, then PDVSA shall be entitled to the escrowed funds. If BTB and/or Silca pay the Strike Price to PDVSA prior to the Option Expiration Date, then BTB and/or Silca shall be entitled to the escrowed funds. A condition precedent of the assignment shall be the formation of a third party escrow account that is mutually acceptable to the parties. Such assignment by PDVSA may be rescinded by PDVSA upon cancellation of the proposed sale of the Refinery.

      10.    **Collateral**. To secure the payment and performance obligations of BTB and Silca to PDVSA arising upon this Agreement, (i) BTB and Silca hereby grant PDVSA a first priority lien on all of BTB/Silca's right, title and interest in the Refinery, whether now owned or hereafter acquired, and on any other of their real property, to secure BTB and Silca's obligations to PDVSA pursuant to and subject to the terms and conditions of a Deed of Trust attached hereto as **Exhibit C**, (ii) BTB hereby grants PDVSA a first priority security interest in substantially all of its personal property (excluding however, BTB's accounts and inventory and the proceeds and products thereof), but including the First Lien Claim, the PDVSA Second Lien Claim and any proceeds thereof (including without limitation the Refinery), pursuant to and subject to the terms and conditions of a Security Agreement attached hereto as **Exhibit D**, (iii) Silca hereby grants PDVSA a first priority security interest in substantially all of their personal property, but including the First Lien Claim, the PDVSA Second Lien Claim and any proceeds thereof (including without limitation the Refinery), pursuant to and subject to the terms and conditions of a Security Agreement attached hereto as **Exhibit E**, and (iv) the owner or owners of the all of the equity interests of Silca shall grant PDVSA a first equitable mortgage in the equity of Silca

-6-

BTB 01974

pursuant to the terms of an Equitable Share Mortgage governed by the laws of the British Virgin Islands and attached hereto as **Exhibit F**. Such liens, security interests and mortgages shall be granted and perfected immediately upon execution of this Agreement. BTB and Silca further agree that they shall not sell, assign, pledge, encumber, hypothecate, transfer or otherwise voluntarily dispose of their interest in the Refinery (whether contingent or otherwise) until (i) payment of the Strike Price following exercise of the option to purchase the PDVSA Second Lien Claim prior to the Option Expiration Date or (ii) satisfaction of the obligation of BTB and Silca owing to PDVSA arising under Section 9 of this Agreement.

    11.    **Personal Guarantee**. Sargeant hereby personally guarantees payment of the Second Lien Purchase Price, pursuant to and subject to the terms and conditions of a Guaranty attached hereto as **Exhibit G**, (a) in the event that PDVSA is adjudged by a court of competent jurisdiction not to hold a valid and enforceable first priority lien on any of the assets, including the Refinery, held by BTB or Silca following BTB's and/or Silca's taking ownership of the Refinery; or (b) in the event BTB and/or Silca sell, assign, pledge, encumber, hypothecate, transfer or otherwise voluntarily dispose of their interest in the First Lien Claim, the PDVSA Second Lien Claim or the Refinery, in each case other than as provided for in this Agreement .

    12.    **Exclusive Option**. Except as otherwise provided by this Agreement, PDVSA agrees that until after the Option Expiration Date, it shall not sell, assign, pledge, encumber, hypothecate, transfer or otherwise voluntarily dispose of the PDVSA Second Lien Claim or its interest therein to any party other than BTB or Silca. BTB and Silca agree that until after the Option Expiration Date, they shall not sell, assign, pledge, encumber, hypothecate, transfer or otherwise voluntarily dispose of the First Lien Claim or the PDVSA Second Lien Claim to the extent they have an interest in it.

-7-

BTB 01975

13.    **Indemnification of PDVSA.** BTB, Sargeant, and Silea, on behalf of themselves as well as on behalf of their respective heirs, successors and assigns agree for and in consideration of the agreements and releases set forth herein, to unconditionally and fully indemnify and hold harmless PDVSA against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages, or liabilities of any nature whatsoever, incurred in connection with any claim, action, suit, proceeding or investigation arising out of or pertaining to the Settlement Documents.

14.    **Further Assurances.** Each Party agrees, promptly upon request of any other Party, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignments, transfers, certificates, assurances and other instruments as may be reasonably required from time to time in order to (A) carry out more effectively the purposes of the Settlement Documents, (B) to the fullest extent permitted by applicable law, subject to any Party's properties, assets, rights or interests to the liens or security interests now or hereafter intended to be covered by any of the Settlement Documents, (C) perfect and maintain the validity, effectiveness and priority of any of the liens or security interests now or hereafter intended to be covered by any of the Settlement Documents, (D) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto any Party the rights granted or now or hereafter intended to be granted to such Party under the Settlement Documents, and (E) correct any material defect or error that may be discovered in the Settlement Documents or in the execution, acknowledgement, filing or recordation thereof.

-8-

BTB 01976

15.   **Release of Claims by PDVSA.**  Effective upon dismissal of the Appeal, PDVSA forever releases, acquits and discharges BTB, Silca and Sargeant, and each of their respective past, present and future agents, heirs, executors, administrators, conservators, successors, assigns, participants, co-participants, direct and indirect parents, principals, subsidiaries, affiliates, related companies, shareholders, interest holders, investors, members, partners (including general and limited partners), managers, representatives, contractors, service providers, receivers, attorneys and beneficiaries from any and all claims, demands, defenses, controversies, actions, debts, or causes of action of whatever nature or character, whether asserted or unasserted, known or unknown, arising from or relating to the events, circumstances and transactions at issue in the Lawsuit and the Appeal, except for obligations and claims arising from the Settlement Documents or relating to the enforcement of the Settlement Documents;

16.   **Release by BTB, Silca and Sargeant.**  Effective upon dismissal of the Appeal, BTB, Silca and Sargeant forever release, acquit and discharge PDVSA and its past, present and future agents, heirs, executors, administrators, conservators, successors, assigns, participants, co-participants, direct and indirect parents, principals, subsidiaries, affiliates, related companies, shareholders, interest holders, investors, members, partners (including general and limited partners), managers, representatives, contractors, service providers, receivers, attorneys and beneficiaries and its past, present and future officers, directors, and employees from any and all claims, demands, defenses, controversies, actions, debts, or causes of action of whatever nature or character, whether asserted or unasserted, known or unknown, arising from or relating to the events, circumstances and transactions at issue in the Lawsuit and the Appeal, except for obligations and claims arising from the Settlement Documents or relating to the enforcement of the Settlement Documents.

-9-

BTB 01977

17.    **Counterparts.** This Agreement may be signed in any number of counterparts, each of which shall be deemed an original, and all of which shall be treated as if they were the same instrument. An executed copy of this Agreement delivered by facsimile or electronic communication capable of producing a printed copy shall be treated in all respects as an original executed copy of this Agreement.

18.    **Successors and Assigns.** All covenants, promises and agreements by or on behalf of a Party contained in this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of that respective Party.

19.    **No Assignment.** The Parties shall not be permitted to assign any of their rights or obligations under the Settlement Documents, except that Silca shall be permitted to assign all, or any portion of the PDVSA Second Lien Claim to BTB. Any assignment not permitted under this Agreement shall be deemed null and void.

20.    **Termination Upon Change in Control.** PDVSA shall have the right to immediately terminate this Agreement upon a change of control of BTB or Silca. For purposes of this Section 20, change in control shall not include the heirs, beneficiaries, executors, trustees or guardians of Sargeant.

21.    **Governing Law and Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law principles that would result in application of the laws of any other jurisdiction. Any action arising under or relating to this Agreement may be brought in any State or Federal Court located in the State of New York ("New York Courts"), and each Party consents to and confers personal jurisdiction over it at the address set forth in this Agreement, and in any action hereunder each of the Parties also hereby irrevocably waives: (a) trial by jury; (b) any defense of

-10-

BTB 01978

improper venue; or (c) forum non conveniens, to any such action brought in New York Courts.

The Parties consent to service of process by certified mail at the addresses listed for notices

herein.

22.    **Notices**.  Any notices under this Agreement shall be given at the following

addresses:

If to PDVSA:

> Isaías Medina
> Coordinator of Litigation and Claims
> Management of International Matters
> General Counsel's Office
> Petróleos de Venezuela, S.A.
> Av. Libertador, Torre Este Piso 1, Oficina 10-30
> Consultoria Juridica, La Campina
> Caracas, Venezuela  1050

With a copy to (which shall not constitute notice):

> Steven J. Reisman, Esq.
> Jonathan J. Walsh, Esq.
> CURTIS, MALLET-PREVOST,
>    COLT & MOSLE LLP
> 101 Park Avenue
> New York, NY 10178-0061

If to BTB:

> Kevin Kirkeide
> Manager
> BTB Refining, LLC
> 4232 Beacon Street
> Corpus Christi, TX 78405

With a copy to (which shall not constitute notice):

> Deirdre B. Ruckman, Esq.
> Gardere Wynne Sewell LLP
> 1601 Elm Street, Suite 3000
> Dallas, TX 75201

If to Silca:

-11-

BTB 01979

Silca Investments, Ltd.
c/o Global Corporate Consultants Group, Inc.
PO Box 4493
Road Town, Tortola, BVI
Attn.: Ramon Anzola, Esq.

With a copy to (which shall not constitute notice):

Deirdre B. Ruckman, Esq.
Gardere Wynne Sewell LLP
1601 Elm Street, Suite 3000
Dallas, TX 75201

If to Sargeant:

Harry Sargeant III
1420 N. Ocean Blvd
Gulf Stream, FL 33483

With a copy to (which shall not constitute notice):

Deirdre B. Ruckman, Esq.
Gardere Wynne Sewell LLP
1601 Elm Street, Suite 3000
Dallas, TX 75201

     23.    **Entire Agreement.**  This Agreement, together with the Settlement

Documents, constitutes the entire agreement between the Parties regarding the subject matter

covered herein, and supersedes all previous communications, agreements and understandings

between them regarding the covered subject matter.

     24.    **No Oral Modification or Waiver.**  This Agreement shall not be

modified, altered, amended, or changed in any way except as specifically set forth in a written

agreement specifically referring to this Agreement and executed by each of the Parties.  No right

or remedy of any Party under this Agreement can be waived except by writing specifically

referring to this Agreement and executed by the Party specifically waiving that right or remedy.

No course of dealing or performance, failure or delay by any Party in exercising, in whole or in

-12-

BTB 01980

part, any right or remedy under this Agreement shall waive or impair such or any other right or remedy under this Agreement, or in any manner preclude its additional or future exercise.

      25.    **Authority.**  All persons executing this Agreement warrant and represent that they have the full authority to do so and that they have the authority to take appropriate action required or permitted to be taken pursuant to this Agreement to effectuate its terms.

*[Remainder of Page Intentionally Left Blank.]*

-13-

BTB 01981

IN WITNESS WHEREOF, the Parties hereby acknowledge their agreement and
consent to the terms and conditions set forth above through their respective signatures as set
forth below.

PDVSA Petróleo, S.A.

By: _____
Its _____

RTB Refining, LLC

By: _____
Its _____

Harry Sargeant III

By: _____
Harry Sargeant III

Siloa Investments, Ltd.

By: _____
Its _____



IN WITNESS WHEREOF, the Parties hereby acknowledge their agreement and consent to the terms and conditions set forth above through their respective signatures as set forth below.

PDVSA Petróleo, S.A.                    BTB Refining, LLC

By: _____          By: _____
    Its _____               Its _____


                                       Harry Sargeant III

                                       By: _____
                                           Harry Sargeant III


                                       Silca Investments, Ltd.

                                       By: _____
                                           Its _____

BTB 01983

# EXHIBIT "B"

TRIGEANT HOLDINGS, LTD..,
a Florida limited partnership

# LIMITED PARTNERSHIP AGREEMENT

AJB 797

LIMITED PARTNERSHIP AGREEMENT FOR TRIGEANT HOLDINGS, LTD,
A FLORIDA LIMITED PARTNERSHIP
EFFECTIVE AS OF June 29 , 2001

### Table of Contents

ARTICLE 1.  DEFINITIONS

1.1  Act
1.2  Adjusted Capital Contributions
1.3  Affiliate
1.4  Agreement
1.5  Articles of Organization
1.6  Capital Account
1.7  Capital Contribution
1.8  Code
1.9  Partnership
1.10  Partnership Property
1.11  Deficit Capital Account
1.12  Depreciation
1.13  Distributable Cash
1.14  Distribution
1.15  Entity
1.16  Deliberately Omitted
1.17  Fiscal Year
1.18  Gift
1.19  Gifting Partner
1.20  Gross Asset Value
1.21  Majority Interest
1.22  General Partners
1.23  Partner
1.24  Membership Interest
1.25  Deliberately Omitted
1.26  Person
1.27  Profits and Losses
1.28  Regulations
1.29  Reorganization
1.30  Reserves
1.31  Sale or Sell
1.32  Secretary of State
1.33  Selling Partner
1.34  Sharing Ratio
1.35    State
1.36    Trading Retained Earnings
1.37  Transfer

2

AJB 798

1.38  Transferring Partner
1.39  Unrecovered Losses
1.40  Voting Interest


ARTICLE 2.  FORMATION OF PARTNERSHIP

2.1  Formation
2.2  Name
2.3  Principal Place of Business
2.4  Registered Office and Registered Agent
2.5  Term


ARTICLE 3.  BUSINESS OF PARTNERSHIP

3.1  Permitted Business

ARTICLE 4.  NAMES AND ADDRESSES OF PARTNERS

ARTICLE 5.  RIGHTS AND DUTIES OF GENERAL PARTNER

5.1  Management
5.2  Number, Tenure and Qualifications
5.3  Certain Powers of General Partner
5.4  Limitations on Authority
5.5  Liability for Certain Acts
5.6  General Partner and Partners Have No Exclusive Duty to Partnership
5.7  Bank Accounts
5.8  Indemnity of the General Partner, Employees and Other Agents
5.9  Resignation
5.10  Removal
5.11  Vacancies
5.12  Compensation, Reimbursement, Organization Expenses
5.13  Right To Rely on General Partner


ARTICLE 6.  RIGHTS AND OBLIGATIONS OF PARTNERS

6.1  Limitation of Liability
6.2  List of Partners
6.3  Partners Have No Agency Authority
6.4  Partnership Books
6.5  Priority and Return of Capital


ARTICLE 7.  ACTIONS OF PARTNERS

3

AJB 799

7.1  No Required Meetings
7.2  Place of Meetings
7.3  Notice of Meetings
7.4  Meeting of all Partners
7.5  Record Date
7.6  Quorum
7.7  Manner of Acting
7.8  Proxies
7.9  Action by Partners Without a Meeting
7.10  Waiver of Notice

ARTICLE  8.  CONTRIBUTIONS  TO  THE  PARTNERSHIP  AND  CAPITAL ACCOUNTS

8.1  Partners' Capital Contributions
8.2  Additional Contributions
8.3  Capital Accounts
8.4  Withdrawal or Reduction of Partners' Contributions to Capital
8.5  Remedies for Nonpayment of Additional Capital Contributions

ARTICLE 9.  ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS

9.1  Allocations of Profits and Losses from Operations
9.2  Special Allocations to Capital Accounts
9.3  Credit or Charge to Capital Accounts
9.4  Distributions
9.5  Limitation Upon Distributions
9.6  Accounting Principles
9.7  Interest on and Return of Capital Contributions
9.8  Loans to Partnership
9.9  Accounting Period
9.10  Records and Reports
9.11  Returns and Other Elections
9.12  Tax Matters Partner
9.13  Certain Allocations for Income Tax (But Not Book Capital Account) Purposes

ARTICLE 10.  TRANSFERABILITY

10.1  General
10.2  Right of First Refusal
10.3  Additional Conditions to Recognition of Transferee
10.4     Gifts of Membership Interests
10.5     Bilateral Buy-Sell

4

AJB 800

## ARTICLE 11. ISSUANCE OF MEMBERSHIP INTERESTS

11.1  Issuance of Additional Membership Interests to New Partners
11.2  Issuance of Additional Partnership Interests to Existing Partners
11.3  Part Year Allocations With Respect to New Partners

## ARTICLE 12. DISSOLUTION AND TERMINATION

12.1  Dissolution
12.2  Effect of Dissolution
12.3  Winding Up, Liquidation and Distribution of Assets
12.4  Filing or Recording Statements
12.5  Return of Contribution Nonrecourse to Other Partners

## ARTICLE 13. MISCELLANEOUS PROVISIONS

13.1  Notices
13.2  Books of Account and Records
13.3  Application of State Law
13.4  Waiver of Action for Partition
13.5  Amendments
13.6  Execution of Additional Instruments
13.7  Construction
13.8  Effect of Inconsistencies with the Act
13.9  Waivers
13.10  Rights and Remedies Cumulative
13.11  Severability
13.12  Heirs, Successors and Assigns
13.13  Creditors
13.14  Counterparts
13.15  Rule Against Perpetuities
13.16  Power of Attorney
13.17  Investment Representations
13.18  Representations and Warranties

AJB 801

THE INTERESTS DESCRIBED AND REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT" OR ANY APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND ARE RESTRICTED SECURITIES AS THAT TERM IS DEFINED IN RULE 144 UNDER THE ACT. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR QUALIFICATION UNDER THE ACT AND APPLICABLE STATE ACTS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT AND APPLICABLE STATE ACTS, THE AVAILABILITY OF WHICH IS TO BE ESTABLISHED TO THE SATISFACTION OF THE PARTNERSHIP.

This Agreement is made and entered into this __ day of _____, 2001, by and among the Partnership, the General Partner and each of the Limited Partners whose signatures appear on the signature page hereof (the General Partner and the Limited Partners shall be referred to collectively as the "Initial Partners"). In consideration of the mutual covenants herein contained and for other good and valuable consideration, the Partners and the Partnership (and each person who subsequently becomes a Partner) hereby agree as follows:

ARTICLE 1. DEFINITIONS

The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein):

1.1   Act shall mean the Florida Revised Uniform Limited Partnership Act (1986) as amended.

1.2   Adjusted Capital Contributions shall mean an amount equal to such Partner's Capital Contributions, if any, pursuant to Subsections 8.1 and 8.2, less any Distributions made to such Partner pursuant to Subsection 9.4.

1.3   Affiliate shall mean, with respect to any Person: (i) any Person directly or indirectly controlling, controlled by, or under common control with such Person; (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Person; (iii) any officer, director, or general partner of such Person; or (iv) any Person who is an officer, director, general partner, trustee, or holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence. For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

1.4   Agreement shall mean this Agreement as originally executed and as amended from time to time.

AJB 802

1.5     Capital Account as of any given date shall mean the Capital Account of each Partner as described in Article 8 and maintained to such date in accordance with this Agreement.

1.6     Capital Contribution shall mean any contribution to the capital of the Partnership in cash or property by a Partner whenever made. Initial Capital Contribution shall mean the initial contribution to the capital of the Partnership pursuant to this Agreement.

1.7     Certificate of Limited Partnership shall mean the Certificate of Limited Partnership of the Partnership as filed with the Secretary of State as the same may be amended from time to time.

1.8     Code shall mean the Internal Revenue Code of 1986, as amended from time to time.

1.9     Partnership shall mean TRIGEANT HOLDINGS LTD.

1.10    Partnership Property shall mean all assets (real or personal, tangible or intangible, including cash) of the Partnership.

1.11    Deficit Capital Account shall mean with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the Fiscal Year, after giving effect to the following adjustments:

（a)     credit to such Capital Account the amount, if any, which such Partner is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Regulations, as well as any addition thereto pursuant to the next to last sentence of Section 1.704-2(g)(1) and (i)(5) of the Regulations, after taking into account thereunder any changes during such year in partnership minimum gain as determined in accordance with Section 1.704-2(d) of the Regulations ("Partnership Minimum Gain") and in any partner nonrecourse debt minimum as determined under Section 1.704-2(i)(3) of the Regulations ("Partner Minimum Gain"); and

(b)     debit to such Capital Account the items described in Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6) of the Regulations. This definition of Deficit Capital Account is intended to comply with the provisions of Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and shall be interpreted consistently with those provisions.

1.12    Depreciation shall mean, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be

2

AJB 803

determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

1.13  Distributable Cash shall mean all cash, whether revenues or other funds received by the Partnership, less the sum of the following to the extent paid or set aside by the Partnership: (i) all principal and interest payments on indebtedness of the Partnership and all other sums paid to lenders; (ii) all cash expenditures incurred incident to the normal operation of the Partnership's business; and (iii) Reserves.

1.14  Distribution shall mean any Transfer of Partnership Property from the Partnership to or for the benefit of a Partner by reason of such Partner's Partnership Interest.

1.15  Entity shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association, or any foreign trust or foreign business organization.

1.16  Deliberately Omitted.

1.17  Fiscal Year shall mean the taxable year of the Partnership as determined under the Code.

1.18  Gift shall mean a gift, bequest, or other transfer for no consideration, whether or not by operation of law, except in the case of bankruptcy.

1.19  Gifting Partner shall mean any Partner who gifts, bequeaths or otherwise transfers for no consideration (by operation of law or otherwise, except with respect to bankruptcy) all or any part of his Partnership Interest.

1.20  Gross Asset Value means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)  The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the General Partner, provided that the initial Gross Asset Values of the assets contributed to the Partnership pursuant to Subsection 8.1 hereof shall be as set forth in Exhibit 8.1, and provided further that, if the contributing Partner is a General Partner, the determination of the fair market value of any other contributed asset shall require the consent of the other Partners owning a Majority Interest (determined without regard to the Voting Interest of such contributing Partner);

(b)  The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the General Partner as of the following times: (i) the acquisition of an additional interest by any new or existing Partner in exchange for more than a de minimis contribution of property

3

AJB 804

(including money); (ii) the Distribution by the Partnership to a Partner of more than a de minimis amount of property as consideration for a Partnership Interest; and (iii) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the General Partners reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

(c)  The Gross Asset Value of any Partnership asset Distributed to any Partner shall be adjusted to equal the gross fair market value of such asset on the date of Distribution as reasonably determined by the distributee and the General Partner, provided that, if the distributee is a General Partner, the determination of the fair market value of the Distributed asset shall require the consent of the other Partners owning a Majority Interest (determined without regard to the Voting Interest of the distributee Partner); and

(d)  The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m) and Subsection 8.3 and subparagraph (e) under the definition of Profits and Losses; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (d) of this definition to the extent that the General Partners reasonably determine that an adjustment pursuant to subparagraph (b) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (a), (b) or (d) of this definition, then such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

1.21  Majority Interest shall mean one or more Voting Interests of Partners which taken together exceed 50% of the aggregate of all Voting Interests.

1.22  General Partner shall mean Trigeant Holdings, LLC. and any Person that succeeds it in that capacity.

1.23  Partner shall mean each of the parties who executes a counterpart of this Agreement as a General Partner or Limited Partner (an "Initial Partner") and each of the parties who may hereafter become a Partner.

1.24  Partnership Interest shall mean a Partner's entire interest in the Partnership, including such other rights and privileges that the Partner may enjoy by being a Partner.

4

AJB 805

1.25  Limited Partner means all persons who have made capital contributions to the Partnership and have agreed to be bound by the provisions of this Agreement, as well as any person who has acquired a Partnership Interest in accordance with Article 10 hereof.

1.26  Person shall mean any individual or Entity, and the heirs, personal representatives, successor, and assigns of such "Person" where the context so permits.

1.27  Profits and Losses shall mean for each Fiscal Year of the Partnership an amount equal to the Partnership's net taxable income or loss for such year as determined for federal income tax purposes (including separately stated items) in accordance with the accounting method and rules used by the Partnership and in accordance with Section 703 of the Code with the following
adjustments:

(a)  Any items of income, gain, loss and deduction allocated to Partners pursuant to Subsections 9.2, 9.3 or 9.13 shall not be taken into account in computing Profits or Losses;

(b)  Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses (pursuant to this definition) shall be added to such taxable income or loss;

(c)  Any expenditure of the Partnership described in Section 705(a)(2)(B) of the Code and not otherwise taken into account in computing Profits and Losses (pursuant to this definition) shall be subtracted from such taxable income or loss;

(d)  In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to subparagraphs (b) or (c) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

(e)  Gain or loss resulting from any disposition of any Partnership asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed with reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(f)  In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year; and

(g)  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) or Section 743(b) of the Code is required pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Regulations to be taken into account in determining Capital Accounts as a result of a Distribution other than in liquidation of a Partnership Interest,

5

AJB 806

the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses.

1.28  **Regulations** shall include proposed, temporary and final regulations promulgated under the Code in effect as of the date of filing the Certificate of Limited Partnership and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

1.29  **Reorganization** shall mean the merger or conversion of the Partnership, or a sale or other disposition of assets of the Partnership, or sale or other disposition of Partnership Interests, or other transaction pursuant to which a Person or Persons acquire all or substantially all of the assets of, or Partnership Interests in, the Partnership in a single or series of related transactions, including without limitation, a merger or conversion of the Partnership into a corporation or other entity, whether or not such corporation or other entity has the same owners as the Partnership and whether or not additional capital is contributed to such corporation or other entity; provided, however, that a Reorganization shall not include the merger or conversion of the Partnership into a general partnership which is not a limited partnership.

1.30  **Reserves** shall mean, with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts reasonably deemed sufficient by the General Partner for working capital, capital expenditures, repairs, maintenance and improvements, and for payment of taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Partnership's business.

1.31  **Sale** or **Sell** shall mean a sale, assignment, exchange, or other transfer for consideration, pledge, hypothocation, or grant of a security interest, or change in ownership by reason of the merger, conversion or other transformation in the identity or form of business organization of the owner, regardless of whether such change or transformation is characterized by state law as not changing the identity of the owner. For purposes hereof, a "Sale" does not include a pledge, hypothecation, or grant of a security interest in a Partnership Interest.

1.32  **Secretary of State** shall mean the Secretary of State of the State.

1.33  **Selling Partner** shall mean any Partner which Sells all or any portion of its Partnership Interest.

1.34  **Sharing Ratio** shall mean:

| Partners | Sharing Ratio |
|---|---|
| Harry Sargeant Jr. | _____% |
| Harry Sargeant III | _____% |

6

AJB 807

| | |
|---|---|
| Dan Sargeant | _____ % |
| James Sargeant | _____ % |
| Arthur J. Brass | 24.75% |
| Trigeant Holdings, LLC. (General Partner) | 1% |

1.35    State shall mean the State of Florida.

1.36    Trading Retained Earnings means the total of the retained earnings of Sargeant Trading, Ltd. , a Bahamas corporation, and all of its subsidiaries as determined under GAAP on the date that the shares of Sargeant Trading. Ltd. are transferred to Trigeant Holdings, Ltd.

1.37    Transfer shall mean any Sale or Gift.

1.38    Transferring Partner shall mean a Selling Partner and a Gifting Partner.

1.39    Unrecovered Losses shall have the meaning set forth in Subsection 9.1.

1.40    Voting Interest shall be, for each Partner, the same percentage as his or its Sharing Ratio.

## ARTICLE 2.  FORMATION OF PARTNERSHIP

2.1    Formation. On June 20, 2001, the General Partner organized a Limited Partnership pursuant to the Act by executing and delivering the Certificate of Limited Partnership to the Secretary of State in accordance with and pursuant to the Act.

2.2    Name. The name of the Partnership is TRIGEANT HOLDINGS, LTD.

2.3    Principal Place of Business. The principal place of business of the Partnership shall be 3020 North Military Trail, Suite 100, Boca Raton, Florida 33431. The Partnership may locate its place of business and registered office at any other place or places as the General Partner may from time to time deem advisable.

2.4    Registered Office and Registered Agent. The Partnership's initial registered office and the name of the registered agent at such address shall be as set forth in the Certificate of Limited Partnership. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State pursuant to the Act.

2.5    Term. The Partnership shall continue in existence until March _____, 2050 unless sooner terminated as provided in Article 12, below.

## ARTICLE 3.  BUSINESS OF PARTNERSHIP

7

AJB 808

3.1 Permitted Business. The only business of the Partnership shall be:

(a)   To engage in the refining, manufacture, distribution and marketing of asphalt and other petroleum products and to hold interests in other companies that engage in the aforesaid businesses; and

(b)   To engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

## ARTICLE 4. NAMES AND ADDRESSES OF PARTNERS

4.1 The names and addresses of the Initial Partners are as set forth on Exhibit 8.1.

4.2 The names and addresses of other Partners shall be maintained as provided under Subsection 9.10.

## ARTICLE 5. RIGHTS AND DUTIES OF GENERAL PARTNERS

5.1 Management. The business and affairs of the Partnership shall be managed by its General Partner.   The General Partner shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Partnership; to make all decisions regarding those matters; and to perform any and all other acts and activities customary or incident to the management of the Partnership's business. The General Partner shall have all the rights and powers which may be possessed by a General Partner pursuant to the Act, including without limitation all rights and powers necessary to carry out the purposes set forth in Article 3 of this Agreement. Unless authorized to do so by this Agreement or by the General Partner, no attorney-in-fact, employee or other agent of the Partnership shall have any power or authority to bind the Partnership in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

5.2 Deliberately Omitted.

5.3 Certain Powers of General Partner. Without limiting the generality of Subsection 5.1 but subject to the limitations of Subsection 5.4, the General Partner shall have power and authority, on behalf of the Partnership to perform the following acts (although any transaction between the Partnership and any person who is directly or indirectly affiliated with a Partner or General Partner must be on arm's length and commercially reasonable terms):

(a) To acquire property from any Person as the General Partner may determine. The fact that a General Partner or a Partner is directly or indirectly affiliated or connected with any such Person shall not prohibit the General Partner from dealing with that Person;

8

AJB 809

(b) To borrow money for the Partnership from banks, other lending institutions, the General Partner, Partners, or Affiliates of the General Partner or Partners on such terms as the General Partner deem appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in Partnership Property to secure repayment of the borrowed sums;

(c) To purchase liability and other insurance to protect the Partnership's property and business;

(d) Intentionally Omitted;

(e) To invest any Partnership funds (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(f) To execute on behalf of the Partnership all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of Partnership Property; assignments; bills of sale; leases; partnership agreements; operating (or limited liability company) agreements of limited liability companies; and any other instruments or documents necessary, in the opinion of the General Partner, to the conduct of the business of the Partnership;

(g) To employ accountants, legal counsel, managing agents or other experts to perform services for the Partnership and to compensate them from Partnership funds;

(h) To enter into any and all other agreements on behalf of the Partnership, with any other Person for any purpose, in such forms as the General Partner may approve;

(i) To execute and file such other instruments, documents and certificates which may from time to time be required by the laws of the State or any other jurisdiction in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement, continue and defend the valid existence of the Partnership;

(j) To do and perform all other acts as may be necessary or appropriate to the conduct of the Partnership's business.

5.4    **Limitations on Authority.** Notwithstanding any other provision of this Agreement, the General Partner shall not cause or commit the Partnership to do any of the following:

(a) do any act which would make it impossible to carry on the ordinary business of the Partnership, except as expressly provided in this Agreement;

9

AJB 810

(b) execute or deliver any general assignment for the benefit of the creditors of the Partnership; or

(c) possess Partnership property or assign the rights of the Partnership in specific property for other than a Partnership purpose.

(d) Issue any option, warrant or any other securities derivative;

(e) Cause the Company to be a party to a Reorganization; or

(f) Admit new Partners;

5.5 Liability for Certain Acts.

(a) The General Partner does not, in any way, guarantee the return of the Partners' Capital Contributions or a profit for the Partners from the operations of the Partnership.

(b) The General Partner shall not be liable to the Partnership or to any Partner for any loss or damage sustained by the Partnership or any Partner (or successor thereto), except to the extent, if any, that the loss or damage shall have been the result of fraud, deceit, or willful misconduct.

5.6 General Partner and Limited Partners Have No Exclusive Duty to Partnership. The General Partners and Limited Partners shall have no exclusive duty to act on behalf of the Partnership. Each General Partner and Limited Partner may have other business interests and may engage in other activities in addition to those relating to the Partnership, although neither the Limited Partners nor the General Partners may engage in the following businesses: asphalt refining, asphalt trading, and any other business in which the Partnership is engaged. Notwithstanding the restrictions contained in the foregoing sentence, there shall be no restriction on the activities, operations, or business of Sargeant Marine, Inc., and no activities, operations, or business of Sargeant Marine, Inc. (even if conducted by a Partner acting on behalf of Sargeant Marine, Inc.) shall be deemed to cause a violation of the restrictions contained in the foregoing sentence. Neither the Partnership nor any General Partner shall have any right, by virtue of this Agreement, to share or participate in any other investments or activities of any other General Partner or Partner.

5.7 Bank Accounts. The General Partner may from time to time open bank accounts in the name of the Partnership, and the Manager of the General Partner shall be the sole signatory thereon, unless the General Partner determines otherwise.

5.8 Indemnity of the General Partner, Employees and Other Agents.

(a) The Partnership shall indemnify each General Partner, along with its

10

AJB 811

Managers and employees, and make advances for expenses to the maximum extent permitted under the Act, except to the extent the claim for which indemnification is sought results from an act or omission for which the General Partner may be held liable to the Partnership or a Partner under Subsection 5.5(b). The Partnership shall indemnify its employees and other agents who are not General Partners to the fullest extent permitted by law, provided that such indemnification in any given situation is approved by Partners owning a Majority Interest.

(b) Expenses (including legal fees and expenses) incurred by a General Partner, its Managers and employees, in defending any claim, demand, action, suit or proceeding subject to Subsection (a) above shall be paid by the Partnership in advance of the final disposition of such claim, demand, action, suit or proceeding upon receipt of an undertaking (which need not be secured) by or on behalf of the General Partner to repay such amount if it shall ultimately be finally determined by a court of competent jurisdiction and not subject to appeal, that the General Partner is not entitled to be indemnified by the Partnership as authorized hereunder.

5.9   Withdrawal of General Partner, Transfer of General Partner's Interest, Admission of New General Partner.

(a)    The General Partner may not voluntarily withdraw from the Partnership without the written consent or affirmative vote for such Voluntary Withdrawal of Limited Partners holding at least a Majority Interest.

(b)    Prior to the Withdrawal of a sole remaining General Partner, Limited Partners holding a two-thirds interest in the Partnership may elect a successor general partner, so long as the successor general partner has the same ownership composition and substantially similar operating documents as the departing general partner.

(c)    Upon its Withdrawal, the General Partner shall cease to be a General Partner, and shall not be entitled to any distributions from the Partnership for the value of its interest in the Partnership but shall be entitled to continue to receive allocations of Profits and Losses, to distributions of Distributable Cash and liquidating distributions as provided in Articles 8, 9, and 12 (i) except in the case of a Withdrawal effected by a transfer or assignment of the General Partner's interest in compliance with this Agreement, in which case the right to receive such allocations and distributions shall belong to the assignee or transferee as provided in this Section 5.9 and (ii) except as may be otherwise agreed among the General Partner, the Limited Partners holding not less than all of the outstanding Interests, and any successor general partner elected by such Limited Partners in connection with the Withdrawal of the General Partner from the Partnership.

(d)    Unless it has first received the written consent or affirmative vote

11

AJB 812

to do so from Limited Partners holding not less than a Majority Interest, the General Partner shall not admit an additional General Partner other than an Affiliate of (i) the General Partner or (ii) any manager, officer, director or shareholder thereof, and the General Partner shall not voluntarily transfer or assign a portion of its interest as General Partner except (i) to an Affiliate of either the General Partner or any manager, officer, director or shareholder thereof, or (ii) to someone who already is a General Partner. Notwithstanding the foregoing, any additional general partner shall have the same ownership composition and substantially similar operating documents as the other general partner.

(e)     A transferee or assignee of all or any part of a withdrawing General Partner's interest shall become a General Partner to the extent of the interest assigned provided that any required consent of the Limited Partners for such transfer or assignment has been obtained pursuant to this Section 5.9.

5.10  Compensation, Reimbursement, Organization Expenses.

(a)     No Partner shall be entitled to compensation from the Partnership for services rendered to the Partnership as such. Upon the submission of appropriate documentation each Partner shall be reimbursed by the Partnership for reasonable out-of-pocket expenses incurred on behalf, or at the request of, the Partnership.

(b)     The Partnership shall reimburse the Partners and General Partners for the legal expenses reasonably incurred by them in connection with the formation, organization and capitalization of the Partnership, including the legal fees incurred in connection with negotiating and drafting this Agreement.

(c)     The General Partner shall cause the Partnership to make an appropriate election to treat the expenses incurred by the Partnership in connection with the formation and organization of the Partnership to be amortized under the 60-month period beginning with the month in which the Partnership begins business to the extent that such expenses constitute "organizational expenses" of the Partnership within the meaning of Code Section 709(b)(2).

5.11  **Right To Rely on the General Partner.**   (a) Any Person dealing with the Partnership may rely (without duty of further inquiry) upon a certificate signed by any General Partner as to:

(1)     The identity of any General Partner or Limited Partner, and the authority of the General Partner to act on behalf of the Partnership;

(2)     The existence or nonexistence of any fact or facts which constitute a condition precedent to acts on behalf of the Partnership by any General Partner or which are in any other manner germane to the affairs of the Partnership;

12

AJB 813

(3)  The Persons who are authorized to execute and deliver any instrument or document of the Partnership;

(4)  Any act or failure to act by the Partnership or any other matter whatsoever involving the Partnership or any Partner.

## ARTICLE 6. RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

6.1  Limitation of Liability. Except as otherwise provided by the nonwaivable provisions of the Act and by this Agreement, no Limited Partner shall be liable for an obligation of the Partnership solely by reason of being or acting as a Limited Partner.

6.2 List of Partners. Upon written request of any Limited Partner made in good faith and for a purpose reasonably related to the Partner's rights as limited Partner under this Agreement (which reason shall be set forth in the written request), the General Partner shall provide a list showing the names, addresses and Partnership Interests of all Partners.

6.3  Limitation Upon Limited Partners' Authority. No Limited Partner, as such, shall take part in the management of the business, transact any business for the Partnership, or have the power to sign for or to bind the Partnership to any agreement or document, such powers being vested solely and exclusively in the General Partner. No action taken or attempted to be taken by one or more of the Limited Partners shall be effective or binding upon the Partnership. Whenever the Limited Partners are entitled, by this Agreement or by the Act, to vote on a particular matter, each Limited Partner, shall be entitled to cast a vote that is commensurate with his proportion of the total Limited Partnership Interests.

6.4  Partnership Books. In accordance with Subsection 9.10 herein, the General Partner shall maintain and preserve, during the term of the Partnership, and for five (5) years thereafter, all accounts, books, and other relevant Partnership documents. Upon reasonable request, each Partner shall have the right, during ordinary business hours, to inspect and copy such Partnership documents at the requesting Partner's expense.

6.5  Priority and Return of Capital. Except as may be expressly provided in Article 9, no Partner shall have priority over any other Partner, either as to the return of Capital Contributions or as to Profits, Losses or Distributions; provided, however, that this Subsection 6.5 shall not apply to loans (as distinguished from Capital Contributions) which a Partner has made to the Partnership. Notwithstanding the foregoing, repayments of loans to Partners shall be made on a pro rata basis (based on the outstanding balance of the loan.)

## ARTICLE 7. DELIBERATELY OMITTED.

## ARTICLE 8.    CONTRIBUTIONS TO THE PARTNERSHIP AND CAPITAL ACCOUNTS

13

AJB 814

8.1  Partners' Capital Contributions. Not later than ten (10) days after each of the parties has executed this Agreement and delivered an executed copy of same to the General Partners, each Partner shall contribute such amount as is set forth in Exhibit 8.1 hereto as its share of the Initial Capital Contribution. The parties agree that the Capital Contribution set forth on Exhibit 8.1 for Arthur J. Brass shall be loaned to Arthur J. Brass by Harry Sargeant, III, or his designee (the "Capital Loan"). The Capital Loan shall be secured by a pledge of Arthur J. Brass' Partnership Interest (which pledge shall secure the Capital Loan as well as any subsequent advances made to Arthur J. Brass pursuant to Section 8.5 hereto) and shall provide that any Distributions to Arthur J. Brass (other than Distributions to pay taxes as set forth in Section 9.4(a)) shall be used first to satisfy the Capital Loan to the extent that it remains outstanding. The terms and conditions of the Capital Loan and the pledge shall be set forth in loan and pledge documentation in the form attached hereto as Exhibit 8.1-A.

8.2  Additional Contributions. Each Partner shall be required to make such additional Capital Contributions as shall be determined by the General Partner from time to time to be necessary to meet the expenses of the Partnership; provided, however, that any such additional Capital Contribution shall be subject to the approval of a Majority Interest of the Partners, and any such additional Capital Contributions shall be made in proportion to the Partners' Partnership Interests in the Partnership. Upon the making of any such determination, the General Partner shall give written notice to each Partner of the amount of required additional contribution, and, subsequent to approval by the Majority Interest of the Partners, each Partner shall deliver to the Partnership its pro rata share thereof of the Partner on the date such notice is given) no later than 30 days following the date such notice is given. The parties agree that the amount of any additional Capital Contribution required to be made pursuant to this paragraph 8.2 by Arthur J. Brass shall be loaned to Arthur J. Brass by Harry Sargeant, III, or his designee, on identical terms with and with the same security as required for the Capital Loan. None of the terms, covenants, obligations or rights contained in this Subsection 8.2 is or shall be deemed to be for the benefit of any Person other than the Partners and the Partnership, and no such third person shall under any circumstances have any right to compel any actions or payments by the General Partners and/or the Partners.

8.3  Capital Accounts.

(a)  A separate Capital Account shall be maintained for each Partner. Each Partner's Capital Account shall be increased by: (1) the amount of money contributed by such Partner to the Partnership; (2) the fair market value of property contributed by such Partner to the Partnership (net of liabilities secured by such contributed property that the Partnership is considered to assume or take subject to under Section 752 of the Code); (3) allocations to such Partner of Profits; (4) any items in the nature of income and gain which are specially allocated to the Partner pursuant to Subsections 9.2 and 9.3; and (5) allocations to such Partner of income described in Section 705(a)(1)(B) of the Code. Each Partner's Capital Account shall be decreased by: (1) the amount of money Distributed to such Partner by the Partnership; (2) the fair market value of property Distributed to such Partner by the Partnership (net of liabilities secured by such Distributed property that

14

AJB 815

such Partner is considered to assume or take subject to under Section 752 of the Code); (3) allocations to such Partner of expenditures described in Section 705(a)(2)(B) of the Code; (4) any items in the nature of deduction and loss that are specially allocated to the Partner pursuant to Subsections 9.2 and 9.3; and (5) allocations to such Partner of Losses.

(b)  Without limiting the other rights and duties of a transferee of a Partnership Interest pursuant to this Limited partnership Agreement, in the event of a permitted sale or exchange of a Partnership Interest in the Partnership: (1) the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Partnership Interest in accordance with Section 1.704-1(b)(2)(iv) of the Regulations; and (2) the transferee shall be treated as the transferor for purposes of allocations and distributions pursuant to Article 9 to the extent that such allocations and distributions relate to the transferred Partnership Interest.

(c)  The manner in which Capital Accounts are to be maintained pursuant to this Subsection 8.3 is intended to comply with the requirements of Section 704(b) of the Code and the Regulations promulgated thereunder. If in the opinion of the Partnership's accountants the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Subsection 8.3 should be modified in order to comply with Section 704(b) of the Code and the Regulations thereunder, then, notwithstanding anything to the contrary contained in the preceding provisions of this Subsection 8.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Partners.

(d)  Upon liquidation of the Partnership, liquidating Distributions shall be made in accordance with the positive Capital Account balances of the Partners, as determined after taking into account all Capital Account adjustments for the Partnership's taxable year during which the liquidation occurs. Liquidation proceeds shall be paid in accordance with Subsection 12.3. The Partnership may offset damages for breach of this Agreement by any Partner whose interest is liquidated (either upon the withdrawal of the Partner or the liquidation of the Partnership) against the amount otherwise Distributable to such Partner.  No Partner shall have any obligation to restore all or any portion of a deficit balance in such Partner's Capital Account.

8.4  Withdrawal or Reduction of Partners' Contributions to Capital.

(a)  A Partner shall not receive a Distribution of any part of its Capital Contribution to the extent such Distribution would violate Subsection 9.5.

(b)  A Partner, irrespective of the nature of its Capital Contribution, does not have the right to demand and receive property other than cash in return for its Capital Contribution.

15

AJB 816

8.5  Remedies for Nonpayment of Additional Capital Contributions. If a Partner does not make his properly assessed Initial Capital Contribution or Additional Capital Contribution in a timely manner ("Non-Contributing Partner") such failure will not constitute a breach of this Agreement, however upon such an occurrence (the "Non-Contribution") the General Partner shall promptly give notice (the "Non-Contribution Notice") to all Partners of: (a) the Non-Contribution and (b) a Special Meeting to discuss the appropriate course of action. The Partners who timely satisfied their obligation to make the required Initial Capital Contributions or Additional Capital Contributions (the "Contributing Partners") may, individually or as a group, pursue the following course of action:

(a) . The Contributing Partners, shall have an option, but no obligation, (except with respect to the Capital Loan and the additional Capital Contributions required to be loaned to Arthur J. Brass pursuant to paragraphs 8.1 and 8.2 above) to loan to the Partnership within sixty (60) days after the Non-Contribution Notice is given (the "Loan Decision Period") the amount which the Non-Contributing Partners have failed to contribute to the Partnership (proportionate to the ratio of the interest in Profits held by each respective Partner electing to loan funds, to the interest in Profits Interests held by all Partners electing to advance funds). The amount that is loaned by any Contributing Partner shall be treated as a loan to the Non-Contributing Partner, bearing interest at a floating rate equal to five (5) percentage points higher than the prime commercial lending rate in effect from time to time at the principal bank used by the Partnership for banking and borrowing purposes (the "default rate"), followed by a contribution of the borrowed funds to the Partnership by the Non-Contributing Partner. Such a loan shall bear interest at the default rate provided above. Until the Non-Contributing Partner's debt to any Contributing Partners, together with interest thereon, is paid in full, any funds or property which would otherwise be Distributed to the Non-Contributing Partner from time to time hereunder shall be paid to such Contributing Partners, according to their respective shares of loans (which are treated as loans to the Non-Contributing Partner). Any such payments shall be deemed to be Distributions to the Non-Contributing Partner by the Partnership, followed by appropriate payments by the Non-Contributing Partner to the respective Contributing Partners. Payments shall be credited first to accrued interest. Payments to Contributing Partners of loans by them pursuant to either Subsection 8.5(a)(1) or 8.5(a)(2) shall be made pari passu. Any loan made pursuant to this Section 8.5 shall be secured by a pledge of the Non-Contributing Partners's Membership Interest in the form attached hereto as Exhibit 8.1-A.

## ARTICLE 9.  ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS

9.1          9.1  Allocations of Profits and Losses from Operations.  Except as provided in Subsections 9.1(a), 9.2 and 9.3, the Profits and Losses for each Fiscal Year shall be allocated among the Partners in accordance with their Sharing Ratios.

16

AJB 817

(a) Special Allocation of Trading Retained Earnings. In the event that the Partnership receives any distributions of the Trading Retained Earnings from Sargeant Trading, Inc., said distributions are to be specially allocated to Harry Sargeant, Jr., Harry Sargeant, III, Daniel Sargeant and James Sargeant in proportion to their interests in the Partnership.

9.2     Special Allocations to Capital Accounts. Notwithstanding Subsection 9.1 hereof:

(a) In the event that any Partner unexpectedly receives any adjustments, allocations or Distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6) of the Regulations, which create or increase a Deficit Capital Account of such Partner, then items of Partnership income and gain (consisting of a pro rata portion of each item of Partnership income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially allocated to such Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Subsection 9.2(a) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Regulations.

(b) The Losses allocated pursuant to Subsection 9.1 hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Partner to have a Deficit Capital Account at the end of any Fiscal Year. In the event that some, but not all, of the Partners would have Deficit Capital Accounts as a consequence of an allocation of Losses pursuant to Subsection 9.1 hereof, the limitation set forth in the preceding sentence shall be applied on a Partner by Partner basis so as to allocate the maximum permissible Losses to each Partner under Section 1.704-1(b)(2)(ii)(d) of the Regulations. All Losses in excess of the limitation set forth in this Subsection 9.2(b) shall be allocated to the Partners in proportion to their respective positive Capital Account balances, if any, and thereafter to the Partners in accordance with their interests in the Partnership as determined by the General Partner in his reasonable discretion. In the event that any Partner would have a Deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of any amount, if any, that such Partner is obligated to restore to the Partnership under Section 1.704-1(b)(2)(ii)(c) of the Regulations and such Partner's share of Partnership Minimum Gain as defined in Section 1.704-2(g)(1) of the Regulations (which is also treated as an obligation to restore in accordance with Section 1.704-1(b)(2)(ii)(d) of the Regulations), the Capital Account of such Partner shall be specially credited with items of Partnership income (including gross income) and gain in the amount of such excess as quickly as possible.

(c) Notwithstanding any other provision of this Subsection 9.2, if there is a net decrease in the Partnership Minimum Gain as during a Fiscal Year, then the Capital Accounts of each Partner shall be allocated items of income (including gross income) and

17

AJB 818

gain for such Fiscal Year (and if necessary for subsequent Fiscal Years) equal to that Partner's share of the net decrease in Partnership Minimum Gain. This Subsection 9.2(c) is intended to comply with the minimum gain chargeback requirement of Section 1.704-2 of the Regulations and shall be interpreted consistently therewith. If in any Fiscal Year that the Partnership has a net decrease in the Partnership Minimum Gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Partners and it is not expected that the Partnership will have sufficient other income to correct that distortion, the General Partner may in their discretion (and shall, if requested to do so by a Partner) seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Section 1.704-2(f)(4) of the Regulations.

(d)    Notwithstanding any other provision of this Subsection 9.2 except Subsection 9.2(c), if there is a net decrease in Partner Minimum Gain attributable to a Partner Nonrecourse Debt during any Partnership Fiscal Year, each Partner who has a share of the Partner Minimum Gain as of the beginning of the Fiscal Year shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) equal to such Partner's share of the net decrease in Partner Minimum Gain attributable to such Partner Nonrecourse Debt. A Partner's share of the net decrease in Partner Minimum Gain shall be determined in accordance with Section 1.704-2(i)(4) of the Regulations; provided, however, that a Partner shall not be subject to this provision to the extent that an exception is provided by Section 1.704-2(i)(4) of the Regulations and any Revenue Rulings issued with respect thereto. Any Partner Minimum Gain allocated pursuant to this provision shall consist of first, gains recognized from the disposition of Partnership property subject to the Partner Nonrecourse Debt and, second, if necessary, a pro rata portion of the Partnership's other items of income or gain (including gross income) for that Fiscal Year. This Subsection 9.2(d) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(e)    Items of Partnership loss, deduction and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Partnership and are characterized as partner nonrecourse deductions under Section 1.704-2(i) of the Regulations shall be allocated to the Partners' Capital Accounts in accordance with said Section 1.704-2(i) of the Regulations.

(f)    Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Regulations), such deductions shall be allocated to the Partners in the same manner as Loss is allocated for such period.

(g)    To the extent that an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) or 743(b) of the Code is required pursuant to Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4) of the Regulations, to be taken into account in determining Capital Accounts as the result of a Distribution to a Partner in

18

complete liquidation of its Partnership Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Partners in accordance with their interests in the Partnership in the event Section 1.704-1(b)(2)(iv)(m)(2) of the Regulations applies, or to the Partner to whom such Distribution was made in the event Section 1.704-1(b)(2)(iv)(m)(4) of the Regulations applies.

(h) Any income, gain, loss or deduction realized by the Partnership as a direct or indirect result of the issuance of an interest in the Partnership by the Partnership to a Partner (the "Issuance Items") shall be allocated among the Partners so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Partner, shall be equal to the net amount that would have been allocated to each such Partner if the Issuance Items had not been realized.

9.3   Credit or Charge to Capital Accounts. Any credit or charge to the Capital Accounts of the Partners pursuant to Subsections 9.2(a), 9.2(b), 9.2(c), 9.2(d), 9.2(e), 9.2(f) and 9.2(g) ("Regulatory Allocations") hereof shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to Subsection 9.1, so that the net amount of any items charged or credited to Capital Accounts pursuant to Subsection 9.1 and the Regulatory Allocations hereof and this Subsection 9.3 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Partner pursuant to the provisions of this Article 9 if the special allocations required by the Regulatory Allocations hereof had not occurred.

9.4   Distributions. Except as provided in Subsections 8.3(d) (with respect to liquidating Distributions) and 9.5 (with respect to limitations on Distributions), the following shall govern Distributions of Distributable Cash:

(a)   The General Partner shall make Distributions out of Distributable Cash to each Partner in proportion to the federal taxable income of the Partnership which will be allocated to such Partner ("Tax Profits") for the current Fiscal Year as reasonably estimated by the General Partner no later than 10 days prior to the dates that federal estimated quarterly taxes are due for individuals an amount equal to the remainder, if any, of: (x) the product of 40% multiplied times the estimated Tax Profits allocable to such Partner for the portion of the year ending on the last day of the most recent quarter, minus (y) the sum of all Distributions made to each such Partner pursuant to this Subsection 9.4(a) with respect to such Fiscal Year, plus 40% of any Unrecovered Tax Losses attributable to such Partner as of the first day of the current Fiscal Year. The Unrecovered Tax Losses attributable to a Partner shall mean the positive remainder, if any, of such Partner's share of Partnership federal tax losses for all prior Fiscal Years minus the Partner's share of Tax Profits for all prior Fiscal Years. The objective of this Subsection 9.4(a), is to require the Partnership to make distributions with reference to each Partner's (and such Partner's predecessor's) share of cumulative Partnership taxable

19

income or loss to the extent of Distributable Cash. Without limiting this objective, for purposes of this Subsection 9.4(a), a Partner's share of Tax Profits and Unrecovered Tax Losses shall be determined with reference to Sections 704(c), 734, and 743 of the Code. In determining whether there is sufficient Distributable Cash to make the distribution set forth in this subparagraph (a), the amount of Distributable Cash shall be determined without reference to the reduction for Reserves.

(b)     The General Partner may make Distributions (to the extent of Distributable Cash less any amounts distributed pursuant to Subparagraph (a) above) to the Partners in an amount to be determined by the General Partner in his reasonable discretion in accordance with their Sharing Ratios. Notwithstanding the foregoing sentence, a Majority Interest of the Partners may by written directive overrule the General Partner's discretion and determine the amount to be distributed under this subparagraph (b), up to the amount of Distributable Cash less any amounts distributed pursuant to subparagraph (a) above.

(c)     Notwithstanding the foregoing, in the event that there are amounts specially allocated to Harry Sargeant, Jr., Harry Sargeant, III, Daniel Sargeant and James Sargeant pursuant to Section 9.1(a) above, the Manager shall distribute said amounts to Harry Sargeant, Jr., Harry Sargeant, III, Daniel Sargeant and James Sargeant in proportion to their interests in the Partnership.

All Distributions which, when made, exceed the recipient Partner's basis in that Partner's Partnership Interest shall be considered advances or drawings against the Partner's Distributive share of Income. To the extent it is determined at the end of the Fiscal Year that the recipient Partner has not been allocated Income that equals or exceeds the total of such advances or drawings for such year, such Partner shall be obligated to recontribute any such advances or drawings to the Partnership. Notwithstanding the foregoing sentence, a Partner will not be required to recontribute such advances or drawings to the extent that, on the last day of the Fiscal Year, such Partner's basis in its Partnership Interest in the Partnership has increased from the time of such advance or drawing.

9.5  Limitation Upon Distributions. No Distribution shall be made if such Distribution would violate the Act.

9.6  Accounting Principles. The profits and losses of the Partnership shall be determined in accordance with accounting principles applied on a consistent basis using the accrual method of accounting determined by the General Partner, unless the Partnership is required to use a different method of accounting for federal income tax purposes, in which case that method of accounting shall be the Partnership's method of accounting.

9.7  Interest on and Return of Capital Contributions. No Partner shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution, except as otherwise specifically provided for herein.

AJB 821

9.8   Loans to Partnership. Nothing in this Agreement shall prevent any Partner from making secured or unsecured loans to the Partnership by agreement with the Partnership as long as such loan is made in a commercially reasonable manner.

9.9   Accounting Period. The Partnership's accounting period shall be the Fiscal Year.

9.10   Records and Reports. At the expense of the Partnership, the General Partner shall maintain records and accounts of all operations and expenditures of the Partnership. At a minimum the Partnership shall keep at its principal place of business the following records:

(a)   A current list of the full name and last known business, residence, or mailing address of each Partner and General Partner, both past and present;

(b)   A copy of the Articles of Organization and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c)   Copies of the Partnership's federal, state, and local income tax returns and reports, if any, for the four (4) most recent Fiscal Years;

(d)   Copies of the Partnership's currently effective written Agreement, copies of any writings permitted or required with respect to a Partner's obligation to contribute cash, property or services, and copies of any financial statements of the Partnership for the three (3) most recent Fiscal Years;

(e)   Minutes of every annual, special meeting and court-ordered meeting; and

(f)   Any written consents obtained from Partners for actions taken by Partners without a meeting.

9.11   Returns and Other Elections. The General Partner shall cause the preparation and timely filing of all tax returns required to be filed by the Partnership pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Partnership does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Partners within a reasonable time after the end of the Fiscal Year.

All elections permitted to be made by the Partnership under federal or state laws shall be made by the General Partner in his or her sole discretion; provided, however, that the General Partners shall make any tax election requested by Partners owning a Majority Interest.

9.12   Tax Matters Partner. The General Partner is hereby designated the Tax Matters Partner ("TMP") as defined in Section 6231(a)(7) of the Code. The TMP and the other Partners shall use their reasonable efforts to comply with the responsibilities outlined in Sections 6221 through 6233 of the Code (including any Regulations promulgated thereunder), and in doing so shall incur no liability to any other Partner.

21

AJB 822

9.13  Certain Allocations for Income Tax (But Not Book Capital Account) Purposes.

(a)       In accordance with Section 704(c)(1)(A) of the Code and Section 1.704-1(b)(2)(i)(iv) of the Regulations, if a Partner contributes property with a initial Gross Asset Value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property shall, solely for federal income tax purposes (and not for Capital Account purposes), be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership and its Gross Asset Value at the time of contribution pursuant to the traditional method under Section 1.704-3(b) of the Regulations.

(b)  Pursuant to Section 704(c)(1)(B) of the Code, if any contributed property is Distributed by the Partnership other than to the contributing Partner within seven (7) years of being contributed, then, except as provided in Section 704(c)(2) of the Code, the contributing Partner shall, solely for federal income tax purposes (and not for Capital Account purposes), be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Partner under Section 704(c)(1)(A) of the Code if the property had been sold at its fair market value at the time of the Distribution.

(c)  In the case of any Distribution by the Partnership to a Partner, such Partner shall, solely for federal income tax purposes (and not for Capital Account purposes), be treated as recognizing gain in an amount equal to the lesser of:

(1)  the excess (if any) of (A) the fair market value of the property (other than money) received in the Distribution over (B) the adjusted basis of such Partner's Partnership Interest immediately before the Distribution reduced (but not below zero) by the amount of money received in the Distribution; or

(2)  the Net Precontribution Gain (as defined in  Section 737(b) of the Code) of the Partner. The NetPrecontribution Gain means the net gain (if any) which would have been recognized by the distributee Partner under Section 704(c)(1)(B) of the Code if all property which: (A) had been contributed to the Partnership within seven (7) years of the Distribution, and (B) is held by the Partnership immediately before the Distribution, had been Distributed by the Partnership to another Partner. If any portion of the property Distributed consists of property which had been contributed by the distributee Partner to the Partnership, then such property shall not be taken into account under this Subsection 9.13(c) and shall not be taken into account in determining the amount of the Net Precontribution Gain. If the property Distributed consists of an interest in an Entity, the preceding sentence shall not apply to the extent that the value of such interest is attributable to the property contributed to such Entity after such interest had been contributed to the Partnership.

(d)  All recapture of income tax deductions resulting from sale or disposition of

22

Partnership property shall be allocated to the Partners to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Partner is allocated any gain from the sale or other disposition of such property.

## ARTICLE 10. TRANSFERABILITY

### 10.1 General.

(a) Except as otherwise specifically provided herein, no Partner shall have the right to Transfer the Partner's Interest.

(b) Each Partner hereby acknowledges the reasonableness of the restrictions on sale and gift of Partnership Interests imposed by this Agreement in view of the Partnership purposes and the relationship of the Partners. Accordingly, the restrictions on sale and gift contained herein shall be specifically enforceable.

(c) Except as set forth in this subparagraph (c), a Partner may not pledge or otherwise encumber such Partner's Partnership Interest without the express unanimous written consent of the Partners. Notwithstanding the foregoing, upon the express written consent of a majority of the Partners, each Partner shall be required to pledge or otherwise encumber his, her or its Partnership Interest in order to secure an institutional loan to the Partnership. In such a case, each Partner shall execute the documents required by the institutional lender in order to effectuate the institutional lender's security interest. In the event that any Partner pledges or otherwise encumbers any of its Partnership Interest as security for repayment of a liability, any such pledge or hypothecation shall be made pursuant to a pledge or hypothecation agreement that requires the pledgee or secured party to be bound by all the terms and conditions of this Article 10, and the pledging Partner shall provide notice of such pledge or encumbrance to the General Partner.

### 10.2 Right of First Refusal.

(a) A Selling Partner which desires to sell all or any portion of its Partnership Interest to a third party purchaser, including a Partner, shall obtain from such third party purchaser ("Third Party Purchaser") a bona fide written offer to purchase such interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered therefor ("Third Party Offer"). The Selling Partner shall give written notification ("Notice of Sale") to the Partnership and the other Partners who are Partners (the "Remaining Partners"), by certified mail or personal delivery, of its intention to so transfer such Partnership Interest (the "Offered Interest"). The Notice of Sale shall be accompanied by a copy of the Third Party Offer. If any portion of the purchase price offered by such third party purchaser consists of consideration other than cash or a promissory note ("Noncash Consideration"), then: (1) the Notice of Sale also shall be accompanied by a good faith estimate by the Selling Partner of the fair market value of the Noncash Consideration, and (2) for purposes of Subsection 10.2(b) and

23

AJB 824

10.2(c) the purchase price of the Offered Interest (the "Purchase Price") shall be adjusted as follows:

(i) The Purchase Price shall be decreased by the Noncash Consideration; and

(ii) The Purchase Price shall be increased by an amount equal to either: (aa) the Selling Partner's good faith estimate of the fair market value of the Noncash Consideration ("Seller's Estimate"), or (bb) in the discretion of the General Partner, the appraised fair market value of the Noncash Consideration determined by an independent appraiser selected by the General Partner in their sole discretion. The General Partner shall have the sole discretion to choose between the amount determined pursuant to clauses (aa) and (bb) of this Subsection 10.2(a)(ii). If the appraised fair market value of the Noncash Consideration is not determined within twenty (20) days after the Notice of Sale, then the such fair market value shall be equal to the amount of the Seller's Estimate.

(b) The Remaining Partners shall have the option ("Buy Option") to purchase all, but not less than all, of the Offered Interest, on a basis pro rata to the Sharing Ratios of the Remaining Partners exercising such option pursuant to this Subsection 10.2(b). The Buy Option may be exercised by one or more of the Remaining Partners by giving written notification ("Buy Notice") to the Selling Partner within thirty (30) days after receiving the Notice of Sale (the "Option Period"). Each Remaining Partner which timely gives a Buy Notice ("Buying Partner") shall purchase such portion of the Offered Interest which is equal to the relative Sharing Ratios of all of the Buying Partners. If there are no Buying Partners, the Buy Option shall terminate and at any time within ninety (90) days following the expiration of the Option Period, the Selling Partner shall be entitled to consummate the sale of the Offered Interest to the Third-Party Purchaser or one or more of its Affiliates upon terms no less favorable than are set forth in the Third-Party Offer.

(c) If there is at least one Buying Partner: (i) the Buying Partners shall designate the time, date and place of closing, provided that the date of closing shall be within forty (40) days after the receipt of the Buy Notice, and (ii) at the closing, the Buying Partners shall purchase, and the Selling Partner shall sell, the Offered Interest for an amount equal to the Purchase Price (as modified in accordance with Subsection 10.2(a)(i) and (ii)) and in accordance with such other terms and conditions set forth in the Third-Party Offer.

(d) A sale of an Offered Interest pursuant to this Subsection 10.2, shall be subject to Subsection 10.3.

10.3 **Additional Conditions to Recognition of Transferee.**

(a) If a Transferring Partner sells or gifts a Partnership Interest to a Person who is

24

not already Partner, as a condition to recognizing one or more of the effectiveness and binding nature of such sale or gift, the remaining Partners may require the Transferring Partner and the proposed successor-in-interest to execute, acknowledge and deliver to the General Partner such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the General Partner may deem necessary or desirable to accomplish any one or more of the following:

     (1)  constitute such successor-in-interest as a Partner;

     (2)  confirm that the proposed successor-in-interest to be admitted as a Partner, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of this Agreement, as the same may have been further amended;

     (3)  preserve the Partnership after the completion of such sale, transfer, assignment, or substitution under the laws of each jurisdiction in which the Partnership is qualified, organized or does business;

     (4)  maintain the status of the Partnership as a partnership for federal tax purposes; and

     (5)  assure compliance with any applicable state and federal laws, including securities laws and regulations.

     (b)  Any sale or gift of a Partnership Interest and admission of a Partner in compliance with this Article 10 shall be deemed effective as of the last day of the calendar month in which the remaining Partners' consent thereto was given. The Transferring Partner hereby indemnifies the Partnership and the remaining Partners against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or purported transfer in violation of this Article 10.

    10.4  **Gifts of Partnership Interests**  A Gifting Partner may gift all or any portion of his Partnership Interest (without regard to Subsection 10.2(a) and 10.2(b)); provided, however, that the successor-in-interest ("donee") complies with Subsection 10.3(a) and further provided that the donee is either the Gifting Partner's spouse, former spouse, or lineal descendant (including adopted children).

    10.5  **Bilateral Buy-Sell**

     (a)  At any time after the date that is five years after the execution of this Agreement, a Partner or group of Partners may serve a written notice of a proposed buy-sell offer ("Buy/Sell Notice") stipulating the purchase price, consisting only of cash consideration, at which the Partner  or Partners (singly or collectively, the "Offering

AJB  826

Partner") will either purchase all the Partnership Interests in the Partnership held by the remaining Partners (the "Remaining Partners") or at which the Selling Partner will sell all of his Partnership Interest to the Remaining Partners, together with the terms upon which the purchase or sale shall be completed.

(b)     The Remaining Partners shall then have a period of thirty (30) days from the service of the Buy/Sell Notice in which to notify the Offering Partner in writing as to whether the Remaining Partners elect to purchase the Offering Partner's Partnership Interest at the price set forth in the Buy/Sell Notice or to sell to the Offering Partner the Remaining Partners' Partnership Interests at the same price. In the absence of a response from the Remaining Partners, the Remaining Partners shall be deemed to have served notice of their willingness to sell their Partnership Interests and such deemed notice shall be effective as of the 45th day following service of the Buy-Sell Notice.

(c)     The sale and purchase pursuant to an election or deemed elections under Subsection (b), immediately above, shall be closed on or before sixty (60) days following service of the Buy/Sell Notice.  At the Closing, the Remaining Partners shall cause all of their Partnership Interests to be transferred to the Offering Partner upon the payment to them by the Offering Partner of the agreed purchase price for same.

(d)     In the event the Remaining Partners elect, during the aforesaid thirty (30) day period, to purchase the Offering Partner's Partnership Interests, then a closing shall be held on or before sixty (60) days following service of the Buy/Sell Notice.  At the Closing, the Offering Partner shall cause all of his Partnership Interest to be transferred pro rata to the Remaining Partners upon payment to him of the agreed purchase price.

10.6    Tag-Along Rights

(a)     If any Partner or group of Partners (collectively, the "Selling Group"), at any time or from time to time, enters into an agreement (whether oral or written) to transfer, sell or otherwise dispose of, directly or indirectly any Partnership Interests (a "Tag-Along Sale"), then after the expiration of the Option Period set forth in Section 10.2 hereof, each other Partner shall have the right, but not the obligation, to participate in such Tag-Along Sale (and to displace the Selling Group to the extent of such participation) by selling up to its pro rata interest (based on the Partnership Interests held by Partners other than members of the Selling Group) of the Partnership Interests (the "Partners' Allotment") equal to the product of (i) the total Partnership Interests proposed to be sold or otherwise disposed of by the Selling Group in the Tag-Along Sale multiplied by (ii) a fraction, the numerator of which shall equal the aggregate Partnership Interests owned by Partners (other than members of the Selling Group) who have elected to participate in such Tag-Along Sale immediately prior to the Tag-Along Sale and the denominator of which shall equal the sum of: (A) the aggregate Partnership Interests owned by members of the Selling Group who have elected to participate in such Tag-Along Sale immediately prior to Tag-Along Sale; and (B) the aggregate Partnership Interests owned by Partners (other than members of the Selling Group) who have elected to participate in such Tag-Along Sale immediately prior to the Tag-Along

26

AJB 827

Sale.

Any such sale by any Partner shall be on the same terms and conditions as the proposed Tag-Along Sale by the Selling Group; provided, however, that all selling Partners shall share *pro rata*, based upon the number of shares being sold by each (i) in any indemnity liabilities to the proposed transferee or purchaser in the Tag-Along Sale (other than representations as to unencumbered ownership of and ability to transfer the Partnership interests being sold of any other seller in the Tag-Along Sale, which shall be the sole responsibility of such other seller) and (ii) in any escrow or holdback for the purpose of satisfying any such indemnity liabilities

(b)    The Selling Group members participating in a Tag-Along Sale or a representative of the Selling Group (the "Selling Group Representative,") shall promptly provide each Partner with written notice (the "Tag-Along Sale Notice") not more than 60 nor less than 30 days prior to the proposed date of the Tag-Along Sale (the "Tag-Along Sale Date").   In order to facilitate the prompt delivery of the Tag-Along Sale Notices, the Partnership hereby covenants to provide the Selling Group members participating in a Tag-Along Sale or the Selling Group Representative, as the case may be, access to any relevant organizational or operational documents of the Partnership. Each Tag-Along Sale Notice shall set forth:  (i) the name and address of each proposed transferee or purchaser of Partnership Interests in the Tag-Along Sale; (ii) the name of each Selling Group member participating in the Tag-Along Sale and the Partnership Interests proposed to be transferred or sold by each such Selling Group member; (iii) the proposed amount and form of consideration to be paid for such Partnership Interests and the terms and conditions of payment offered by each proposed transferee or purchaser, (iv) the percentage of the Partnership's total Partnership Interests held of record as of the close of business on the date of the Tag-Along Sale Notice (the "Tag-Along Notice Date") by the Partner to whom the notice is sent; (v) the aggregate Partnership Interests held of record as of the Tag-Along Notice Date by the Selling Group; (vi) the maximum Partnership Interests (the "Partner's Allotment") that the Partner to whom the notice is sent is entitled to include in the Tag-Along Sale assuming each Partner elected to participate in the Tag-Along Sale and elected to sell the maximum Partnership Interests owned by such Partner; (vii) confirmation that the proposed purchaser or transferee has been informed of the "Tag-Along Rights" provided for herein and has agreed to purchase Partnership Interests in accordance with the terms hereof; (viii) the Tag-Along Sale Date and (ix) confirmation that, with respect to the Partnership Interests to be received by the proposed transferee or purchaser, the proposed transferee or purchaser agrees in writing to be bound by, and covenants that each transferee of all such Partnership Interests shall be bound by, the provisions of this Agreement as if it were a member of the Selling Group.

Each Partner shall provide written notice (or oral notice confirmed in writing) (the "Tag-Along Notice") to the member(s) of the Selling Group participating in the Tag-Along Sale, or, at such Partner's option, to the Selling Group Representative, no less than 15 days prior to the Tag-Along Sale Date. The Tag-Along Notice shall set forth the Partnership Interests, if any, that such Partner desires to include in the Tag-Along Sale (which shall not exceed such Partner's Allotment).

27

AJB 828

The participating members of the Selling Group shall determine the aggregate Partnership Interests to be sold by each participating Partner in any given Tag-Along Sale in accordance with the terms hereof, and the Tag-Along Notices given by the Partners shall constitute their binding respective agreements to sell such shares on the terms and conditions applicable to such sale (including the requirements of this Section 10.6).

If a Tag-Along Notice from a Partner is not received by the members of the Selling Group participating in the Tag-Along Sale or by the Selling Group Representative, as the case may be, within the 15-day period specified above, the Selling Group members shall have the right to sell or otherwise transfer the Partnership Interests specified in the Tag-Along Sale Notice to the proposed purchaser or transferee without any participation by such Partner, but only on the terms and conditions stated in such Tag-Along Sale Notice and only if such sale occurs on a date within five business days of the Tag-Along Sale Date.

(c)     The provisions of this Section 10.6 shall apply regardless of the form of consideration received in the Tag-Along Sale.

10.7    Drag-Along Rights

(a)     If a Majority Interest of the Partners (the "Majority Group") determine to accept an offer from any person (other than an Affiliate or a family member of a Partner (which shall be defined as any sibling, ancestor, descendant or spouse of a Partner)) to acquire 100% of the outstanding Partnership Interests in the Partnership in a purchase transaction, and the Option Period defined in Section 10.2 has expired, then, subject to paragraph (c) below, at the option of the Majority Group, each of the other Partners shall sell, all Partnership Interests held by it pursuant to such offer to purchase (the "Drag-Along Sale"). All holders of Partnership Interests in such Drag-Along Sale (i) shall receive the same proportionate consideration, shall be subject to the same terms and conditions of sale and shall otherwise be treated equally or, where appropriate, pro rata based upon the Partnership Interests held by each Partner, and (ii) shall execute such documents and take such actions as may be reasonably required by the Majority Group. Any such sale by any Partner shall be on the same terms and conditions as the proposed Drag-Along Sale by the Majority Group; provided, however, that all selling Partners shall share pro rata, based upon the Partnership Interests being sold by each, (i) in any indemnity liabilities to the purchaser in the Drag-Along Sale (other than representations as to unencumbered ownership of and ability to transfer the Partnership Interests being sold of any other seller in the Drag-Along Sale, which shall be the sole responsibility of such other seller) and (ii) in any escrow or holdback for the purpose of satisfying any such indemnity liabilities; provided that each Partner's sharing obligation hereunder with respect to such indemnity or other liabilities shall be limited to the Partnership Interests being sold by such Partner and the proceeds thereof, including, without limitation, the cash and non-cash consideration received by such Partner with respect to such Partnership Interests.

28

AJB 829

(b)    The Majority Group participating in a Drag-Along Sale shall promptly provide each Partner with written notice (the "Sale Notice") not more than 60 nor less than 30 days prior to the date of the Drag-Along Sale (the "Drag-Along Sale Date").  Each Sale Notice shall set forth:  (i) the name and address of each proposed transferee or purchaser of Partnership Interests of Partnership in the Drag-Along Sale; (ii) the proposed amount and form of consideration to be paid for such Partnership Interests and the terms and conditions of payment offered by each proposed transferee or purchaser, (iii) confirmation that the proposed purchaser or transferee has been informed of the "Drag-Along Rights" provided for herein and has agreed to purchase Partnership Interests of the Partnership in accordance with the terms hereof; and (iv) the Drag-Along Sale Date.

(c)    The provisions of this Section 10.7 shall apply regardless of the form of consideration received in the Drag-Along Sale, and if any non-cash consideration is proposed in the Drag-Along Sale, each Partner shall accept its pro rata share of such non-cash consideration for Partnership Stock based upon its proportional ownership of Partnership Interests.    In addition to the foregoing, each Partner agrees to vote in favor of any reincorporation merger undertaken to change the Partnership's domicile.  In addition, if the General Partner of the Partnership has approved a merger, sale, recapitalization or other transaction requiring Partner approval (an "Approved Transaction"), then each Partner agrees to vote all of its Partnership Interests (or execute a written consent with respect thereto) in favor of the Approved Transaction, will take all actions necessary or desirable in connection with the consummation of the Approved Transaction as are requested by the General Partner.

(d)    Purchaser Representative.    If any transaction undertaken pursuant to this Article V involves entering into any negotiation or transaction for which Rule 506 under the Securities Act (or any similar rule then in effect) promulgated by the Securities and Exchange Commission may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), those Partners involved in such transaction who are not "accredited investors" (as such term is defined in Rule 501 under the Securities Act) (the "Unaccredited Partners") shall, at the request of the Partnership appoint one "purchaser representative" (as such term is defined in Rule 501 under the Securities Act (or any similar rule then in effect)) for all such Unaccredited Partners. The Partnership shall first propose a purchaser representative to the Unaccredited Partners. If holders of a majority of the Partnership Interests held by the Unaccredited Partners do not approve the purchaser representative designated by the Partnership, such holders shall appoint one purchaser representative to represent all Unaccredited Partners.   The Partnership shall not be responsible for the fees of the purchaser representative so appointed.

## ARTICLE 11. ISSUANCE OF PARTNERSHIP INTERESTS

11.1 Issuance of Additional Partnership Interests to New Partners. From the date of the formation of the Partnership, any Person acceptable to a Majority Interest may become a Partner in the Partnership by the issuance by the Partnership of Partnership Interests for such consideration as the Partners holding a Majority Interest shall determine, subject to the terms and conditions of this Agreement. Nothwithstanding the foregoing, in the event that such an issuance of Partnership Interests is contemplated, each existing Partner shall first have the right

29

AJB 830

to purchase his proportionate share of the Partnership Interests contemplated to be issued, which sale shall be on the same terms and conditions as the contemplated issuance. In the event that non-cash consideration is to be paid for the additional Partnership Interests, the existing Partner's rights under this paragraph 11.1 shall be based on the General Partner's good faith estimate of the value of the non-cash consideration.

11.2  Issuance of Additional Partnership Interests to Existing Partners. From the date of the formation of the Partnership, the Partnership may issue additional Partnership Interests to one or more existing Partners for such consideration as the Partners holding a Majority Interest shall determine, subject to the terms and conditions of this Agreement. Nothwithstanding the foregoing, in the event that such an issuance of Partnership Interests is contemplated, each existing Partner shall first have the right to purchase his proportionate share of the Partnership Interests contemplated to be issued, which sale shall be on the same terms and conditions as the contemplated issuance. In the event that non-cash consideration is to be paid for the additional Partnership Interests, the existing Partner's rights under this paragraph 11.2 shall be based on the General Partner's good faith estimate of the value of the non-cash consideration.

11.3  Part Year Allocations With Respect to New Partners. No new Partners shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Partnership. In accordance with the provisions of Section 706(d) of the Code and the Regulations promulgated thereunder, the General Partner may, at his or his option, at the time a Partner is admitted, close the Partnership books (as though the Partnership's Fiscal Year had ended) or make pro rata allocations of loss, income and expense deductions to a new Partner for that portion of the Partnership's Fiscal Year in which a Partner became an Partner.

## ARTICLE 12. DISSOLUTION AND TERMINATION

12.1  Dissolution.

(a)  The Partnership shall be dissolved only upon the occurrence of any of the following events:

(1)  by the unanimous written agreement of all Partners; or

(2)  upon the expiration of the term, if any, specified in Subsection 2.5 of this Agreement. Notwithstanding anything to the contrary in the Act, the Partnership shall not be dissolved upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Partner.

(b)  As soon as possible following the occurrence of any of the events specified in Subsection 12.1(a) effecting the dissolution of the Partnership, the appropriate representative of the Partnership shall execute all documents required by the Act at the time of dissolution and file or record such statements with the appropriate officials.

30

AJB  831

12.2 **Effect of Dissolution.** Upon dissolution, the Partnership shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence shall continue until winding up and Distribution is completed.

12.3 Winding Up, Liquidation and Distribution of Assets.

(a) Upon dissolution, an accounting shall be made by the Partnership's independent accountants of the accounts of the Partnership and of the Partnership's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The General Partner shall immediately proceed to wind up the affairs of the Partnership.

(b) If the Partnership is dissolved and its affairs are to be wound up, the General Partner shall:

(1) Sell or otherwise liquidate all of the Partnership's assets as promptly as practicable (except to the extent that the General Partner may determine to Distribute in kind any assets to the Partners);

(2) Allocate any Profit or Loss resulting from such sales to the Partners' Capital Accounts in accordance with Article 9 hereof;

(3) Discharge all liabilities of the Partnership, including liabilities to Partners who are also creditors, to the extent otherwise permitted by law, other than liabilities to Partners for Distributions and the return of capital, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Partnership (for purposes of determining the Capital Accounts of the Partners, the amounts of such Reserves shall be deemed to be an expense of the Partnership);

(4) Distribute the remaining assets to the Partners in accordance with their positive Capital Account balances;

(5) If any assets of the Partnership are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Partners. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Partners shall be adjusted pursuant to the provisions of Article 9 and Subsection 8.3 of this Agreement to reflect such deemed sale; and

(6) The positive balance (if any) of each Partner's Capital Account (as determined after taking into account all Capital Account adjustments for the Partnership's Fiscal Year during which the liquidation occurs) shall be

31

AJB 832

Distributed to the Partners, either in cash or in kind, as determined by the General Partner, with any assets Distributed in kind being valued for this purpose at their fair market value. Any such Distributions to the Partners in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Regulations.

(c) Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations, if any Partner has a Deficit Capital Account (after giving effect to all contributions, Distributions, allocations and other Capital Account adjustments for all Fiscal Years, including the year during which such liquidation occurs), such Partner shall have no obligation to make any Capital Contribution, and the negative balance of such Partner's Capital Account shall not be considered a debt owed by such Partner to the Partnership or to any other Person for any purpose whatsoever.

(d) Upon completion of the winding up, liquidation and Distribution of the assets, the Partnership shall be deemed terminated.

(e) The General Partner shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Partnership and the final Distribution of its assets.

12.4 Filing or Recording Statements. Upon the conclusion of winding up, the appropriate representative of the Partnership shall execute all documents required by the Act at the time of completion of winding up and file or record such statements with the appropriate officials.

12.5 Return of Contribution Nonrecourse to Other Partners. Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Partner shall look solely to the assets of the Partnership for the return of its Capital Contribution. If the Partnership property remaining after the payment or discharge of the debts and liabilities of the Partnership is insufficient to return the cash contribution of one or more Partners, such Partners shall have no recourse against any other Partner.

## ARTICLE 13. MISCELLANEOUS PROVISIONS

13.1 Notices. Any notice, demand, or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served if sent by telecopy or facsimile transmission, delivered by messenger or overnight courier, or mailed, certified first class mail, postage prepaid, return receipt requested, and addressed or sent to the Partner's and/or Partnership's address, as set forth on Exhibit 13.1. Such notice, demand or communication shall be effective: (a) if delivered by messenger or by overnight courier, upon actual receipt (or if the date of actual receipt is not a business day, upon the next business day); (b) if sent by telecopy or facsimile transmission, upon confirmation of receipt (or if the date of such confirmation of receipt is not a business day, upon the next business day); or (c) if mailed,

32

AJB 833

upon the earlier of three (3) business days after deposit in the mail and the delivery as shown by return receipt therefor. Any Partner or the Partnership may change its address by giving notice in writing to the Partnership and the other Partners of its new address.

13.2  Books of Account and Records. Proper and complete records and books of account shall be kept or shall be caused to be kept by the General Partner, in which shall be entered fully and accurately all transactions and other matters relating to the Partnership's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Partnership. Such books and records shall be maintained as provided in Subsection 9.10. The books and records shall at all times be maintained at the principal executive office of the Partnership and shall be open to the reasonable inspection and examination of the Partners or their duly authorized representatives during reasonable business hours.

13.3  Application of State Law. This Agreement, and the application and interpretation hereof, shall be governed exclusively by its terms and by the laws of the State, and specifically the Act.

13.4  Waiver of Action for Partition. Each Partner irrevocably waives during the term of the Partnership any right that it may have to maintain any action for partition with respect to the Partnership Property.

13.5  Amendments. Neither this Agreement nor the Certificate of Limited Partnership of the Partnership may be amended except by the written agreement of a Majority Interest of the Partners. Notwithstanding the foregoing, any amendment of this Agreement shall require the consent of Arthur J. Brass if said amendment would have a detrimental impact upon Arthur J. Brass' rights set forth in Section 10.6 (relating to Tag-Along Rights), Section 10.7 (relating to Drag-Along Rights), Section 5.6, or Sections 8.1, 8.2, 8.5, 9.4(a), 11.1, 11.2 or 13.5. Additionally, this Agreement may not be amended in any manner that would change or alter any of the Manager's obligations to deal in an arm's length and commercially reasonable manner.

13.6  Execution of Additional Instruments. Each Partner hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

13.7  Construction. Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

13.8  Effect of Inconsistencies with the Act. It is the express intention of the Partners and the Partnership that this Agreement shall be the sole source of agreement among them, and, except to the extent that a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. In the event that the Act is subsequently amended or interpreted in such a way to make valid any provision of this Agreement that was

33

AJB 834

formerly invalid, such provision shall be considered to be valid from the effective date of such interpretation or amendment. The Partners and the Partnership hereby agree that the duties and obligations imposed on the Partners as such shall be those set forth in this Agreement, which is intended to govern the relationship among the Partnership and the Partners, notwithstanding any provision of the Act or common law to the contrary.

13.9  Waivers. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

13.10  Rights and Remedies Cumulative. The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

13.11  Severability. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law. Without limiting the generality of the foregoing sentence, to the extent that any provision of this Agreement is prohibited or ineffective under the Act or common law, this Agreement shall be considered amended to the minimum degree possible in order to make the Agreement effective under the Act or common law.

13.12  Heirs, Successors and Assigns. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, personal representatives, successors and assigns.

13.13  Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

13.14  Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

13.15  Rule Against Perpetuities. The parties hereto intend that the Rule Against Perpetuities (and any similar rule of law) not be applicable to any provisions of this Agreement. However, notwithstanding anything to the contrary in this Agreement, if any provision in this Agreement would be invalid or unenforceable because of the Rule Against Perpetuities or any similar rule of law but for this Subsection 13.16, the parties hereto hereby agree that any future interest which is created pursuant to said provision shall cease if it is not vested within twenty-one (21) years after the death of the survivor of the group composed of the undersigned individuals and their issue who are living on the effective date of this Agreement.

13.16  Power of Attorney. Each Partner hereby irrevocably makes, constitutes and

34

AJB 835

appoints the General Partner, with full power of substitution, so long as such General Partner is acting in such a capacity (and any successor General Partner thereof so long as such General Partner is acting in such capacity), its true and lawful attorney, in such Partner's name, place and stead (it is expressly understood and intended that the grant of such power of attorney is coupled with an interest) to make, execute, sign, acknowledge, swear and file with respect to the Partnership:

    (a) all amendments of this Agreement adopted in accordance with the terms hereof;

    (b) all documents which the General Partner deems necessary or desirable to effect the dissolution and termination of the Partnership;

    (c) all such other instruments, documents and certificates which may from time to time be required by the laws of the State or any other jurisdiction in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement, continue and defend the valid existence of the Partnership; and

    (d) all instruments, documents and certificates which the General Partner deems necessary or desirable in connection with a Reorganization which has been authorized in accordance with the terms of this Agreement.

This power of attorney shall not be affected by and shall survive the bankruptcy, insolvency, death, incompetency, or dissolution of a Partner and shall survive the delivery of any assignment by the Partner of the whole or any portion of its Partnership Interest. Each Partner hereby releases each General Partner from any liability or claim in connection with the exercise of the authority granted pursuant to this power of attorney, and in connection with any other action taken by such General Partner pursuant to which such General Partner purports to act as the attorney-in-fact for one or more Partners, if the General Partner believed in good faith that such action taken was consistent with the authority granted to it pursuant to this Subsection 13.17.

13.17  Investment Representations. The undersigned Partners, if any, understand: (1) that the Partnership Interests evidenced by this Agreement have not been registered under the Securities Act of 1933, or any other applicable state or federal securities laws (the "Securities Acts") because the Partnership is issuing these Partnership Interests in reliance upon the exemptions from the registration requirements of the Securities Acts providing for issuance of securities not involving a public offering; (2) that the Partnership has relied upon the fact that the Partnership Interests are to be held by each Partner for investment; and (3) that exemption from registrations under the Securities Acts would not be available if the Partnership Interests were acquired by an Partner with a view to Distribution.

Accordingly, each Partner hereby confirms to the Partnership that such Partner is acquiring the Partnership Interests for such own Partner's account, for investment and not with a view to the resale or Distribution thereof. Each Partner agrees not to transfer, sell or offer for

35

AJB 836

sale any of portion of the Partnership Interests unless there is an effective registration or other qualification relating thereto under the Securities Acts or unless the holder of Partnership Interests delivers to the Partnership an opinion of counsel, satisfactory to the Partnership, that such registration or other qualification under such Act is not required in connection with such transfer, offer or sale. Each Partner understands that the Partnership is under no obligation to register the Partnership Interests or to assist such Partner in complying with any exemption from registration under the Securities Acts if such Partner should at a later date, wish to dispose of the Partnership Interest. Furthermore, each Partner realizes that the Partnership Interests are unlikely to qualify for disposition under Rule 144 of the Securities and Exchange Commission unless such Partner is not an "affiliate" of the Partnership and the Partnership Interest has been beneficially owned and fully paid for by such Partner for at least three years.

Each Partner, prior to acquiring a Partnership Interest, has made an investigation of the Partnership and its business, and the Partnership has made available to each Partner, all information with respect to the Partnership which such Partner needs to make an informed decision to acquire the Partnership Interest. Each Partner considers himself, herself or itself to be a person possessing experience and sophistication as an investor which are adequate for the evaluation of the merits and risks of such Partner's investment in the Ownership Interest.

13.18  Representations and Warranties.

(a)  In General. As of the date hereof, each of the Partners hereby makes each of the representations and warranties applicable to such Partner as set forth in this Subsection 13.18, and such warranties and representations shall survive the execution of this Agreement.

(b)  Representations and Warranties. Each Partner hereby represents and warrants that:

(1)  Due Incorporation or Formation; Authorization of Agreement. With respect to each Partner that is a juridical entity, such Partner is a corporation duly organized or a partnership or limited liability company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate, partnership or limited liability company power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby. Such Partner is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder. Such Partner has the corporate, partnership or limited liability company power and authority to execute and deliver this Agreement and to perform its obligations hereunder and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate, partnership or limited liability company action. This Agreement constitutes the legal, valid, and binding obligation of such Partner.

36

AJB 837

(2) No Conflict with Restrictions; No Default. Neither the execution, delivery, and performance of this Agreement nor the consummation by such Partner of the transactions contemplated hereby: (a) will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Partner or any of its Affiliates, (b) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement, limited liability company agreement or operating agreement of such Partner or any of its Affiliates or of any material agreement or instrument to which such Partner or any of its Affiliates is a party or by which such Partner, or any of its Affiliates is or may be bound or to which any of its material properties or assets is subject, (c) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization, or approval under any indenture, mortgage, lease agreement, or instrument to which such Partner or any of its Affiliates is a party or by which such Partner or any of its Affiliates is or may be bound, or (d) will result in the creation or imposition of any lien upon any of the material properties or assets of such Partner or any of its Affiliates.

(3) Government Authorizations. Any registration, declaration, or filing with, or consent, approval, license, permit, or other authorization or order by, any government or regulatory authority, domestic or foreign, that is required in connection with the valid execution, delivery, acceptance, and performance by such Partner under this Agreement or the consummation by such Partner of any transaction contemplated hereby has been completed, made, or obtained on or before the effective date of this Agreement.

(4) Litigation. There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Partner or any of its Affiliates, threatened against or affecting such Partner or any of its Affiliates or any of their properties, assets, or businesses in any court or before or by any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator which could, if adversely determined (or, in the case of an investigation could lead to any action, suit, or proceeding, which if adversely determined could) reasonably be expected to materially impair such Partner's ability to perform its obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Partner; and such Partner or any of its Affiliates has not received any currently effective notice of any default, and such Partner or any of its Affiliates is not in default, under any applicable order, writ, injunction, decree, permit, determination, or award of any court, any governmental

37

department, board, agency, or instrumentality, domestic or foreign, or any arbitrator which could reasonably be expected to materially impair such Partner's ability to perform its obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Partner.

(5) Confidentiality. Except as contemplated hereby or required by a court of competent authority, each Partner shall keep confidential and shall not disclose to others and shall use its reasonable efforts to prevent its Affiliates and any of its, or its Affiliates', present or former employees, agents, and representatives from disclosing to others without the prior written consent of the General Partners any information which: (a) pertains to this Agreement, any negotiations pertaining thereto, any of the transactions contemplated hereby, or the business of the Partnership, or (b) pertains to confidential or proprietary information of any Partner or the Partnership or which any Partner has labeled in writing as confidential or proprietary; provided that any Partner may disclose to its Affiliates' employees, agents, and representatives any information made available to such Partner. No Partner shall use, and each Partner shall use its best efforts to prevent any Affiliate of such Partner from using, any information which: (i) pertains to this Agreement, any negotiations pertaining hereto, any of the transactions contemplated hereby, or the business of the Partnership, or (ii) pertains to the confidential or proprietary information of any Partner or the Partnership or which any Partner has labeled in writing as confidential or proprietary, except in connection with the transactions contemplated hereby.

[Signature Page and Certificate Follows]

38

AJB 839

## CERTIFICATE

The undersigned hereby agree, acknowledge and certify that the foregoing Agreement, consisting of **38** pages, excluding the Table of Contents and attached Exhibits, constitutes the Agreement of TRIGEANT HOLDINGS, LTD adopted by the Partners as of _June 29_ , 2001.

TRIGEANT HOLDINGS, LLC, General Partner

By: _____

Its:  Manager

_____
Harry Sargeant, Jr.

_____
Harry Sargeant, III.

_____
Daniel Sargeant

_____
Arthur J. Brass

_____
James Sargeant

39

AJB 840

CERTIFICATE

The undersigned hereby agree, acknowledge and certify that the foregoing Agreement, consisting of 3ᶻ pages, excluding the Table of Contents and attached Exhibits, constitutes the Agreement of TRIGEANT HOLDINGS, LTD adopted by the Partners as of _June 29_ , 2001.

TRIGEANT HOLDINGS, LLC, General Partner

By:_____
Its: Manager

_____
Harry Sargeant, Jr.

_____
Harry Sargeant, III.

_____
Daniel Sargeant

_____
Arthur J. Brass

_____
James Sargeant

38

AJB 841

EXHIBIT 8.1

## INITIAL CAPITAL CONTRIBUTIONS

Name and Address of Initial Partner                      Initial Capital
                                                         Contribution


| Name and Address of Initial Partner | Initial Capital Contribution |
|---|---|
| Trigeant Holdings., LLC, General Partner | $10.00 |
| Harry Sargeant, Jr., Limited Partner | $* |
| Harry Sargeant, III, Limited Partner | $* |
| Daniel Sargeant        , Limited Partner | $* |
| Arthur J. Brass, Limited Partner | $247.50 |
| James Sargeant, Limited Partner | $* |

* Totaling $742.50.

40

AJB 842

EXHIBIT 13.1

## NAME, ADDRESS AND FACSIMILE NUMBER OF
## PARTNERS

Name/Address                                    Facsimile Number

Arthur J. Brass

_____

Houston, Texas

Harry Sargeant, Jr.                             (561) 999-9506
3020 Military Trail, Suite 100
Boca Raton, Florida 33431

Harry Sargeant, III.                            (561) 999-9506
3020 Military Trail, Suite 100
Boca Raton, Florida 33431

Daniel Sargeant                                 (561) 999-9506
3020 Military Trail, Suite 100
Boca Raton, Florida 33431

James Sargeant                                  (561) 999-9506
3020 Military Trail, Suite 100
Boca Raton, Florida 33431

41

AJB 843

## PROMISSORY NOTE

$490,000.00                                                                                    June 27, 2001

FOR VALUE RECEIVED, **ARTHUR J. BRASS** referred to herein as "Borrower," promises to pay to the order of **HARRY SARGEANT, III** referred to herein as the "Lender," the principal sum of FOUR HUNDRED NINETY THOUSAND DOLLARS ($490,000.00), or, any such amounts as may now or hereafter have been advanced and be outstanding hereunder, together with interest on the unpaid principal balance as set forth below. All sums hereunder are payable to the Lender at his principal office in 3020 Military Trail, Suite 100, Boca Raton, Florida.

1. _Definitions_. Unless the context hereof otherwise requires or provides, the terms used herein have the same meanings as defined in that certain Security Agreement between the Borrower and the Lender of even date herewith, as the same has been or may be amended or supplemented from time to time (the "Agreement"). In addition, the following terms shall have the following meanings:

_"Maximum Rate"_ means the higher of the maximum interest rate allowed by applicable United States or Florida law as amended from time to time and in effect on the date for which a determination of interest accrued hereunder is made.

_"LIBOR Rate"_ shall mean the fluctuating rate of interest equal to the ninety (90) day London Interbank Offered Rate as published in the "Money Rates" section of _The Wall Street Journal_ on the fifteenth day of each month during the term hereof. The initial LIBOR Rate shall be set on the fifteen day of the month in which funding occurs and shall be adjusted on a monthly basis, on the fifteen day of each following month. Interest will accrue on any non-business day at the rate in effect on the immediately preceding business day.

_"Bankruptcy Default"_ means (i) the Borrower pursuant to or within the meaning of any Bankruptcy Law (as herein defined) (a) commences a voluntary case, (b) consents to the entry of an order for relief against him in any involuntary case, (c) consents to the appointment of a Custodian (as herein defined) of him for all or substantially all of his property, or (d) makes a general assignment for the benefit of his creditors; or (ii) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that remains unstayed and in effect for ninety (90) days that (a) is for relief against the Borrower in an involuntary case, (b) appoints a Custodian of the Borrower for all or substantially all of his property, or (c) orders the liquidation of the Borrower. The term "Bankruptcy Law" means Title 11, U. S. Code or any similar federal or state law for the relief of debtors. The term "Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

_"Loan Year"_ for purposes of this Note means each complete 365-period (366 days in a leap year) after the first scheduled payment date set forth in 3(a) hereof.

2. _Interest Rate_.

(a)     The unpaid principal balance from the date hereof until maturity (whether by acceleration or otherwise) shall bear interest at a rate per annum equal to the lesser of:

(i)     A fluctuating rate of interest equal to the LIBOR Rate (changing as the LIBOR Rate changes) plus 3.75%; or

AJB 844

(ii)    The Maximum Rate.

(b)    Interest calculated in accordance with Section 2(a) shall be at a daily rate equal to 1/365th (1/366th in a leap year) and shall be charged and collected on the actual number of days elapsed.

(c)    If at any time the rate of interest which this Note would bear if the rate of interest were determined in accordance with Section 2(a)(i) hereof would otherwise exceed the Maximum Rate, then the rate of interest which this Note bears shall be limited to the Maximum Rate as set forth in Section 2(a)(ii) hereof.

(d)    All past-due payments of principal and interest under this Note shall bear interest at the LIBOR Rate plus 5% from maturity until paid ("Past Due Rate").

3.    _Payment of Principal and Interest._

(a)    Principal and accrued interest shall be payable in full on the 29ᵗʰ day of _June_, 20_05_ ("Maturity Date").

(b)    Each payment shall be first credited to the discharge of interest accrued on the unpaid principal balance to the date of the payment, and the remainder shall be credited to the reduction of said principal.

(c)    The principal and interest due hereunder shall be evidenced by the Lender's records which, absent manifest error, shall be conclusive evidence of the computation of principal and interest balances owed by the Borrower to the Lender.

(d)    Borrower agrees to make mandatory prepayments of principal and accrued interest equal to any distributions (other than tax distributions) due and payable to Borrower subject to and in accordance with the terms of that certain Limited Partnership Agreement, dated June 29, 2001 among others, Trigeant Holdings, Ltd., a Florida limited partnership and Borrower and that certain Operating Agreement, dated June 29, 2001 among others Trigeant LLC, a Florida limited liability company among Borrower and others.Under no circumstances shall Borrower's obligations to make payment of the principal and interest evidenced by this Note be deemed the only source for repayment of the indebtedness evidenced by this Note. Borrower's repayment obligation being absolute and unconditional. Nothing in this subsection (d) shall be deemed to prevent Borrower from making any voluntary prepayments at any time or from time to time without premium or penalty

4.    _Default._ Upon the occurrence of a Bankruptcy Default, the entire principal of and accrued interest on this Note shall forthwith be due and payable without demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices and further actions of any kind, all of which are hereby expressly waived by the Borrower. Should any other Event of Default occur and be continuing, the holder of this Note may, without demand or notice of his election declare the entire unpaid balance of this Note, or any part thereof, immediately due and payable, whereupon the principal of and accrued interest on such Note shall be forthwith due and payable without demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices and further actions of any kind, all of which are hereby expressly waived by the Borrower.

2

AJB 845

5.    *Waiver*. The Borrower hereby (a) waives filing of suit and diligence in collecting this Note or enforcing any other security with respect to same, (b) agrees to any substitution, surrender, subordination, waiver, modification, change, exchange or release of any security, (c) agrees that the Lender is not required first to institute suit or exhaust his remedies hereon against the Borrower or to enforce his rights against Borrower or any security with respect to same, and (d) consents to any extension or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice thereof to Borrower. No failure or delay on the part of the Lender in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.    *Attorneys' Fees*. If this Note is not paid at maturity, regardless of how such maturity may be brought about, or is collected or attempted to be collected through the initiation or prosecution of any suit or through any probate, bankruptcy or any other judicial proceedings, or is placed in the hands of an attorney for collection, the Borrower shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorney's fees incurred by the holder hereof.

7.    *Limitation on Agreements*. All agreements between the Borrower and the Lender, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to or charged or demanded by the Lender for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the Maximum Rate. If any circumstance otherwise would cause the amount paid, charged or demanded to exceed the Maximum Rate, the amount paid or agreed to be paid to or charged or demanded by the Lender shall be reduced to the Maximum Rate, and if the Lender ever receives interest which otherwise would exceed the Maximum Rate, such amount which would be excessive interest shall be applied to the reduction of the principal of this Note and not to the payment of interest, or if such excessive interest otherwise would exceed the unpaid balance of principal of this Note such excess shall be applied first to other indebtedness of the Borrower to the Lender, and the balance, if any, shall be refunded to the Borrower. In determining whether the interest paid, agreed to be paid, charged or demanded hereunder exceeds the highest amount permitted by applicable law, all sums paid or agreed to be paid to or charged or demanded by the Lender for the use, forbearance or detention of the indebtedness of the Borrower to the Lender shall, to the extent permitted by applicable law, (i) be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest on account of such indebtedness is uniform throughout such term, and (ii) exclude any prepayments and the effects thereof. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between the Lender and the Borrower in conflict herewith.

8.    *Governing Law and Venue*. THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY THE LAWS OF THE STATE OF FLORIDA. Borrower hereby covenants and agrees that a federal or state court having a situs in Palm Beach County, Florida shall have personal jurisdiction and proper venue over any dispute between Lender and Borrower; provided however, the foregoing consent shall not deprive the Lender of the right in his discretion to voluntarily commence or participate in any action, suit or proceeding in any other court having jurisdiction and venue over Borrower. Borrower may be served in any manner provided by law in which event, Borrower's time to respond shall be the time provided by law.

3

AJB 846

9.    **Business Day.** If any action is required or permitted to be taken hereunder on a Sunday, legal holiday or other day on which banking institutions in the State of Florida are authorized or required to close, such action shall be taken on the next succeeding day which is a business day, and, to the extent applicable, interest on the unpaid principal balance shall continue to accrue at the applicable rate.

10.    **Agreement.** This Note is the Promissory Note referred to in the Agreement, and is entitled to the benefits thereof and the security as provided for therein. Reference is made to the Agreement for a statement of the rights and obligations of the Borrower, a description of the nature and extent of the security and the rights of the parties with respect to such security, and a statement of the terms and conditions under which the due date of this Note may be accelerated.

Arthur J. Brass

PromissoryNote.6.28(H).final.doc

4

AJB 847

# SECURITY AGREEMENT

ARTHUR J. BRASS ("Debtor") whose address is 2205 Huldy, Houston, TX 77019 and HARRY SARGEANT III ("Secured Party") whose address is 3020 Military Trail, Suite 100, Boca Raton, Florida, agree as follows:

## ARTICLE 1
### Creation of Security Interest

In order to secure the prompt and unconditional payment of the indebtedness herein referred to and the performance of the obligations, covenants, agreements and undertakings herein described, Debtor hereby grants to Secured Party a security interest in and mortgages, assigns, transfers, delivers, pledges, sets over and confirms to Secured Party all of Debtor's remedies, powers, privileges, rights, titles and interests (including all power of Debtor, if any, to pass greater title than it has itself) of every kind and character now owned or hereafter acquired, created or arising in and to the following:

(i) all of Debtor's right, title and interests as:

 (a) a limited partner of TRIGEANT, LTD., a Florida limited partnership; AND

 (b) a member of TRIGEANT, LLC, a Florida limited liability company, the general partner of TRIGEANT LTD.; AND

 (c) a limited partner of TRIGEANT HOLDINGS, LTD., a Florida limited partnership; AND

 (d) a member of TRIGEANT HOLDINGS, LLC, a Florida limited liability company, the general partner of TRIGEANT HOLDINGS, LTD.; AND

 (e) a limited partner of TRIGEANT TERMINALS, LTD., a Florida limited partnership; AND

 (f) a member of TRIGEANT TERMINALS, LLC, a Florida limited liability company; AND

 (g) a limited partner, member or shareholder of any partnership, limited liability company or corporation or any other entity hereafter affiliated in any manner with any of the foregoing entities; AND

(ii) all distributions and rights to receive all distributions and other property which Debtor may hereafter become entitled to receive on account of the foregoing; and

(iii) any and all successors of any of the aforesaid entities and any and all limited partnership and/or membership rights and privileges under any of the foregoing

AJB 848

entities and the capacity to exercise any and all such rights or privileges;

all accessions, appurtenances and additions to and substitutions for any of the foregoing and all products and proceeds of any of the foregoing, together with all renewals and replacements of any of the foregoing, all accounts, instruments, notes, chattel paper, documents (including all documents of title), books, records, contract rights and general intangibles arising in connection with any of the foregoing (including all insurance and claims for insurance affected or held for the benefit of Debtor or Secured Party in respect of the foregoing). All of the properties and interests described in this Article are herein collectively called the "Collateral." The inclusion of proceeds does not authorize Debtor to sell, dispose of or otherwise use the Collateral in any manner not authorized herein.

## ARTICLE 2
### Secured Indebtedness

2.1     This Agreement is made to secure all of the following present and future debt and obligations:

(a)     All indebtedness now and hereafter evidenced and to be evidenced by (i) the promissory note dated concurrently herewith in the face amount of Four Hundred Ninety Thousand Dollars ($490,000.00), executed by Debtor and payable to the order of Secured Party; (ii) any and all past, concurrent or future modifications, extensions, renewals, rearrangements, replacements and increases of such note (the "Note"); and (iii) any and all further advances made by Secured Party to Debtor evidenced by the Note or another promissory note.

(b)     All other obligations, if any, described or referred to in any other place in this Agreement.

(c)     Any and all sums and the interest which accrues on them as provided in this Agreement which Secured Party hereafter may advance or which Debtor may owe Secured Party pursuant to this Agreement on account of Debtor's failure to keep, observe or perform any of Debtor's covenants under this Agreement.

2.2     The term "Debt" means and includes the Note and all other debt and obligations described or referred to in Section 2.1. The Debt includes interest and other obligations accruing or arising after (a) commencement of any case under any bankruptcy or similar laws by or against Debtor or (b) the obligations of Debtor shall cease to exist by operation of law or for any other reason. The Debt also includes all reasonable attorneys' fees and any other reasonable expenses incurred by Secured Party in enforcing the Note and this Agreement.

## ARTICLE 3
### Representations and Warranties

Debtor represents and warrants as follows:

(a)     Debtor is the legal and equitable owner and holder of good and marketable title to the Collateral free of any adverse claim and free of any security interest or encumbrance except

2

AJB  849

only for the security interest granted hereby in the Collateral and those other security interests (if any) expressly referred to or described in this Agreement. Debtor agrees to defend the Collateral and its proceeds against all claims and demands of any person at any time claiming the Collateral, its proceeds or any interest in either. Debtor has not heretofore signed any financing statement directly or indirectly affecting the Collateral or any part of it which has not been completely terminated of record, and no such financing statement signed by Debtor is now on file in any public office except only those statements (if any) true and correct copies of which Debtor has actually delivered to Secured Party.

(b)     The location of Debtor is the address set forth at the beginning of this Agreement and in this regard, Debtor's location is defined to mean (i) Debtor's place of business if Debtor has only one such place of business, (ii) Debtor's chief executive office if Debtor has more than one place of business, or (iii) Debtor's residence if Debtor has no place of business.

(c)     All of Debtor's books and records with regard to the Collateral are maintained and kept at the address of Debtor set forth in this Agreement.

(d)     Debtor's execution, delivery and performance of this Agreement do not and will not require (i) any consent of any other person or entity or (ii) any consent, license, permit, authorization or other approval (including foreign exchange approvals) of any court, arbitrator, administrative agency or other governmental authority, or any notice to, exemption by, any registration, declaration or filing with or the taking of any other action in respect of, any such court, arbitrator, administrative agency or other governmental authority.

(e)     Debtor has duly and validly executed, issued and delivered the Note and this Agreement.

(f)     All information supplied to Secured Party, and all statements made to Secured Party by or on behalf of Debtor before, concurrently with or after Debtor's execution of this Agreement are and will be true, correct, complete, valid and genuine in all material respects.

(g)     Debtor has filed all tax returns required to be filed and paid all taxes shown thereon to be due, including interest and penalties, except for taxes being diligently contested in good faith and for payment of which adequate reserves have been set aside.

(h)     Debtor is now solvent, and no bankruptcy or insolvency proceedings are pending or contemplated by or--to Debtor's knowledge--against Debtor.  Debtor's liabilities and obligations under this Agreement do not and will not render Debtor insolvent, cause Debtor's liabilities to exceed Debtor's assets or leave Debtor with too little capital to properly conduct all of its business as now conducted or contemplated to be conducted.

(i)     Except as otherwise expressly permitted by this Agreement, the liens and security interests of this Agreement will constitute valid and perfected first and prior liens and security interests on the Collateral, subject to no other liens, security interests or charges whatsoever.

(j)     The Collateral is genuine, free from any restriction on transfer (except as set forth in the agreements governing the entities described in Article 1), duly and validly authorized and

3

AJB 850

issued, constituting the valid and legally binding obligation of the issuer (the "Issuer"), enforceable in accordance with its terms, and fully paid, and is hereby duly and validly pledged and hypothecated to Secured Party in accordance with law.

### ARTICLE 4
### Covenants

4.1   Debtor covenants and agrees with Secured Party as follows:

(a).   Debtor shall furnish to Secured Party such instruments as may be required by Secured Party to assure the transferability of the Collateral when and as often as may be requested by Secured Party.

(b)   Debtor will cause to be paid before delinquency all taxes, charges, liens and assessments heretofore or hereafter levied or assessed against the Collateral, or any part thereof, or against Secured Party for or on account of the Debt or the interest created by this Agreement and will furnish Secured Party with receipts showing payment of such taxes and assessments at least ten (10) days before the applicable default date therefor.

(c)   If the validity or priority of this Agreement or of any rights, titles, security interests or other interests created or evidenced hereby shall be attacked, endangered or questioned or if any legal proceedings are instituted with respect thereto, Debtor will give prompt written notice thereof to Secured Party and at Debtor's own cost and expense will diligently endeavor to cure any defect that may be developed or claimed, and will take all necessary and proper steps for the defense of such legal proceedings, and Secured Party (whether or not named as a party to legal proceedings with respect thereto) is hereby authorized and empowered to take such additional steps as in its judgment and discretion may be necessary or proper for the defense of any such legal proceedings or the protection of the validity or priority of this Agreement and the rights, titles, security interests and other interests created or evidenced hereby, and all expenses so incurred of every kind and character shall constitute sums advanced pursuant to Section 4.2 of this Agreement.

(d)   Debtor will, on request of Secured Party, (i) promptly correct any defect, error or omission which may be discovered in the contents of this Agreement or in any other instrument executed in connection herewith or in the execution or acknowledgment thereof; (ii) execute, acknowledge, deliver and record or file such further instruments (including further security agreements, financing statements and continuation statements) and do such further acts as may be necessary or proper to carry out more effectively the purposes of this Agreement and such other instruments and to be subject to the security interests hereof and thereof any property intended by the terms hereof and thereof to be covered hereby and thereby including specifically any renewals, additions, substitutions, replacements or appurtenances to the then Collateral; and (iii) execute, acknowledge, deliver, procure and record or file any document or instrument (including specifically any financing statement) deemed necessary by Secured Party to protect the security interest hereunder against the rights or interests of third persons.

4

AJB 851

(e)  Notwithstanding the security interest in proceeds granted herein, Debtor will not, except as otherwise expressly permitted herein, sell, lease, exchange, lend, rent, assign, transfer or otherwise dispose of, or pledge, hypothecate or grant any security interest in, or permit to exist any lien, security interest, charge or encumbrance against, all or any part of the Collateral or any interest therein or permit any of the foregoing to occur or arise or permit title to the Collateral, or any interest therein, to be vested in any other party, in any manner whatsoever, by operation of law or otherwise, without the prior written consent of and upon such conditions as may be approved by Secured Party.

(f)  To the extent not prohibited by applicable law, Debtor will pay all reasonable costs and expenses and reimburse Secured Party for any and all expenditures of every character incurred or expended from time to time, regardless of whether or not a default shall have occurred, in connection with (a) the renewal, revision, modification, increase, review or restructuring of any loan or credit facility secured by this Agreement, including legal, accounting, and auditing services and disbursements, or in connection with collecting or attempting to enforce or collect the Note or this Agreement, (b) Secured Party's protecting any of the Collateral and (c) Secured Party's creating, perfecting and realizing upon Secured Party's security interests in and liens on any of the Collateral, and all reasonable costs and expenses relating to Secured Party's exercising any of its rights and remedies at law, including all appraisal fees, filing fees, taxes, brokerage fees and commissions, Uniform Commercial Code search fees, other fees and expenses incident to reports and security interests, escrow fees, attorneys' fees, legal expenses, court costs, other fees and expenses incurred in connection with any complete or partial liquidation of any of the Collateral and all fees and expenses for any professional services relating to any of the Collateral or any operations conducted in connection with it; provided, that no right or option granted by Debtor to Secured Party or otherwise arising pursuant to any provision of this or any other instrument shall be deemed to impose a duty on Secured Party to supervise, monitor or control any aspect of the character or condition of any of the Collateral or any operations conducted in connection with it for the benefit of Debtor or any other person or entity other than Secured Party. Any amount to be paid under this Section by Debtor to Secured Party shall be a demand obligation owing by Debtor to Secured Party and shall bear interest from the date of expenditure until paid at the Past Due Rate (hereinafter defined).

(g)  Debtor shall account fully and faithfully for and, if Secured Party so elects, shall promptly pay or turn over to Secured Party the proceeds in whatever form received from the sale or disposition or realization in any manner of any of the Collateral, whether the Debt is mature or not, but only after an Event of Default. Debtor shall at all times keep the Collateral and its proceeds separate and distinct from other property of Debtor, but only after an Event of Default, and shall keep accurate and complete records of the Collateral and its proceeds. Debtor shall, where applicable, at Debtor's own expense take all reasonable and appropriate steps to enforce the collection of the Collateral and items representing proceeds thereof.

(h)  Debtor will not change its address, location, name, identity or, if applicable, structure without notifying Secured Party of such change in writing at least thirty (30) days before the effective date of such change and unless Debtor shall have taken such action, satisfactory to Secured Party, to have caused the security interest of Secured Party in the Collateral to be at all times fully perfected and in full force and effect.

5

AJB 852

(i)    Debtor shall at all times keep accurate books and records reflecting all facts concerning the Collateral including those pertaining to Debtor's warranties, representations and agreements under this Agreement. Immediately upon the execution of this Agreement, Debtor will make or allow Secured Party to make written designation on Debtor's books and records to reflect thereon the assignment to Secured Party of the Collateral covered by this Agreement; provided, however, that the failure of Debtor and/or Secured Party to make such a written designation shall not affect the rights of Secured Party to any of the Collateral.

(j)    Immediately upon acquiring knowledge thereof, Debtor will notify Secured Party by telephone (and confirm such notice in writing within two (2) days) of the existence of any Event of Default, specifying the nature and duration thereof and what action Debtor has taken, is taking and proposes to take with respect thereto. In no event shall silence by Secured Party be deemed a waiver of default or of an Event of Default. Debtor will take all such steps as are necessary or appropriate to remedy promptly any such default or Event of Default.

(k)    Debtor shall furnish to Secured Party from time to time such information relating to the Collateral or Debtor's financial condition and affairs as Secured Party may from time to time request.

4.2    If Debtor should fail to comply with any of its agreements, covenants or obligations under this Agreement or the Note then Secured Party (in Debtor's name or in Secured Party's own name) may perform them or cause them to be performed for Debtor's account and at Debtor's expense, but shall have no obligation to perform any of them or cause them to be performed. Any and all reasonable expenses thus incurred or paid by Secured Party shall be Debtor's obligations to Secured Party due and payable on demand, or if no demand is sooner made, then they shall be due on or before four (4) years after the respective dates on which they were incurred, and each shall bear interest from the date Secured Party pays it until the date Debtor repays it to Secured Party, at the Past Due Rate as defined in the Note. Upon making any such payment or incurring any such expense, Secured Party shall be fully and automatically subrogated to all of the rights of the person, corporation or body politic receiving such payment. Any amounts owing by Debtor to Secured Party pursuant to this or any other provision of this Agreement shall automatically and without notice be and become a part of the Debt and shall be secured by this Agreement. The amount and nature of any such expense and the time when it was paid shall be fully established by the affidavit of Secured Party or any of Secured Party's officers or agents. Without notice to Debtor or any other person or entity, the Past Due Rate shall automatically fluctuate upward and downward as and in any amount by which the maximum nonusurious rate of interest permitted by such applicable law and the rate of interest as provided for in the Note first described in Section 2.1(a) for interest on past due principal fluctuate, respectively. The exercise of the privileges granted to Secured Party in this Section shall in no event be considered or constitute a cure of the default or a waiver of Secured Party's right at any time after an Event of Default to declare the Debt to be at once due and payable, but is cumulative of such right and of all other rights given by this Agreement or the Note and of all rights given Secured Party by law.

## ARTICLE 5
### Assignment of Payments;

6

AJB 853

## Certain Powers of Secured Party; Voting Rights

Debtor hereby authorizes and directs each Issuer and each account debtor and each other person or entity obligated to make payment in respect of any of the Collateral (each Issuer and each such account debtor and other person or entity being herein called a "Collateral Obligor") to pay over to Secured Party, its officers, agents or assigns, upon demand by Secured Party, but only after an Event of Default which is not remedied, all or any part of the Collateral without making any inquiries as to the status or balance of the Debt and without any notice to or further consent of Debtor. Debtor hereby agrees to indemnify each Collateral Obligor and hold each Collateral Obligor harmless from all expenses and losses which it may incur or suffer as a result of any payment it makes to Secured Party pursuant to this paragraph. To facilitate the rights of Secured Party hereunder, Debtor hereby authorizes Secured Party, its officers, employees, agents or assigns, but only after an Event of Default which is not remedied:

(a)     to notify Collateral Obligors of Secured Party's security interest in the Collateral and to collect all or any part of the Collateral without further notice to or further consent by Debtor, and Debtor hereby constitutes and appoints Secured Party the true and lawful attorney of Debtor (such agency being coupled with an interest), irrevocably, with power of substitution, in the name of Debtor or in its own name or otherwise, to take any of the actions described in the following clauses (b), (c), (d), (e), (f) and (g);

(b)     to ask, demand, collect, receive, receipt for, sue for, compound and give acquittance for any and all amounts which may be or become due or payable under the Collateral and to settle and/or adjust all disputes and/or claims directly with any Collateral Obligor and to compromise, extend the time for payment, arrange for payment in installments, otherwise modify the terms of, or release, any of the Collateral, on such terms and conditions as Secured Party may determine (without thereby incurring responsibility to or discharging or otherwise affecting the liability of Debtor to Secured Party under this Agreement or otherwise);

(c)     to direct delivery of, receive, open and dispose of all mail addressed to Debtor and to execute, sign, endorse, transfer and deliver (in the name of Debtor or in its own name or otherwise) any and all receipts or other orders for the payment of money drawn on the Collateral and all notes, acceptances, commercial paper, drafts, checks, money orders and other instruments given in payment or in part payment thereof and any other documents necessary to evidence, perfect and realize upon the security interests and obligations of this Agreement;

(d)     in his discretion, to file any claim or take any other action or proceeding which Secured Party may deem necessary or appropriate to protect and preserve the rights, titles and interests of Secured Party hereunder;

(e)     to sign the name of Debtor to financing statements, drafts against Collateral Obligors, assignments or verifications of any of the Collateral and notices to Collateral Obligors;

(f)     to station one or more representatives of Secured Party on Debtor's premises for the purpose of exercising any rights, benefits or privileges available to Secured Party hereunder

7

AJB 854

or at law or in equity, including receiving collections and taking possession of books and records relating to the Collateral; and

(g)     to cause title to any or all of the Collateral to be transferred into the name of Secured Party or any nominee or nominees of Secured Party.

Unless and until an Event of Default, as hereinafter defined, shall have occurred and has not been cured within any applicable grace period, Debtor shall be entitled to receive any distributions from any of the entities described in Article 1 above, which are made solely for the purpose of the payment of income taxes, exercise all voting and consensual powers and rights pertaining to the Collateral or any part thereof for all purposes. Upon and after the occurrence of an Event of Default, Secured Party shall have the right to the extent permitted by applicable law (but shall not be obligated to exercise such right), and Debtor shall take all such action as may be necessary or appropriate to give effect to such right, to vote and give consents, ratifications and waivers, and take any other action with respect to any or all of the Collateral with the same force and effect as if Secured Party were the owner thereof. All rights or options issued in connection with the Collateral, and all liquidating or distributions or return of capital upon or in respect of the Collateral or any part thereof, or resulting from any split, revision or reclassification of the Collateral or any part thereof or received in exchange for the Collateral or any part thereof as a result of a merger, consolidation or otherwise, shall be paid or transferred directly to Secured Party, or if paid to or received by Debtor, shall, immediately upon receipt thereof, be paid over, transferred and delivered to Secured Party and shall be Collateral pledged under and subject to the terms of this Agreement except as provided in Section 7.1(c).

The powers conferred on Secured Party pursuant to this Article 5 are conferred solely to protect Secured Party's interest in the Collateral and shall not impose any duty or obligation on Secured Party to perform any of the powers herein conferred. No exercise of any of the rights provided for in this Article 5 shall constitute a retention of collateral in satisfaction of the indebtedness as provided for in Section 679.505 of the Uniform Commercial Code of Florida.

### ARTICLE 6
### Events of Default

Debtor shall be in default under the terms of this Agreement or the Note upon the occurrence and continuation of any of the following events ("Events of Default"):

a.     failure to pay within seven (7) business days after due any installment of principal or interest;

b.     failure to observe any material covenant in this Agreement or the Note and such failure continues for more than thirty (30) days after written notice to Debtor describing such failure in reasonable detail, and Debtor fails to remedy within such thirty (30) day period, or in a reasonable time thereafter if not curable in thirty (30) days;

8

AJB 855

c.   the seizure or attachment of the Collateral or any part thereof by any governmental authority;

d.   the filing of any petition by or against the Debtor or the commencement of any proceedings for the relief or readjustment of any indebtedness of the Debtor either through reorganization composition, extensive or otherwise, under any law relating to bankruptcy, insolvency or reorganization or relief of debtors;

e.   the general nonpayment by the Debtor of his debts as such debts become due (unless contested by Debtor), or his admission in writing of his inability to pay his debts generally or his making of a general assignment for the benefit of creditors or his taking advantage of any law relating to insolvency;

f.   the appointment of a receiver or conservator of any property of the Debtor;

## ARTICLE 7
### Remedies in Event of Default

7.1   Upon the occurrence of an Event of Default, and at any time thereafter:

(a)   Secured Party shall have the option of declaring, without notice to any person, all Debt to be immediately due and payable.

(b)   Secured Party may, upon written notice as hereinafter provided, sell the Collateral or any part thereof at public or private sale or at any broker's board or on any securities exchange (with or without appraisal or having the Collateral at the place of sale) for cash, upon credit, or for future delivery, and at such price or prices as Secured Party may deem best, and Secured Party may be the purchaser of any and all of the Collateral so sold and may apply upon the purchase price therefor any of the Debt and thereafter hold the same absolutely free from any right or claim of whatsoever kind. Secured Party is authorized at any such sale, if Secured Party deems it advisable or is required by applicable law so to do, (i) to restrict the prospective bidders on or purchasers of any of the Collateral to a limited number of sophisticated investors who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of any of the Collateral, (ii) to cause to be placed on any evidence of the Collateral a legend to the effect that such security has not been registered under the Securities Act of 1933 (the "Act") and may not be disposed of in violation of the provisions of said Act, and (iii) to impose such other limitations or conditions in connection with any such sale as Secured Party deems necessary or advisable in order to comply with said Act or any other applicable law. Debtor covenants and agrees that it will execute and deliver such documents and take such other action as Secured Party deems necessary or advisable in order that any such sale may be made in compliance with applicable law. Upon any such sale Secured Party shall have the right to deliver, assign and transfer to the purchaser thereof the Collateral so sold. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right of whatsoever kind, including any equity or right of redemption, stay or appraisal which Debtor has or may have under any rule of law or statute now existing or hereafter adopted. To the extent notice is required by applicable law, Secured Party shall give Debtor written notice at the address

9

AJB 856

set forth herein (which shall satisfy any requirement of notice or reasonable notice in any applicable statute) of Secured Party's intention to make any such public or private sale. Such notice (if any is required by applicable law) shall be personally delivered or mailed, postage prepaid, at least ten (10) calendar days before the date fixed for a public sale, or at least (10) calendar days before the date after which the private sale or other disposition is to be made. Such notice (if any is required by applicable law), in case of public sale, shall state the time and place fixed for such sale or, in case of private sale or other disposition other than a public sale, the time after which the private sale or other such disposition is to be made. In case of sale at broker's board or on a securities exchange, such notice shall state the board or exchange at which such sale is to be made and the day on which the Collateral or that portion thereof so being sold will first be offered for sale at such board or exchange. Any public sale shall be held at such time or times, within the ordinary business hours and at such place or places, as Secured Party may fix in the notice of such sale. At any sale the Collateral may be sold in one lot as an entirety or in separate parcels as Secured Party may determine. Secured Party shall not be obligated to make any sale pursuant to any such notice. Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at any time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned. In case of any sale of all or any part of the Collateral on credit or for future delivery, the Collateral so sold may be retained by Secured Party until the selling price is paid by the purchaser thereof, but Secured Party shall incur no liability in case of the failure of such purchaser to take up and pay for the Collateral so sold, and in case of any such failure, such Collateral may again be sold upon like notice. Each and every method of disposition described in this Section shall constitute disposition in a commercially reasonable manner. The Debtor shall remain liable for any deficiency.

(c)    Secured Party shall have all the rights of a secured party after an Event of Default under the Uniform Commercial Code of Florida (including, but not limited to, its rights under Section 679.505, Florida Statutes) and in conjunction with, in addition to or in substitution for those rights and remedies:

(i)    it shall not be necessary that the Collateral or any part thereof be present at the location of any sale pursuant to the provisions of this Article; and

(ii)    before application of proceeds of disposition of the Collateral to the Debt, such proceeds shall be applied to the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorneys' fees and legal expenses incurred by Secured Party, Debtor to remain liable for any deficiency; and

(iii)    the sale by Secured Party of less than the whole of the Collateral shall not exhaust the rights of Secured Party hereunder, and Secured Party is specifically empowered to make successive sale or sales hereunder until the whole of the Collateral shall be sold; and, if the proceeds of such sale of less than the whole of the Collateral shall be less than the aggregate of the Debt, this Agreement and the security interest created hereby shall remain in full force and effect as to the unsold portion of the Collateral just as though no sale had been made; and

10

AJB 857

(iv)    in the event any sale hereunder is not completed or is defective in the opinion of Secured Party, such sale shall not exhaust the rights of Secured Party hereunder and Secured Party shall have the right to cause a subsequent sale or sales to be made hereunder; and

(v)    any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to nonpayment of any indebtedness or as to the occurrence of any default, or as to Secured Party having declared all of such indebtedness to be due and payable, or as to notice of time, place and terms of sale and the Collateral to be sold having been duly given, as to any other act or thing having been duly done by Secured Party, shall be taken as prima facie evidence of the truth of the facts so stated and recited; and

(vi)    Secured Party may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Secured Party, including the sending of notices and the conduct of sale, but in the name and on behalf of Secured Party; and

(vii)    demand of performance, advertisement and presence of property at sale are hereby WAIVED and Secured Party is hereby authorized to sell hereunder any evidence of debt it may hold as security for the Debt.  All demands and presentments of any kind or nature are expressly WAIVED by Debtor.  Debtor WAIVES the right to require Secured Party to pursue any other remedy for the benefit of Debtor.

7.2    All remedies herein expressly provided for are cumulative of any and all other remedies existing at law or in equity and are cumulative of any and all other remedies provided for in any other instrument securing the payment of the Debt, or any part thereof, or otherwise benefiting Secured Party, and the resort to any remedy provided for hereunder or under any such other instrument or provided for by law shall not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies.

7.3    Secured Party may resort to any security given by this Agreement or to any other security now existing or hereafter given to secure the payment of the Debt, in whole or in part, and in such portions and in such order as may seem best to Secured Party in its sole and uncontrolled discretion, and any such action shall not in anywise be considered as a waiver of any of the rights, benefits or security interests evidenced by this Agreement.

7.4    To the full extent Debtor may do so, Debtor agrees that Debtor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for any appraisement, valuation, stay, extension or redemption, and Debtor, for Debtor, Debtor's heirs, devisees, executors, administrators, personal representatives, successors, receivers, trustees and assigns, and for any and all persons ever claiming any interest in the Collateral, to the extent permitted by law, hereby WAIVES and releases all rights of redemption, valuation, appraisement, stay of execution, notice of intention to mature or to declare due the whole of the Debt, notice of election to mature or to declare due the whole of the Debt and all rights to a marshaling of the assets of Debtor, including the Collateral, or to a sale in inverse order of alienation in the event of foreclosure of the security interest hereby created.

11

AJB 858

## ARTICLE 8
### Additional Agreements

8.1    Subject to the automatic reinstatement provisions of <u>Section 8.24</u> below, upon full payment of the Debt, and complete performance of all of the obligations of the Debtor under this Agreement, all rights under this Agreement shall terminate and the Collateral shall become wholly clear of the security interest evidenced hereby, and upon written request by Debtor such security interest shall be released promptly by Secured Party in due form and at Debtor's cost and the Collateral returned to Debtor.

8.2    Secured Party may waive any default without waiving any other prior or subsequent default.   Secured Party may remedy any default without waiving the default remedied.  The failure by Secured Party to exercise any right, power or remedy upon any default shall not be construed as a waiver of such default or as a waiver of the right to exercise any such right, power or remedy at a later date.  No single or partial exercise by Secured Party of any right, power or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right, power or remedy hereunder may be exercised at any time and from time to time.  No modification or waiver of any provision hereof nor consent to any departure by Debtor therefrom shall in any event be effective unless the same shall be in writing and signed by Secured Party and then such waiver or consent shall be effective only in the specific instances, for the purpose for which given and to the extent therein specified.  No notice to nor demand on Debtor in any case shall of itself entitle Debtor to any other or further notice or demand in similar or other circumstances.  Acceptance by Secured Party of any payment in an amount less than the amount then due on the Debt shall be deemed an acceptance on account only and shall not in any way affect the existence of a default hereunder.

8.3    Secured Party may at any time and from time to time in writing (a) waive compliance by Debtor with any covenant herein made by Debtor to the extent and in the manner specified in such writing; (b) consent to Debtor's doing any act which hereunder Debtor is prohibited from doing, or consent to Debtor's failing to do any act which hereunder Debtor is required to do, to the extent and in the manner specified in such writing; or (c) release any part of the Collateral, or any interest therein, from the security interest of this Agreement.  No such act shall in any way impair the rights of Secured Party hereunder except to the extent specifically agreed to by Secured Party in such writing.

8.4    Secured Party shall not be required to take any steps necessary to preserve any rights against prior parties to any of the Collateral.

8.5    The security interest and other rights of Secured Party hereunder shall not be impaired by any indulgence, moratorium or release granted by Secured Party, including but not limited to (a) any renewal, extension or modification which Secured Party may grant with respect to the Debt, (b) any surrender, compromise, release, renewal, extension, exchange or substitution which Secured Party may grant in respect of any item of the Collateral, or any part thereof or any interest therein, or (c) any release or indulgence granted to any endorser, guarantor or surety of the Debt.

12

AJB 859

8.6    Secured Party may call at Debtor's place or places of business at intervals to be determined by Secured Party and, without hindrance or delay, inspect, audit, check and make extracts from and copies of the books, records, journals, orders, receipts, correspondence and other data relating to the Collateral or to any transaction between Debtor and Secured Party, and Debtor shall assist Secured Party in such actions.

8.7    Secured Party may render and send to Debtor a statement of account showing loans made, all other charges, expenses and items charged to Debtor, payment by Debtor against the loans, proceeds collected and applied to the loans, other appropriate debts and credits, and a total of Debtor's indebtedness on the loans as of the date of the statement of account.

8.8    A carbon, photographic or other reproduction of this Agreement or of any financing statement relating to this Agreement shall be sufficient as a financing statement.

8.9    Debtor will cause all financing statements and continuation statements relating hereto to be recorded, filed, re-recorded and refiled in such manner and in such places as Secured Party shall reasonably request and will pay all such recording, filing, re-recording, and refiling taxes, fees and other charges.

8.10    In the event the ownership of the Collateral or any part thereof becomes vested in a person other than Debtor, Secured Party may, without notice to Debtor, deal with such successor or successors in interest with reference to this Agreement and to the Debt in the same manner as with Debtor, without in any way vitiating or discharging Debtor's liability hereunder or upon the Debt. No sale of the Collateral, and no forbearance on the part of Secured Party and no extension of the time for the payment of the Debt given by Secured Party shall operate to release, discharge, modify, change or affect, in whole or in part, the liability of Debtor hereunder for the payment of the Debt or the liability of any other person hereunder for the payment of the Debt, except as agreed to in writing by Secured Party.

8.11    Any other or additional security taken for the payment of any of the Debt shall not in any manner affect the security given by this Agreement.

8.12    To the extent that proceeds of the Debt are used to pay indebtedness secured by any outstanding lien, security interest, charge or prior encumbrance against the Collateral, such proceeds have been advanced by Secured Party at Debtor's request and Secured Party shall be subrogated to any and all rights, security interests and liens owned by any owner or holder of such outstanding liens, security interests, charges or encumbrances, irrespective of whether said liens, security interests, charges or encumbrances are released.

8.13    If any part of the Debt cannot be lawfully secured by this Agreement, or if the lien, assignments and security interests of this Agreement cannot be lawfully enforced to pay any part of the Debt, then and in either such event, at the option of Secured Party, all payments on the Debt shall be deemed to have been first applied against that part of the Debt.

8.14    Secured Party may assign this Agreement so that the assignee shall be entitled to the rights and remedies of Secured Party hereunder and in the event of such assignment, Debtor

13

AJB 860

will assert no claims or defenses it may have against the assignee except those granted in this Agreement.

8.15   This Agreement shall not be changed orally but shall be changed only by agreement in writing signed by Debtor and Secured Party. No course of dealing between the parties, no usage of trade and no parole or extrinsic evidence of any nature shall be used to supplement or modify any of the terms or provisions of this Agreement.

8.16   Any notice, request or other communication required or permitted to be given hereunder shall be given in writing by delivering it against receipt for it, by depositing it with an overnight delivery service or by depositing it in a receptacle maintained by the United States Postal Service, postage prepaid, registered or certified mail, return receipt requested, addressed to the respective parties at the addresses shown herein (and if so given, shall be deemed given when mailed). Debtor's address for notice may be changed at any time and from time to time, but only after thirty (30) days' advance written notice to Secured Party and shall be the most recent such address furnished in writing by Debtor to Secured Party. Secured Party's address for notice may be changed at any time and from time to time, but only after ten (10) days' advance written notice to Debtor and shall be the most recent such address furnished in writing by Secured Party to Debtor. Actual notice, however and from whomever given or received, shall always be effective when received.

8.17   This Agreement shall be binding upon Debtor, and the heirs, devisees, executors, administrators, personal representatives, trustees, beneficiaries, conservators, receivers, successors and assigns of Debtor, including all successors in interest of Debtor in and to all or any part of the Collateral, and shall benefit Secured Party and its successors and assigns.

8.18   If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected thereby, and this Agreement shall be liberally construed so as to carry out the intent of the parties to it. Each waiver in this Agreement is subject to the overriding and controlling rule that it shall be effective only if and to the extent that (a) it is not prohibited by applicable law and (b) applicable law neither provides for nor allows any material sanctions to be imposed against Secured Party for having bargained for and obtained it.

8.19   Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in its possession if it takes such action for that purpose as Debtor requests in writing, but failure of Secured Party to comply with such request shall not of itself be deemed a failure to have exercised reasonable care, and no failure of Secured Party to take any action so requested by Debtor shall be deemed a failure to exercise reasonable care in the custody or preservation of such Collateral. Secured Party shall not be responsible in any way for any depreciation in the value of the Collateral, nor shall any duty or responsibility whatsoever rest upon Secured Party to take any steps to preserve rights against prior parties or to enforce collection of the Collateral by legal proceedings or otherwise, the sole duty of Secured Party, its successors and assigns, being to receive collections, remittances and payments on such Collateral as and when made and received by Secured Party and, at Secured Party's option, to apply the

14

AJB 861

amount or amounts so received, after deduction of any collection costs incurred, as payment upon any of the Debt or to hold the same for the account and order of Debtor.

8.20    In the event Debtor instructs Secured Party, in writing or orally, to deliver any or all of the Collateral to a third person, and Secured Party agrees to do so, the following conditions shall be conclusively deemed to be a part of Secured Party's agreement, whether or not they are specifically mentioned to Debtor at the time of such agreement: (i) Secured Party shall assume no responsibility for checking the genuineness or authenticity of any person purporting to be a messenger, employee or representative of such third person to whom Debtor has directed Secured Party to deliver the Collateral, or the genuineness or authenticity of any document of instructions delivered by such person; (ii) Debtor will be considered by requesting any such delivery to have assumed all risk of loss as to the Collateral; (iii) Secured Party's sole responsibility will be to deliver the Collateral to the person purporting to be such third person described by Debtor, or a messenger, employee or representative thereof; and (iv) Secured Party and Debtor hereby expressly agree that the foregoing actions by Secured Party shall constitute reasonable care.

8.21    The pronouns used in this Agreement are in the masculine and neuter genders but shall be construed as feminine, masculine or neuter as occasion may require. "Secured Party" and "Debtor" as used in this Agreement include the heirs, devisees, executors, administrators, personal representatives, trustees, beneficiaries, conservators, receivers, successors and assigns of those parties. When this Agreement is executed by more than one person, corporation or other legal entity, it shall be construed as though "Debtor" were written "Debtors" and as though the pronoun and verbs were changed to correspond; and in such case (a) each of Debtors shall be bound jointly and severally with one another to keep, observe and perform the covenants, agreements, obligations and liabilities imposed by this Agreement upon the "Debtor", (b) a release of one or more persons, corporations or other legal entities comprising "Debtor" shall not in any way be deemed a release of any other person, corporation or other legal entity comprising "Debtor", and (c) a separate action hereunder may be brought and prosecuted against one or more of the persons, corporations or other legal entities comprising "Debtor" without limiting any liability or impairing Secured Party's right to proceed against any other person, corporation or other legal entity comprising "Debtor".

8.22    The section headings appearing in this Agreement have been inserted for convenience only and shall be given no substantive meaning or significance whatever in construing the terms and provisions of this Agreement. Terms used in this Agreement which are defined in the Florida Uniform Commercial Code are used with the meanings as therein defined. Wherever the term "including" or a similar term is used in this Agreement, it shall be read as if it were written "including by way of example only and without in any way limiting the generality of the clause or concept referred to."

8.23    **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE APPLICABLE LAWS OF THE STATE OF FLORIDA FROM TIME TO TIME IN EFFECT.**

8.24    Debtor agrees that, if at any time all or any part of any payment previously applied by Secured Party to the Debt is or must be returned by Secured Party—or recovered from Secured

15

AJB 862

Party-for any reason (including the order of any bankruptcy court), this Agreement shall automatically be reinstated to the same effect, as if the prior application had not been made, and, in addition, Debtor hereby agrees to indemnify Secured Party against, and to save and hold Secured Party harmless from any required return by Secured Party--or recovery from Secured Party-of any such payments because of its being deemed preferential under applicable bankruptcy, receivership or insolvency laws, or for any other reason.

8.25    Debtor hereby covenants and agrees that a federal or state court having a situs in Palm Beach County, Florida shall have personal jurisdiction and proper venue over any dispute between Secured Party and Debtor; provided, however, the foregoing consent shall not deprive the Secured Party of the right in his discretion to voluntarily commence or participate in any action, suit or proceeding in any other court having jurisdiction and venue over the Collateral. Debtor may be served in any manner provided by law in which event, Debtor's time to respond shall be the time provided by law.

8.26    This Agreement and the Note embody the entire agreement and understanding between Secured Party and Debtor with respect to their subject matter and supersede all prior conflicting or inconsistent agreements, consents and understandings relating to such subject matter. Debtor acknowledges and agrees there is no oral agreement between Debtor and Secured Party which has not been incorporated in this Agreement and the Note.

EXECUTED as of the _29_ day of _June, 2001_

**DEBTOR:**

ARTHUR J. BRASS

**SECURED PARTY:**

HARRY SARGEANT III

SECURITY.AGREEMENT.BRASS.SARG.RGSSG.6.28(H).final.DOC

`16

AJB 863