UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:

TRIGEANT HOLDINGS, LTD., *et al.*,

Debtors.

_____/

Chapter 11 Case
Case No. 14-29027-EPK
(Jointly Administered)

TRIGEANT, LTD., TRIGEANT HOLDINGS,
LLC, and TRIGEANT HOLDINGS, LTD;

      Plaintiffs,

v.

HARRY SARGEANT III, BTB REFINING,
LLC, SILCA INVESTMENTS, LTD., MUSTAFA
ABU-NABA'A, INTERNATIONAL OIL TRADING
COMPANY, LLC, INTERNATIONAL OIL TRADING
COMPANY, LIMITED, SARGEANT MARINE, SA,

      Defendants.

_____/

Adv. No. 15-01079

## AMENDED ADVERSARY COMPLAINT

Plaintiffs, TRIGEANT, LTD., TRIGEANT HOLDINGS, LLC. and TRIGEANT
HOLDINGS, LTD., through their undersigned attorneys, hereby sue Defendants HARRY
SARGEANT III, BTB REFINING, LLC, SILCA INVESTMENTS, LTD., MUSTAFA ABU-
NABA'A, INTERNATIONAL OIL TRADING COMPANY, LLC, INTERNATIONAL OIL
TRADING COMPANY, LIMITED and SARGEANT MARINE, SA, and state:

### JURISDICTION AND VENUE

1.    This is an adversary proceeding governed by Federal Rule of Bankruptcy
Procedure 7001, et seq.

≝ BERGER SINGERMAN

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §157 and §1334. This is a non-core proceeding. The Court may not enter a final judgment in this case.

## THE PARTIES

3.      Plaintiff Trigeant, Ltd. is a Florida limited partnership. Trigeant Holdings, LLC, is a Florida limited liability company and is the general partner of Trigeant Holdings, Ltd.

4.      Plaintiff Trigeant Holdings, Ltd. owns 100% of the membership in Trigeant LLC and is the limited partner of Trigeant, Ltd. that owns 100% of the membership interest in Trigeant Holdings LLC. Trigeant Holdings, Ltd. is owned 99% by Harry Sargeant, Jr. ("Harry Sr."), Daniel Sargeant ("Dan"), James Sargeant ("Jim") and Harry Sargeant III, with the remaining 1% owned by the sole general partner, Trigeant Holdings, LLC.

5.      Plaintiff Trigeant Holdings, LLC is owned entirely by Harry Sr., Dan, Jim and Harry Sargeant III in the same percentages that they own Trigeant Holdings, Ltd.

6.      Plaintiffs Trigeant, Ltd., Trigeant Holdings, Ltd. and Trigeant Holdings, LLC are all debtors in possession before this Court and are sometimes collectively referred to as "Trigeant."

7.      Defendant, Harry Sargeant III ("Harry") is a Florida citizen, residing in Palm Beach County, Florida, and is *sui juris*. Harry is Harry Sr.'s eldest son and by reason of his various ownership interests and as such, Harry is an insider of the Trigeant entities as defined in section 101(31)(C) of the Bankruptcy Code. Additionally, because Harry owns more than 20% of Trigeant Holdings, LLC, he is considered an insider of Trigeant pursuant to §101(31)(E) of the Bankruptcy Code.

-2-

8.      Defendant BTB Refining, LLC ("BTB") was originally a Florida limited liability company. On September 28, 2011, a civil Final Judgment on the Verdict was entered against Harry and his business partner and co-defendant, Mustafa Abu Nabaa and in favor of the plaintiff, Mohammad Al-Saleh in the Circuit Court of Palm Beach in the amount of $28,800,000 (the "Al-Saleh Case"). On July 25, 2011, while the Al-Saleh Case was in the midst of trial, Harry changed BTB's domicile to a Texas limited liability company, to prevent a judgment creditor from exercising Florida collection rights against BTB. Notwithstanding the change of state of incorporation, BTB's principal place of business was and remains located at 925 South Federal Highway, Suite 375, Boca Raton, Florida. As pled with specificity below, BTB is the alter ego of Harry and Mustafa Abu Naba'a.

9.      Defendant International Oil Trading Company, LLC ("IOTC") is a Florida limited liability company, with its principal place of business located in Palm Beach County, Florida, with its office at 925 S. Federal Highway, Suite 375, in Boca Raton. IOTC was formed with its Articles of Organization filed with the Florida Secretary of State on July 12, 2006. At all times relevant hereto, IOTC was owned and operated by Harry and Mustafa Abu Naba'a. As pled with  specificity below, IOTC is the alter ego of Harry and Mustafa Abu Naba'a.

10.     Defendant International Oil Trading Company, Limited ("IOTC Ltd.") was formerly known both as "IOTC FZCO" and "IOTC Dubai" and was initially domiciled in Dubai, although Plaintiffs do not know when that occurred. In June 2010, IOTC Ltd. was redomiciled as a Bahamian entity. Its principal place of business is located in Palm Beach County, Florida, with its office at 925 S. Federal Highway, Suite 375, in Boca Raton. At all times relevant hereto, IOTC, Ltd. has been owned and operated by Harry and Mustafa Abu

-3-

Naba'a. As pled with specificity below, IOTC is the alter ego of Harry and Mustafa Abu
Naba'a.

11.     Because the past and present affairs of IOTC and IOTC Ltd. are so intertwined
as to ownership, operations and finances, especially as it pertains to all matters related to the
Jet Fuel Contracts and the purchase by BTB of the AmCap note as described below, IOTC and
IOTC Ltd. are collectively referred to below as IOTC. Plaintiff's believe there may be a third
IOTC entity not named in this complaint that will be divulged during discovery in this case.
Plaintiffs reserve their right to amend this complaint following obtaining a full understanding
of what other IOTC entities exist and further, which IOTC entity is liable for the acts
complained of herein. Notwithstanding, upon information and belief, Harry and Mustafa are
the owners and alter egos of all IOTC entities.

12.     Defendant Silca Investments, Ltd. ("Silca") is a BVI business company that
purports to have a registered office in Tortola, British Virgin Islands. On information and
belief, Harry owns a 50% beneficial interest in Silca, with the other 50% owned by Mustafa
Abu Naba'a. As pled with specificity below, Silca is the alter ego of Harry and Mustafa.

13.     Defendant Mustafa Abu-Naba'a ("Mustafa") is a citizen of the Dominican
Republic. Mustafa is subject to the jurisdiction of this court pursuant to Fla. Stat. §48.193, the
Florida Long Arm Statute, by reason of his: (a) operating and conducting a business in this
state with an office located in this state, being defendant IOTC, and (b) committing a tortious
act within this state. Further, on information and belief, Mustafa owns real property in Florida
and regularly visits and stays in Florida. All of the substantial and not isolated activity which
submits Mustafa to this Court's jurisdiction is pled in detail below. Further, Mustafa's contacts

-4-

with the State of Florida, particularly as they pertain to the allegations of this lawsuit, principally occurred in Palm Beach County.

14.    Defendant Sargeant Marine, SA ("SMSA") is a corporation formed pursuant to the laws of the Dominican Republic.  SMSA is owned by Harry and Mustafa.  SMSA maintains an office in Palm Beach County at 925 South Federal Highway, Suite 375 in Boca Raton. As pled with more specificity below, SMSA is the alter ego of Harry and Mustafa.

## SARGEANT FAMILY BACKGROUND

15.    Harry Sr., the Sargeant family patriarch, is a family man of stature and strong character, who joined the Navy at a young age and stayed in the military for 27 years. After he left the Navy in 1977 and was employed by an asphalt shipping company, Harry Sr. started his own company in about 1983, now known as Sargeant Marine, Inc. ("Sargeant Marine").  That business, which continues to operate today, concentrated initially on shipping asphalt from Venezuela which produces the heavy crude oil necessary to make asphalt, to the east coast of the United States.  Harry Sr. innovatively changed the model of how asphalt was shipped and sold.  Previously, customers were responsible for purchase of the entire asphalt inventory carried on a ship.  Harry Sr.'s successful new model chartered larger ships and filled them on a requirements basis for numerous customers who paid the same price, so that no customer would have a competitive edge.  Sargeant Marine has grown today to include in its fleet some of the largest asphalt freighters in the world.

16.    In 1989, Harry Sr. founded Sargeant Bulktainers, Ltd. ("Bulktainers") and invented a new and practical method to deliver asphalt to end users, being 19 metric ton heated cylinder containers.  Bulktainers supplied these containers to its customers at no charge, subject to them buying their asphalt from Bulktainers.  This opened new markets in the

-5-

Caribbean and other places that were without asphalt terminals, because end users now had an easier method to transport hot asphalt where it was ultimately to be used, which was usually for road and airport construction.

17.    On January 1, 1997, in order to become more competitive worldwide, Harry Sr. formed Sargeant Trading, a new Bahamian company, also to trade and ship asphalt. The low tax structure in the Bahamas enabled Sargeant Trading to reinvest income and grow the business by expanding into new markets.

18.    Harry Sr. initially caused the Sargeant Trading stock to be issued equally to his four children, Harry, Daniel ("Dan"), James ("Jim") and Cathy, although some years later, Cathy's shares were purchased back by Harry Sr. By 1998, Harry, Dan and Jim were all working in the Sargeant family asphalt businesses and each had assumed major work responsibility. Further, by this time, the Sargeant brand had gained worldwide notoriety for its dependability and success in supplying asphalt for major international infrastructure projects, including Ascension Island for the U.S. government and the Hong Kong airport.

## THE GENESIS OF THIS LAWSUIT STARTS IN
## VENEZUELA, WITH THE FAILED CHAVEZ COUP

19.    Harry Sr. also created Sargeant Marine to establish and maintain a strong purchasing relationship with PDVSA Petroleo S.A. ("PDVSA"), which is the Venezuelan government controlled crude oil and petroleum products distributor.

20.    In about 2000, Harry met Mr. Sandy Brass ("Brass"), who built and owned an asphalt refinery in Corpus Christi, Texas (the "Refinery"). In June 2001, Brass sold the Refinery to a newly created Sargeant family entity, plaintiff Trigeant, Ltd. Brass's son, A.J. Brass, became a 25% shareholder, and the balance of the Trigeant shares were indirectly

-6-

owned by Harry Sr., Harry, Dan and Jim, through Trigeant Holdings, LLC and Trigeant Holdings, Ltd. At that time, in a corporate restructuring, the Sargeant family members surrendered their stock in Sargeant Trading, which was rolled up into Trigeant Holdings, which then became the owner of Sargeant Trading. By 2002, Trigeant had become a party to a Supply Contract with PDVSA for the supply of crude oil to the Refinery.

21.     By 2002, Harry also was the Manager of Trigeant Holdings, LLC, which was the general partner of and in control of Trigeant Holdings, Ltd., which owned Trigeant, Ltd. At all times relevant to the claims asserted herein, being from acquisition of the Refinery until February 2013, Harry served as Manager of Trigeant Holdings, LLC. In 2002 and for many years thereafter, Sargeant family members got along well and worked cohesively in their various related asphalt businesses. There was a high level of communication, cooperation and trust between Harry Sr. and Dan on one hand, and Harry on the other, especially as it pertained to Trigeant.

22.     In all respects and at all times material hereto, without Sargeant family involvement or interference, Harry had full and unfettered managerial control over all affairs of the Trigeant entities, including their finances, the Refinery's operation and all issues pertaining to the PDVSA Supply Contract. As it turned out and as pled below, Harry grossly mismanaged Trigeant and its PDVSA relationship. During this time, Harry Sr., Dan and Jim were legally powerless to stop Harry as they did not control the 70% vote of Trigeant owners necessary to dismiss Harry under Trigeant's bylaws.

23.     In early 2002, Hugo Chavez, the president of Venezuela enacted a series of laws that brought PDVSA's oil revenues under state control, which was met with opposition by PDVSA's directors and managers. In early April 2002, PDVSA challenged Chavez, including

-7-

## BERGER SINGERMAN

instigating a national strike, an oil production slowdown, newspaper blackouts, anti-Chavez television ads and massive public marches in support of PDVSA. Ultimately, there was a brief attempted unsuccessful coup of Chavez in mid-April 2002. Chavez remained in power in Venezuela until his death.

24.     By December 2002, PDVSA sold Trigeant four cargos of Boscan crude oil under the Supply Contract. On December 2, 2002, private sector business interests and the unions initiated what became known as the "Oil Strike" and a few days later, PDVSA employees joined the strike. PDVSA then declared *force majeure* on all Supply Contracts, with Chavez firing management and most employees of PDVSA, which continued to operate under an emergency plan with the employees who did not join the strike. Trigeant then purchased three more cargos of PDVSA crude oil through the "spot market" or open commodities exchange and obtained letters of credit ("LC's") to cover all seven of its crude oil cargos. However, PDVSA was operating understaffed and did not call on the banks holding the Trigeant LC's for payment during the six month period that they were in force, so that after six months had passed, the LC's expired and became null and void.

25.     During the time period of the attempted coup, probably the most vocal anti-Chavez, pro-PDVSA United States spokesman was Ambassador Otto Reich, with whom Harry maintained a relationship and significant contact. Harry, by his own words to Sargeant family members, worked against the interests of Chavez for nearly two years. In fact, Otto Reich and Ignacio Arcaya, the Venezuelan Ambassador to the United States, were paid consultants to Trigeant. Following the failed coup, those persons or companies that Chavez believed plotted against him or were aligned with those who did, were blacklisted from doing business with

-8-

PDVSA. Given Harry's relationship with Otto Reich and Ignacio Arcaya, the blacklisting included Sargeant Marine, Sargeant Trading and Trigeant.

## HARRY'S NON-PAYMENT TO PDVSA FOR ASPHALT
## LEADS TO HIS FAILED TRIGEANT EP DEAL

26.    Meanwhile, Trigeant had taken possession of the seven cargos of crude oil, and it then refined and sold the resulting asphalt. However, although the LC's had expired, instead of paying PDVSA directly for the product upon its sale, and over the objections of Harry Sr. and Dan, in June 2003, Harry used the proceeds from the PDVSA crude oil sales to purchase another refinery and distribution operation in the Southeastern United States from Coastal Refining and Marketing, Inc. ("Coastal") for approximately $38 million, through a new Trigeant subsidiary formed and controlled by Harry, commonly known as "Trigeant EP." Harry rationalized to Harry Sr. and Dan that he could buy the Coastal refinery and still procure all of Trigeant's oil supply requirements from PDVSA, notwithstanding what had happened politically in Venezuela concerning PDVSA, Otto Reich and the failed Chavez coup.

27.    From its inception, Trigeant EP hemorrhaged money, losing about $2 million per month. Despite protests from Harry Sr. and Dan, Harry refused to both stop throwing good money after bad and to shut down Trigeant EP, until finally, two years later, Trigeant lost about $30 million.

28.    Harry's actions with respect to Trigeant and Trigeant EP constituted a gross abuse of business judgment and breach of fiduciary duty: (i) because instead of paying PDVSA for the seven cargos of oil, which was a valid debt, Harry used those funds to purchase the Coastal refinery; (ii) by proceeding with the Trigeant EP acquisition without conducting an appropriate due diligence, and (iii) by not closing the Coastal refinery quickly, once it was

-9-

clear that it was a financial disaster, and instead, running up the losses to Trigeant, Ltd. of $30 million.

## THE TRIGEANT JET FUEL CONTRACTS

29.     In the summer of 2003, Harry told Harry Sr. and Dan about the Defense Energy Support Center ("DESC"), an entity within the jurisdiction of the U.S. Department of Defense, and the opportunity for Trigeant to supply jet fuel to U.S. military bases in Iraq (the "Jet Fuel Contracts"). Harry as Manager of Trigeant, arranged for the first Jet Fuel Contract to be placed with Trigeant, Ltd. and it lost approximately $7 million on that contract. That first contract was technically a humanitarian aide contract that involved diesel fuel and gasoline, as opposed to the subsequent contracts that involved jet fuel.

30.     In April 2004, Harry then told Harry Sr. and Dan that he wanted to personally go in a different business direction from the family and continue on with the Jet Fuel Contracts by himself. Harry Sr. and Dan spoke with Harry extensively about the future prospects for the Jet Fuel Contracts, given that the first contract in Trigeant, Ltd.'s name suffered a loss. Harry misrepresented to Harry Sr. and Dan his true then-existing knowledge and plans about the future success of the Jet Fuel Contracts and their viability. Harry told Harry Sr. and Dan that he had a low expectation of financial profitability and he downplayed the scope of the Jet Fuel Contracts, reiterating that he was at a point in life where he needed to do something different and on his own, which was described as being an IOTC entity.

31.     Harry further failed to disclose to Harry Sr. and Dan that the Jet Fuel Contracts were expected to generate significant profits, especially given that a related IOTC entity, IOTC Jordan, obtained an exclusive right of passage through Jordan that other government contractors did not obtain. This was arranged by Harry and Mustafa's other one-third partner,

-10-

Mohammad Al-Saleh ("Al-Saleh"), the brother-in-law of Jordan's King Abdullah II, who was instrumental in securing a letter of authorization granting this monopolistic right. Harry knew that obtaining this letter was critical to locking up the Jet Fuel Contracts, and at no time did Harry accurately disclose anything to Harry Sr. or Dan about Al-Saleh, the authorization letter, or his business strategies in Jordan regarding the Jet Fuel Contracts.

32.    Most critical, Harry also represented to Harry Sr. and Dan his promise that IOTC would pay Trigeant: (a) the $7 million it lost on the first Jet Fuel Contract (being the Humanitarian Aid contract), before he or IOTC would take any profit from the Jet Fuel Contracts, and (b) $11.00 per ton for any fuel sold by IOTC under the Jet Fuel Contracts, irrespective of whether or not IOTC earned a profit in the Jet Fuel Contracts (the "Jet Fuel Payment Inducements").

33.    All of the foregoing representations were material to, relied upon by and induced Harry Sr. and Dan into giving their acquiescence to Harry to engage in the Jet Fuel Contracts through his new business, IOTC. This reliance and inducement is especially contextually relevant, given that: (a) Trigeant was experiencing financial uncertainty given the events in Venezuela, (b) Trigeant EP had just suffered $30 million in losses, (c) Harry Sr. and Dan had no expectation that Harry would lie to them about the financial viability of the Jet Fuel Contracts, and (d) Harry's representation that IOTC would repay Trigeant its lost $7 million, plus the $11.00 a ton of jet fuel sold, before any profits were paid to IOTC.

34.    On information and belief, by that time, some document was executed transferring the rights to the Jet Fuel Contracts from Trigeant to IOTC.

35.    As it turned out, each of Harry's foregoing representations made to Harry Sr. and Dan about the lack of financial viability of the Jet Fuel Contracts and the Jet Fuel Payment

-11-

Inducements were false and known to be false by Harry at the time they were made. This is established by, among other facts: (a) Harry and Mustafa had already lined up Al-Saleh as their partner, along with the right of passage through Jordan that Al-Saleh obtained; (b) IOTC started making millions of dollars in profit very quickly, and (c) related to Jet Fuel Payment Inducements, IOTC never made a single payment to Trigeant whatsoever, which is a red flag of fraud. Thus, with respect to the Jet Fuel Contracts, Harry defrauded Trigeant, breached a fiduciary duty owed to Trigeant and usurped a business opportunity not just intended for, but which actually already had been owned as a contract right of Trigeant. Mustafa aided and abetted and conspired with Harry to commit these torts.

36.     At some point well into the Jet Fuel Contracts, Al-Saleh learned that Harry and Mustafa created a new entity, IOTC USA, to siphon off payments from DESC, thereby stealing Al-Saleh's 1/3 share of profits earned from the Jet Fuel Contracts. Thereafter, Al-Saleh filed a lawsuit in the Circuit Court of Palm Beach County, Florida, entitled: *Mohammad Anwar Farid Al-Saleh v. Harry Sargeant, III, Mustafa Abu-Naba'a and International Oil Trading Company, LLC,* Case No. 08 CA 010187, (the "Al-Saleh Fraud Case"). On July 27, 2011, Harry and Mustafa were found guilty by a jury of committing fraud against Al-Saleh, and a final judgment was then entered against them and IOTC in the amount of $28.8 million.

37.     On July 25, 2011, two things happened. First, Harry testified at trial on the Al-Saleh Fraud Case at page 2531 of the transcript that the Jet Fuel Payment Inducements described above were owed to Trigeant, and were to be paid before any profits were distributed. Second, BTB was redomiciled from being a Florida LLC to a Texas LLC. Texas law makes it more difficult to collect on a judgment against a member of an LLC compared to Florida law.

-12-

## ≝ BERGER SINGERMAN

38.     Subsequently, as to four of IOTC's Jet Fuel Contracts, a Pentagon audit found that the U.S. government overpaid IOTC (and thereby, Harry and Mustafa), between $160 million to $204 million more for jet fuel than could be supported by price or cost analysis. Also, Congressman Henry Waxman, Chairman of the House Committee on Oversight and Government Reform wrote Defense Secretary Robert M. Gates on October 16, 2008, advising that Harry, Mustafa and IOTC were awarded the Jet Fuel Contracts despite having the highest bid, and stated they engaged in price gouging and war profiteering. This letter is now a part of the Congressional Record. Ultimately, at the end of IOTC's involvement in the Jet Fuel Contracts, the Government refused to make a payment of about $70 million to IOTC. The Pentagon audit calculated the amount of tons of Jet Fuel sold, as pled below, and which is foundational to determining IOTC's gross revenues and damages suffered by Trigeant. Given that Harry usurped Trigeant's corporate opportunity and fraudulently induced converting the Jet Fuel Contracts from Trigeant to IOTC, Trigeant is entitled to recover all such lost profits gained by IOTC.

39.     IOTC (and IOTC Ltd., again collectively, "IOTC") are dominated by and are the alter egos of Harry and Mustafa. These legal entities are a sham as they were created and in fact used for the improper purpose of misleading creditors and to perpetrate a fraud upon them, including but not limited to: (a) Al-Saleh, who as established by res judicata, was defrauded by Harry and Mustafa through IOTC, and (b) Trigeant, Ltd., as described above.

40.     Harry and Mustafa so dominate the activities and affairs of IOTC that it is their alter ego and the corporate form of IOTC must be disregarded. The plaintiff's judgment in the Al-Saleh Fraud Case against IOTC (the Florida entity) and Harry remains almost entirely unsatisfied in the present approximate amount of $32 million, plus accrued interest, despite

-13-

significant effort by Al-Saleh to collect on same. Moreover and worse, no Jet Fuel Payment Inducements were ever paid to Trigeant, Ltd.

41. IOTC was formed and utilized for an improper purpose, as its accounts have been systematically commingled with those of BTB and SMSA, and their overseas accounts have been used as a "cookie jar" by Harry and Mustafa for a variety of improper personal and business purposes, including but not limited to funding BTB and SMSA. Further, Harry, Mustafa and IOTC have failed to maintain adequate records and corporate formalities, have commingled funds, and upon information and belief, have failed to file U.S. tax returns or pay taxes on repatriation transactions involving defendant BTB. Harry also benefitted from windfall profits on the Jet Fuel Contracts with funds in IOTC accounts that allowed him to spend an extraordinary sum of money on an exorbitant lifestyle, and to shelter and fraudulently transfer Jet Fuel Contract profits from his, IOTC and Trigeant victim creditors, including PDVSA, Al-Saleh, Trigeant and others.

42. Notably, once Harry became involved in the Jet Fuel Contracts, he focused mostly on his personal business interests, although he continued to control and dominate Trigeant, and Harry became very secretive about his business dealings. Thus, neither Harry Sr. nor Dan knew what Harry was really doing with respect to the Jet Fuel Contracts or in Trigeant, or that IOTC had not paid Trigeant the Jet Fuel Payment Inducements.

43. As it turned out, Harry spent more than eight years engaged in a consistent ongoing fraudulent scheme, directed against the Trigeant entities and other Sargeant family businesses, which are not the subject of this lawsuit. This continuing fraud commenced with Harry's above misrepresentations regarding the viability of the Jet Fuel Contracts and the Jet Fuel Payment Inducements and continued unimpeded through the fraudulent transfer mortgage

-14-

## ≊ BERGER SINGERMAN

foreclosure sale of Trigeants' Corpus Christi Refinery.

## THE TWO PDVSA ARBITRATION JUDGMENTS

44.     Going back to the seven PDVSA cargos, when Harry directed Trigeant not to pay PDVSA, that resulted in two arbitration awards being entered against Trigeant. PDVSA obtained a $17 million arbitration award against Trigeant on March 10, 2006, for its damage under the Supply Contract ("First Arbitration Award"). However, during that arbitration, Trigeant's attorneys filed a jurisdiction-based motion that resulted in PDVSA's claims related to the spot market purchases being dismissed from that case.

45.     PDVSA then filed a second arbitration proceeding against Trigeant on August 29, 2007, which resulted in a second arbitration award of $35 million, entered on August 24, 2008. This second award carried at least double penalty charges amounting to millions of dollars that would not have been assessed against Trigeant, if the spot market claims were not dismissed from the first PDVSA arbitration. As a result, by April 2012, Trigeant owed PDVSA $47 million on the "Second Arbitration Award" on an obligation that should have been paid by Trigeant at Harry's direction from the proceeds of the sale of the seven cargos of crude oil he initially bought from PDVSA, but instead, was spent on the failed Trigeant EP deal.

46.     Moreover, had Harry not defrauded Trigeant and usurped its corporate opportunity with respect to the Jet Fuel Contracts, in 2005 through 2007, Trigeant would have received Jet Fuel Payment Inducements payments of at least $40 million, based on the agreement Harry admitted to at trial during the Al-Saleh Fraud Case and given the amount of tons of jet fuel sold by IOTC based upon the Pentagon audit. Thus, Trigeant would have been able to pay PDVSA for the seven cargos, without ever having to be involved in all of the

-15-

## Ẹ BERGER SINGERMAN

resulting PDVSA litigation. These facts support Plaintiffs' contention of Harry's gross mismanagement well beyond the business judgment rule, as well as his breach of fiduciary duty to Trigeant.

## THE TARCO CONTRACT

47. Additionally, two months after the First Arbitration Award was entered, on May 19, 2006, Harry caused Trigeant to enter into a Processing Agreement with Texas Asphalt Refining Company ("TARCO"). This agreement provided for TARCO to pay Trigeant for a fixed per barrel rate of crude oil with minimum mandatory quotas that guaranteed Trigeant a minimum of $21.6 million in annual revenue. However, by the fall of 2007, TARCO advised Harry that it was not renewing the Processing Agreement, because, among other things, (a) Harry had tried to change the agreement to include payment for certain capital improvements at the Refinery, and (b) TARCO was having financial difficulties and needed concessions from Trigeant, which Harry refused to even discuss. As a result of the Processing Agreement being terminated, Trigeant lost approximately $21.6 million per year in revenue.

48. Simultaneously, Oldcastle, Inc., was the 60% majority owner of TARCO, which by 2007 was winding down its asphalt refinery operations. At that time, TARCO sold $8 million of asphalt to one of Harry and Mustafa's jointly owned entities, defendant SMSA, a Dominican Republic company. Harry and Mustafa then sold the $8 million of TARCO's product and except for making a $1 million payment to TARCO; SMSA, Harry and Mustafa failed to pay TARCO the $7 million balance owed. Unfortunately, Harry structured the initial TARCO asphalt purchase transaction by SMSA so that Trigeant was the registered seller of record for the asphalt. Thus, Trigeant, still under Harry's control, was responsible for sending out invoices for TARCO and collecting the balance that should have been paid by SMSA.

-16-

Then, when SMSA intentionally failed to pay TARCO for its asphalt, which was converted to the benefit of SMSA, TARCO held Trigeant responsible for SMSA's remaining $7 million debt. This transaction reflects another instance of Harry and Mustafa's continuing fraud directed against Trigeant.

49.    Harry and Mustafa so dominate the activities and affairs of SMSA that it is their alter ego and the corporate form of SMSA must be disregarded. SMSA's accounts have been used by Harry and Mustafa for a variety of improper personal and business purposes unrelated to SMSA, particularly to prop up BTB and shelter assets from Harry and IOTC's creditors including PDVSA, Al-Saleh and Trigeant. Further, Harry and Mustafa have commingled and used SMSA's overseas bank accounts as a "cookie jar" to filter funds back and forth through and among IOTC, SMSA and BTB, as reflected both by its general ledger and an alleged $40 million promissory note where BTB is maker and SMSA is the payee, which is unsupportable by other documentation. SMSA also has not maintained adequate corporate or financial records and further, upon information and belief, it has violated United States repatriation tax law at Harry's direction. This is especially the case with respect to transactions involving defendant BTB.

50.    Harry Sr. and Dan were unhappy with Harry's handling of the TARCO situation, but they did not understand or yet have reason to know that Harry was defrauding Trigeant. In fact, Harry put on a facade that he was always watching out for Trigeant and Sargeant family business interests and he continuously falsely represented and promised Harry Sr. and Dan that Trigeant would be repaid its losses on the TARCO transaction. Nor did Harry ever cause SMSA to repay Trigeant for the TARCO losses.

≝ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301 Telephone 954-525-9900 Facsimile 954-523-2872

## HARRY'S FRAUDULENT TRANSFER OF THE REFINERY

51.    After PDVSA was not paid for its cargos, it sued Trigeant, Ltd. in arbitration and obtained a $17 million award on March 10, 2006 ("First Arbitration Award"). Then, in December 2006, after PDVSA's First Arbitration Award was entered, Harry caused Trigeant to borrow $22 million from American Capital Financial Services, Inc. ("AmCap") in exchange for a first lien on all of Trigeant's assets, including the Refinery. The principal purpose of the loan was to pay the First Arbitration Award. Had Harry as Manager of Trigeant, Ltd. and Trigeant Holdings, LLC simply paid PDVSA for the crude oil cargos when Trigeant had the ability to do so, there would have been no First Arbitration Award entered against Trigeant, Ltd., nor would it have needed to borrow $22 million from AmCap.

52.    Trigeant soon thereafter fell into default on its loan obligations to AmCap, resulting from Harry converting TARCO's asphalt to SMSA's benefit and to Trigeant's detriment, combined with Trigeant losing the TARCO Processing Agreement, which extinguished Trigeant's cash flow. By December 2007, AmCap was proceeding to a mortgage foreclosure sale of the Refinery.

53.    In an effort to stave off the otherwise inevitable loss of the Refinery to AmCap, Harry, who was still Manager of Trigeant, took Jet Fuel Contract profits from IOTC that were owed to Trigeant, and instead of paying Trigeant the Jet Fuel Payment Inducements that it was owed so that Trigeant could pay off the AmCap debt, on December 10, 2007, Harry formed BTB as the acquisition vehicle for the Refinery, and then used Jet Fuel Contract proceeds to capitalize BTB, which then paid off the AmCap debt.

54.    Simultaneously, Harry also fraudulently induced Harry Sr. and Dan to agree to have Trigeant execute assignment and other related documents, so that BTB became the holder

-18-

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

of the AmCap documents. Harry failed to disclose to Harry Sr. and Dan material facts including that (a) he had never caused IOTC to pay Trigeant the Jet Fuel Payment Inducements, (b) he was using IOTC Jet Fuel Profits to purchase the AmCap loan documents, rather than simply pay off Trigeant's debt to AmCap and (c) Harry's goal (and which he achieved, at least back then), which was using IOTC and BTB as his alter egos, was to retitle ownership of the Refinery from Trigeant to BTB, so that Harry could control the Refinery to the exclusion of Trigeant.

55. On March 4, 2008, with Trigeant being unable to pay the AmCap debt now owned by BTB, BTB foreclosed on the real estate assets of Trigeant, Ltd. (the "Foreclosure"). At the Foreclosure sale, BTB credit bid $22,565,193.55, which was the full amount of the Trigeant indebtedness under the AmCap loan that BTB bought with IOTC money owed to Trigeant.

56. At the same time, notwithstanding Trigeant's payoff of the First Arbitration Award with the AmCap loan proceeds, Harry never caused Trigeant to pay PDVSA for the rest of the crude oil sold by PDVSA, leaving a remaining balance owed of approximately $18,000,000. This debt was also litigated in a second arbitration that resulted in an award of approximately $35.1 million in favor of PDVSA, entered on August 24, 2008 (the "Second Arbitration Award").

57. PDVSA did not learn about the Foreclosure until after it had occurred. Then with no resolution of the Second Arbitration Award, PDVSA filed *PDVSA Petroleo S.A. v. Trigeant, Ltd., BTB Refining, LLC and Harry Sargeant III*, Case No. 09-cv-00038, in the United States District Court for the Southern District of Texas (the "Fraudulent Transfer Case") asserting that BTB's foreclosure of the Refinery, after acquiring Trigeant's assignment

-19-

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301 Telephone 954-525-9900 Facsimile 954-523-2872

of the AmCap loan documents was a fraudulent transfer. On August 7, 2012, the Court in the Fraudulent Transfer Case filed its 22 page Findings of Fact and Conclusions of Law. Those findings established that Harry, as an insider, acted with actual intent to defraud and with ultimate managerial responsibility over Trigeant and BTB, and that Harry orchestrated the fraudulent transfer of the Refinery from Trigeant to BTB. The Court also found that BTB intended to buy the Refinery at the lowest possible price. A copy of these judicial findings are attached as Exhibit A and remain in force as an appeal by BTB to the United States Fifth Circuit Court of Appeal was dismissed in June 2014.

58.     Harry sat on both sides of the lender/borrower Foreclosure. Harry remained in complete control of Trigeant, Ltd. and Trigeant Holdings, LLC at the time of the Foreclosure and dominated the affairs of Trigeant, Ltd. and Trigeant Holdings, LLC without involvement by or consultation with Dan, Jim or Senior. Further, Harry was the 100% owner of BTB and sole decision maker as to all BTB financial and operational decisions, and as pled herein, Harry is the alter ego of BTB. Also, with respect to the Foreclosure, Harry concealed the non-judicial foreclosure sale and the relationship between BTB and Harry from PDVSA.

59.     Harry, using BTB for an improper purpose, effected this fraudulent transfer to: (a) prevent a legitimate independent third party from showing up at any foreclosure sale and buying the Refinery, (b) prevent PDVSA from executing and levying on the Refinery in post-arbitration award collection proceedings, (c) eliminate it as an asset for post-judgment collection by Al-Saleh, (d) to assure that a company owned by Harry, being BTB, had access to or owned a Refinery, as a condition to IOTC keeping its Jet Fuel Contracts active, and (e) most important, to strategically set up a fraudulent transaction intended to wrest control of the Refinery away from Trigeant and other Sargeant family members.

-20-

60.     BTB is a sham and alter ego of Harry and Mustafa. It was initially formed as a Florida LLC, and then was redomesticated as a Texas LLC in furtherance of an effort to hinder, delay and defraud creditors. BTB was capitalized with IOTC Jet Fuel Contract profits that were payable to Trigeant as Jet Fuel Payment Inducements. BTB was created and in fact used for the improper purpose of perpetrating a fraud upon creditors, including but not limited to: (a) Al-Saleh, who as established by res judicata, was defrauded by Harry and Mustafa through IOTC, (b) Trigeant, Ltd. and (c) PDVSA. BTB was also formed and utilized for an improper purpose, being to perpetrate a fraudulent transfer mechanism to prevent Trigeant from retaining ownership of the Refinery, as referenced above.

61.     Even though on paper Harry is supposed to be the sole owner of BTB, Harry and Mustafa so dominate the activities and affairs of BTB that it is their alter ego, and the corporate form of BTB must be disregarded. On information and belief, Harry and Mustafa have a non-documented agreement between them that provides Mustafa owns an equal actual or beneficial interest in BTB to that of Harry. The Al-Saleh judgment remains almost entirely unsatisfied in the present approximate amount of $32 million, plus accrued interest, despite effort by Al-Saleh to collect on same, and notably, Harry caused BTB to be re-domiciled as a Texas LLC the same day he testified in the Al-Saleh fraud trial, where he was also a defendant. Moreover, Jet Fuel Payment Inducements owed to Trigeant, Ltd. by IOTC were directed for payment to capitalize BTB and to pay off the AmCap Loan Documents described herein, although Harry admitted at the Al-Saleh fraud trial those monies were owed to Trigeant. Further, BTB's funds have been systematically commingled with those of IOTC and SMSA, and have been used as a "cookie jar" by Harry and Mustafa for a variety of improper personal and business purposes without adequate record keeping, and further upon information and

-21-

belief, in violation of United States repatriation tax law involving transactions with BTB, IOTC and SMSA.

62.    To sum up, by the end of December 2007, Harry, while serving as Manager of Trigeant and in derogation of his fiduciary duties, and at times also acting through IOTC and BTB, his alter egos, acting with Mustafa as an aider and abetter and in conspiracy with Harry:

(a)    misrepresented and failed to disclose material facts to Trigeant (through Harry Sr. and Dan) about the nature and extent of the Jet Fuel Contracts, so as to induce Trigeant to willingly abandon those contracts to IOTC;

(b)    defrauded Trigeant out of $7 million in payments owed under the Jet Fuel Contracts, plus another $11.00 per ton of jet fuel sold, converting these sums to the benefit of IOTC, BTB, SMSA and Harry and Mustafa individually, based upon their commingling of funds;

(c)    defrauded Al-Saleh out of $28.8 million as his share of profits from the Jet Fuel Contracts;

(d)    as Manager of Trigeant, Harry effectively stole multi-millions of dollars in asphalt from PDVSA, leading to entry of PDVSA's First Arbitration Award in the amount of $17 million;

(e)    sold the aforementioned PDVSA asphalt and instead of paying PDVSA, Harry invested the proceeds from the sale of the asphalt into Trigeant EP, which then lost $30 million;

(f)    fully mortgaged Trigeant's Refinery by obtaining a loan from AmCap to pay off the PDVSA First Arbitration Award, which led to a radically increased $35 million Second Arbitration Award against Trigeant;

-22-

(g)    allowed a $4.1 million judgment to be entered against Trigeant arising out of the TARCO transaction;

(h)    lost the TARCO contract, which resulted in extinguishing Trigeant's cash flow that could and would have been used to pay either PDVSA or AmCap;

(i)    made no effort to resolve the PDVSA Second Arbitration Award, evidenced by the fact he paid none of it down with proceeds generated from the TARCO contract, or from other sources, including Trigeant's substantial stolen profits from the IOTC Jet Fuel Contracts that remained in the custody and control of IOTC or other transferees;

(j)    fraudulently transferred title of the Corpus Christi Refinery from Trigeant to BTB, with actual intent to defraud.

63.    And, in the space of 18 months, by August 2012, two fraud-based judgments were entered against Harry involving approximately $60 million in claims. As each of those cases were reduced to judgment and resolved against Harry with finality on appeal, including the severe findings that Harry had committed fraud, they illuminated to Harry Sr. and Dan (and therefore, to Trigeant), that they too had been defrauded by Harry as described above. Shortly after the two fraud judgments were entered against Harry, they removed him from his Manager and Director positions in Trigeant and all other Sargeant family businesses.

## **HARRY ACQUIRES PDVSA'S CLAIM AGAINST TRIGEANT**

64.    On January 23, 2015, PDVSA filed Proof of Claim #6 in the underlying Trigeant related bankruptcies in the amount of $40,374,663.08 (the "PDVSA Claim").

65.    Prior thereto, both PDVSA and BTB, but not Trigeant, Ltd., appealed the Fraudulent Transfer Case decision. During the time of the filing and briefing of that appeal, and at all times relevant hereto, Harry remained in control of Trigeant, Ltd. and continued to

-23-

dominate its affairs in all respects.

66.     In May 2014, after the dismissal of the first Trigeant, Ltd. Chapter 11 bankruptcy case, and while the appeal on the Fraudulent Transfer Case appeal was pending, and with some expectation that a ruling by the Fifth Circuit Court of Appeals was imminent, Harry, BTB and Silca entered into a Settlement Agreement and Mutual Release with PDVSA, a copy of which is attached as Exhibit B (the "PDVSA Settlement").

67.     The PDVSA Settlement provides, among other things, BTB and Silca "the exclusive option to purchase... the Arbitration Award... and all other claims or causes of action PDVSA has against Trigeant Ltd., Trigeant L.L.C., Trigeant Holdings Ltd., Trigeant Holdings L.L.C....."

68.     The PDVSA Settlement provides that the option strike price is $18,500,000 plus 7% interest compounded annually.

69.     Moreover, the PDVSA Settlement provides at section 9 that "[i]f, prior to the Option Expiration Date, a sale of the [CPU] is scheduled either (i) In [Trigeant, Ltd.'s] bankruptcy case (under a plan or under section 363 of the Bankruptcy Code or otherwise) or (ii) in a foreclosure sale, then PDVSA shall assign its claim to BTB and/or Silca and BTB and/or Silca shall credit bit both the [BTB claims against Trigeant, Ltd.] and the [PDVSA Claim] at such sale, for BTB's account."

70.     The purpose of the PDVSA Settlement was to have the PDVSA Claim available to BTB and by extension, so that Harry could acquire control of the Refinery. Further, it was to provide a mechanism for Harry, through BTB and Silca, to further profit off of the Trigeant entities for damage he directly caused while controlling Trigeant, by obtaining the approximate $21.5 million spread given PDVSA's reduced $18.5 million payment under the PDVSA

-24-

Settlement and the $40 million PDVSA proof of claim.

71.    Silca is the alter ego of Harry and Mustafa.  Silca was formed as a BVI company without capitalization and solely for the improper purpose of participating in the PDVSA settlement so as to shelter from creditors the upside proceeds above $18.5 million on the PDVSA proof of claim.  Silca was created as an offshore entity to assure that neither Al-Saleh nor Trigeant could attach any proceeds from the PDVSA Settlement as to Al-Saleh's existing judgment and a judgment that could result against Harry, Mustafa and BTB in this litigation.  On information and belief, Silca presently has no offices, employees or hard assets, cash or bank accounts, books and records other than those created for its formation.

72.    As a result of actions directed by Harry through BTB against Trigeant, the debt that BTB asserts is owed to it by Trigeant related to the AmCap transaction, and which is subject to BTB's proof of claim in the pending Trigeant bankruptcy, should be subject to setoff given the findings in the Fraudulent Transfer Case and the allegations pled herein.  Further, that debt should be declared null and void and unenforceable, as a matter of law.

### HARRY AND BTB'S OTHER EFFORTS TO DAMAGE TRIGEANT

73.    Prior to and during the pendency of the appeal in the Fraudulent Transfer Case and during the first Trigeant Chapter 11 bankruptcy proceeding, Harry and BTB engaged in a systematic, bad faith course of conduct deliberately intended to permanently damage and destroy Trigeant. During this time period, BTB was a tenant of Trigeant's at the Refinery, given that Trigeant was (and dispositively still is) owner of the Refinery.  Further, technically, BTB also was a lender to Trigeant.  Accordingly, both of these relationships imposed upon BTB a common law duty to act in good faith and fair dealing towards Trigeant, notwithstanding the fiduciary duties imposed upon Harry as Manager of Trigeant, until his

-25-

involuntary removal from that position.

74.     Harry and BTB engaged in numerous bad faith acts intended to damage Trigeant by destroying the value of the Refinery and Trigeant's ability to operate the Refinery. These acts include, but are not limited to:

(a)     Failing to conduct routine maintenance at the Refinery, allowing it to fall into great disrepair, diminishing the Refinery's value and creating a large expense for Trigeant to perform necessary repairs.

(b)     Intentionally failing to pay BTB trade creditors, taxing authorities and Bay/Berry who have attempted to collect their debts against Trigeant, thus making it difficult to reestablish trade creditor business connections and otherwise conduct business.

(c)     Landing the roofs on the asphalt tanks, contrary to standard practice in the oil/asphalt industry, knowing that doing so would create for Trigeant both an environmental problem and a material cost issue related to subsequent cleaning and refilling of the tanks.

(d)     Converting proceeds payable to Trigeant under an agreement with Freepoint in violation of a federal court order, and then not only failing to pay required Refinery obligations with those proceeds, but also leaving Trigeant without its funds to pay these expenses.

(e)     Notwithstanding certain BTB lien rights and the Court's recognition of those rights, BTB removed all personalty from the Refinery to prevent Trigeant from using or even renting such property, although BTB had no use for and did not use, rent or sell the personalty after its repossession from the Refinery, therefore failing to mitigate its alleged damage.

-26-

(f)     Notwithstanding certain BTB lien rights, BTB removed all Refinery related industry, regulatory and environmental records to prevent Trigeant from using or having access to such records, although BTB had absolutely no use for the records and could never use them for any business purpose outside of the Refinery.

(g)     Intentionally leaving behind at the Refinery hazardous waste, so that Trigeant would have to deal with its clean up.

(h)     After BTB vacated the Refinery, it prohibited Trigeant from utilizing the dock at the premises, which was necessary and essential for the conduct of Trigeant business, including BTB using intimidation by hiring armed guards who threatened Trigeant employees.

(i)     Attempting to sabotage transactions Trigeant was working on by going directly to parties with which Trigeant had developed or was developing relationships.

(j)     Refusing to sign perfunctory permits and applications to enable Trigeant to operate the Refinery.

75.     The proof that the foregoing acts were committed in bad faith is established by BTB being an alleged lender to Trigeant.   Lenders acting in good faith have a goal of getting their debt paid and maintaining, if not maximizing the value of their collateral.  Commercially reasonable lenders do not take measures that impede a borrower's ability to pay the outstanding debt, or to diminish the value of their collateral, yet every step taken by BTB, as described above, was expressly intended to damage Trigeant to prevent it from succeeding at the Refinery.

76.     Additionally, Harry has made overt statements and threats about not just ruining Trigeant, but all of the Sargeant family related businesses.  His ongoing and continuing pattern of detrimental conduct against Trigeant and Sargeant family interests, are foundational to the

-27-

legal claims pled below asserting Harry's self-dealing, breaches of fiduciary duty and other tort based causes of action.

77.     All of the torts alleged below, and particularly the fraud claims, were continuing, successive, synergistic and cumulative torts. The fraud alleged herein was part of an ongoing fraud and pattern of conduct by Harry intended to damage Trigeant that started with Harry's misrepresentations about the Jet Fuel Contracts and which grew and continued from then until present day.

78.     All conditions precedent to bringing this action have been performed or are otherwise excused.

<div align="center">

**COUNT I**
**OBJECTION TO CLAIM OF IOTC AND FOR DECLARATORY RELIEF AGAINST**
**IOTC FOR SET OFF ON ITS PROOF OF CLAIM**

</div>

79.     Plaintiffs reallege and incorporate paragraphs 1-78 above into this paragraph 79, as if fully stated herein.

80.     IOTC filed Claim No. 10 against Trigeant Holdings (the "IOTC Claim"), asserted in the amount of $5,860,000, plus interest, costs and attorneys' fees.

81.     Pursuant to Section 502(b)(1) of the Bankruptcy Code, and based upon the facts pled above and herein, the Trigeant Entities object to the IOTC Claim and request that it be stricken and disallowed in its entirety.

82.     At all times pertinent to entry into and performance of the Jet Fuel Contracts, Harry managed all affairs of Trigeant. Accordingly, through this position, Harry had both superior knowledge and unfettered control over all business, financial and legal matters related to Trigeant, including every aspect of the Jet Fuel Contracts.

<div align="center">

-28-

**≣ BERGER SINGERMAN**

</div>

83.     Harry's position as Manager of Trigeant, as well as his direct and exclusive involvement in handling the Jet Fuel Contracts, provided him with a full understanding of the scope, extent and potential profitability of the Jet Fuel Contracts that Harry Sr., Dan and Jim did not have.

84.     After Trigeant lost money on the first Jet Fuel Contract, Harry represented to Harry Sr. and Dan that he wanted to branch off away from the family business into the jet fuel business. Harry described to his father and brother the general nature of the Jet Fuel Contracts and that they involved dangerous work transporting jet fuel across Middle East borders during war time. He specifically also represented that the Jet Fuel Contracts had a limited range of profitability. Notwithstanding, Harry stated that he wanted to try something new in business and while it was a gamble, he could make some profit in the jet fuel business. Harry's representations about the expected limited profitability of the Jet Fuel Contracts were false and known by him to be false at the time they were made.

85.     Harry failed to disclose the truth to Harry Sr. and Dan, that he had learned much from working on the first Jet Fuel Contract, as to how to make the business profitable and that he had a plan to do so. Harry failed to disclose that he and Mustafa understood that profits from future Jet Fuel Contracts would be enormous, especially since they were bringing Al-Saleh into the business to not only arrange with the Jordanian government the passage route guarantees needed to assure the approval of the DESC contract, but that this arrangement would virtually monopolize the Jet Fuel Contract business because IOTC could proceed through Jordan while no other potential jet fuel defense contractor could do so. Harry also did not disclose that, upon information and belief, somehow he had caused the DESC to transfer Trigeant's interest in the Jet Fuel Contracts to IOTC.

-29-

86.     Notwithstanding Harry's misrepresentations and omissions about the Jet Fuel Contracts, Harry affirmatively represented to Harry Sr. and Dan his commitment that IOTC would pay Trigeant the Jet Fuel Payment Inducements, being the $7 million it lost on the first Jet Fuel Contract, before he or his business would take any profit, in addition to $11.00 per ton for any jet fuel sold, irrespective of whether IOTC made money or not.

87.     Harry intended that Trigeant rely on his misrepresentations.    Had Harry disclosed the material omissions of fact and not misrepresented to Harry Sr. and Dan (as representatives of Trigeant), the actual scope and his expectations of financial profitability of the Jet Fuel Contracts, Harry Sr. and Dan would have insisted that Trigeant continue with the Jet Fuel Contracts.    Alternatively, if Harry converted the Jet Fuel Contracts to IOTC notwithstanding any informed protest, Trigeant would have been in a position to legally challenge that action derivatively through its other owners, including Harry Sr., Dan and Jim.

88.     Harry had superior knowledge of the facts about the Jet Fuel Contracts which he gained while in serving in a fiduciary capacity to Trigeant as its Manager, including having an understanding of the enormous profits to be gained by the Jet Fuel Contracts.

89.     Harry acted with scienter at all times relevant hereto in making his foregoing misrepresentations and omissions of material fact. This is best evidenced by the facts that (a) the Jet Fuel Contracts were almost instantly hugely profitable, (b) Harry never caused IOTC to pay back any money whatsoever to Trigeant in the form of the Jet Fuel Payment Inducements although IOTC had the clear capability to make the payments, and (c) years later, when testifying in the Al-Saleh fraud trial, Harry clearly recounted that the Jet Fuel Payment Inducements were due and owing to Trigeant.

-30-

## BERGER SINGERMAN

90.     At all times pertinent hereto, although Harry was serving in a fiduciary capacity as Manager of Trigeant, he was also acting with authority as Manager and on behalf of Harry and Mustafa's company, IOTC, which is therefore liable for the fraud committed upon Trigeant under principles of agency law and *respondeat superior*.

91.     Trigeant did not learn and could not have known about the true facts and omissions about the Jet Fuel Contracts complained of above, and the non-payment of the Jet Fuel Payment Inducements until following the trial in the Al-Saleh fraud case at the earliest, and in the exercise of due diligence, Trigeant could not have learned of them sooner.

92.     As a result of Harry's misrepresentations and fraudulent inducement, Trigeant abandoned pursuing its continued involvement with the Jet Fuel Contracts to allow Harry to pursue them through IOTC.

93.     Further, as Manager of Trigeant, Harry owed it common law fiduciary duties of good faith, fair dealing, full disclosure and loyalty, which he breached as described above in paragraphs 62 and 74.

94.     While serving as Manager of Trigeant, Harry breached his fiduciary duty to Trigeant by engaging in certain systematic and continuing self-serving actions, conflicts of interest, deliberate and malicious conduct and usurpation of corporate opportunities, all of which were intended to and did benefit himself and business entities such as IOTC and BTB, both of which were his alter ego, and all of such conduct which was directly contrary to the interests of Trigeant. In addition to the fraudulent conduct described above, Harry's breaches of fiduciary duty include, but are not limited to:

-31-

(a)     effectively stealing multi-millions of dollars in asphalt from PDVSA leading to entry of PDVSA's First Arbitration Award against Trigeant in the amount of $17 million;

(b)     selling the aforementioned PDVSA asphalt and instead of paying PDVSA, investing the proceeds from the sale of the asphalt into Trigeant EP which then lost $30 million;

(c)     fully mortgaging Trigeant's Corpus Christi property by obtaining a loan from AmCap to pay off the grossly mismanaged PDVSA First Arbitration Award, which next led to the $35 million unsatisfied Second Arbitration Award against Trigeant;

(d)     refusing to negotiate in good faith a modification to the TARCO processing Agreement, which resulted in TARCO terminating the agreement and Trigeant losing all of its $21.6 million a year cash flow from the contract, which funds could and would have been used to pay either PDVSA or AmCap;

(e)     fraudulently transferring the Corpus Christi refinery from Trigeant to BTB;

(f)     allowing a $4.1 million judgment to be entered against Trigeant, arising out of the TARCO transaction;

(g)     making no effort to resolve the PDVSA Second Arbitration Award, evidenced by the fact Harry paid none of it down with proceeds generated from the TARCO contract, or from other sources, including the substantial profits from the IOTC Jet Fuel Contracts, when substantial sums of Jet Fuel Projects were owed to Trigeant;

(h)     in the time frame of 18 months after having engaged in substantial fraudulent conduct, having two fraud-based judgments entered against Harry that establishes a

-32-

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301 Telephone 954-525-9900 Facsimile 954-523-2872

lack of moral character and in violation of Harry's duty of good faith and fair dealing, involving approximately $60 million in claims.

95.    In the course of performing the Jet Fuel Contracts, IOTC made substantial profits. Had Trigeant performed the Jet Fuel Contracts, and had Harry and Mustafa conducted themselves lawfully by not defrauding Al-Saleh, Trigeant would have received this profit. At a minimum, by Harry's under oath admissions in the Al-Saleh Fraud Case trial, Trigeant is entitled to $7 million for its loss on the first Jet Fuel Contract, plus the $11.00 per ton for any jet fuel sold by IOTC. As a result of Harry's breaches of fiduciary duties, Trigeant has been damaged significantly comprising lost profits and other special damages such as reputational damage resulting from the extreme negative publicity suffered by Trigeant after the two judgments were entered. Trigeant also seeks a presently undetermined amount of other consequential damages to be determined from an accounting of other Trigeant profits earned but never paid to its members, including a reassessment of all funds paid or transferred by Trigeant to any source during Harry's tenure as Manager of Trigeant.

WHEREFORE, Trigeant, Ltd., Trigeant Holdings, LLC and Trigeant Holdings, Ltd. request (a) that the Court strike and disallow the IOTC Claim and allow Trigeant to establish their set off damages, and until such time that a final adjudication on the merits of the facts and issues described herein occurs, (b) that the Court reserve the amount of the IOTC claim; (c) a declaratory judgment determining that Harry in the course of matters pertaining to IOTC committed fraud against and breached fiduciary duties to Trigeant, (d) a declaratory judgment that Harry and Mustafa were the alter egos of IOTC, and (e) granting all such other relief as the Court deems just and appropriate.

-33-

## COUNT II
## OBJECTION TO CLAIM OF BTB AND FOR DECLARATORY RELIEF AGAINST BTB FOR SET OFF AND TO NULLIFY AMCAP AND BTB LOAN DOCUMENTS

96.     Plaintiff realleges and incorporates paragraphs 1- 78 above into this paragraph 96, as if fully stated herein.

97.     BTB filed Claim No. 8-1 against Trigeant Holdings; Claim No. 4-1 against LLC; and Claim No. 13-1 against Trigeant (collectively, the "BTB Claims").

98.     The BTB Claims are asserted in the amount of $26,467,607.14, plus interest, costs and attorneys' fees. As to Trigeant, the BTB Claims are asserted to be secured.

99.     Pursuant to Section 502(b)(1) of the Bankruptcy Code, and for the reasons stated hereafter, the Trigeant Entities object to the BTB Claims and request that the BTB Claims be stricken and disallowed in their entirety.

100.    With respect to the $22 million loan from AmCap, Trigeant, Trigeant Holdings, LLC and Trigeant Holdings, Ltd. executed various agreements in addition to a Promissory Note, a Deed of Trust on the Refinery, and various pledges of stock or interests in the foregoing Trigeant entities (collectively, the "AmCap Loan Agreements.")

101.    By early December 2007, after Trigeant was in default on its loan obligations to AmCap, Harry commenced negotiations with AmCap about buying the debt at foreclosure. AmCap agreed with same and Harry formed BTB and requested that the foreclosure sale be held on January 1, 2008, because Harry believed there would be less chance of bidders that day. AmCap was only concerned about recouping its investment. It had no interest in maximizing the sale of the Refinery and because AmCap had a guaranteed buyer of the AmCap Loan Agreements, AmCap agreed to hold the sale on January 1, 2008.

-34-

## BERGER SINGERMAN

102.    Given the possibility that AmCap might be outbid at the public auction, BTB's strategy changed from purchasing the Refinery, to purchasing the loan and lien from AmCap. By substituting itself as the foreclosing creditor, BTB believed it would have more control over the foreclosure process and the outcome of the sale. Thus, still in December 2007, BTB brought the idea of a note purchase to AmCap. AmCap felt that this was the cleanest way for it to get paid, so it agreed to the change in plan.    BTB and AmCap then negotiated an Assignment and Acceptance Agreement through which AmCap would transfer the loan and lien to BTB. On December 28, 2007, BTB and AmCap executed an Assignment and Acceptance Agreement and BTB paid AmCap $21,828,446.65, which represented the outstanding balance on the AmCap note.

103.    BTB was formed only weeks before it purchased the AmCap Loan Agreements and at the time of formation, BTB had no pre-existing capital, ongoing business, banking relationships or any other legitimate source of funds. Given these circumstances, Harry, who as pled above, was the alter ego of both IOTC and BTB, took $21,828,446.65 of IOTC funds, which were profits directly gained from the IOTC Jet Fuel Contract, to buy the AmCap debt. Given Harry's foregoing stated trial admissions in the Al-Saleh Fraud Case that the Jet Fuel Payment Inducements were owed to Trigeant, the funds used to buy the AmCap Loan Agreements were undeniably owed to and stolen from Trigeant, as directed by Harry. In other words, Trigeant's money was converted by Harry and BTB to buy the AmCap Loan Agreements.

104.    In December 2007 and January 2008, however, Harry, Sr., Dan and Trigeant did not understand that to be the case. Instead, they believed that Trigeant was tied into two arms-length transactions, being: (i) Harry's handling of the Trigeant/AmCap default and purchase of

-35-

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301 Telephone 954-525-9900 Facsimile 954-523-2872

the AmCap Loan Agreements by BTB, and (ii) a new set of loan documents executed between BTB and Trigeant, since BTB's purchase of the AmCap Loan Documents made BTB the lender to Trigeant. In effect, Harry, IOTC and BTB stole Trigeant's Jet Fuel Profits to buy the AmCap Loan Agreements for the benefit of BTB, who then became Trigeant's lender on its own stolen money.

105. Further, among the AmCap Loan Agreements were Pledge Agreements that provide for the transfer of stockholding interests of Sargeant family members in Trigeant entities, to the holder of the BTB Loan Agreements, upon the event of a default on the underlying AmCap note. Indeed, there was a default under the note, which is, of course, what gave rise to BTB buying the AmCap Loan Agreements and then the resulting Fraudulent Transfer Case judgment.

106. BTB was not a bona fide purchaser for value of the AmCap Loan Documents. BTB, acting through its alter ego Harry, was a knowing participant in and beneficiary of Trigeant's stolen Jet Fuel Payment Inducements, and further, BTB gave no consideration to IOTC for the $21,828,446.65 that BTB used to pay off and acquire the AmCap debt, rather than satisfy same. BTB should be precluded from being exercising the remedies of the AmCap Loan Documents, including but limited to the Note, Deed of Trust and Stock Pledge Agreements to obtain payment of a debt that effectively has been fully paid, satisfied and discharged.

107. Further, while serving as Manager of Trigeant, Harry breached his fiduciary duty to Trigeant by engaging in certain systematic and continuing self-serving actions, conflicts of interest, deliberate and malicious conduct and usurpation of corporate opportunities, all of which were intended to and did benefit himself and business entities such

-36-

as IOTC and BTB, both of which he was their alter ego, and all of such conduct which was directly contrary to the interests of Trigeant. In addition to the fraudulent conduct described above, Harry's breaches of fiduciary duty include, but are not limited to:

(a)    effectively stealing multi-millions of dollars in asphalt from PDVSA leading to entry of PDVSA's First Arbitration Award against Trigeant in the amount of $17 million;

(b)    selling the aforementioned PDVSA asphalt and instead of paying PDVSA, investing the proceeds from the sale of the asphalt into Trigeant EP which then lost $30 million;

(c)    fully mortgaging Trigeant's Corpus Christi property by obtaining a loan from AmCap to pay off the grossly mismanaged PDVSA First Arbitration Award, which next led to the $35 million unsatisfied Second Arbitration Award against Trigeant;

(d)    refusing to negotiate in good faith a modification to the TARCO processing Agreement, which resulted in TARCO terminating the agreement and Trigeant losing all of its $21.6 million a year cash flow from the contract, which funds could and would have been used to pay either PDVSA or AmCap;

(e)    fraudulently transferring the Corpus Christi refinery from Trigeant to BTB;

(f)    allowing a $4.1 million judgment to be entered against Trigeant, arising out of the TARCO transaction;

(g)    making no effort to resolve the PDVSA Second Arbitration Award, evidenced by the fact Harry paid none of it down with proceeds generated from the TARCO contract, or from other sources, including the substantial profits from the IOTC Jet Fuel Contracts, when substantial sums of Jet Fuel Projects were owed to Trigeant;

≝ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

(h)      in the time frame of 18 months after having engaged in substantial fraudulent conduct, having two fraud-based judgments entered against Harry that establishes a lack of moral character and in violation of Harry's duty of good faith and fair dealing, involving approximately $60 million in claims.

108.      In the course of performing the Jet Fuel Contracts, IOTC made substantial profits. Had Trigeant performed the Jet Fuel Contracts, and had Harry and Mustafa conducted themselves lawfully by not defrauding al-Saleh, Trigeant would have received this profit. At a minimum, by Harry's under oath admissions in the Al-Saleh Fraud Case trial, Trigeant is entitled to $7 million for its loss on the first Jet Fuel Contract, plus the $11.00 per ton for any jet fuel sold by IOTC. As a result of Harry's breaches of fiduciary duties, Trigeant has been damaged significantly comprising lost profits and other special damages such as reputational damage resulting from the extreme negative publicity suffered by Trigeant after the two judgments were entered. Trigeant also seeks a presently undetermined amount of other consequential damages to be determined from an accounting of other Trigeant profits earned but never paid to its members, including a reassessment of all funds paid or transferred by Trigeant to any source during Harry's tenure as Manager of Trigeant.

109.      As a result of BTB's complicity in Harry's scheme to defraud Trigeant, BTB now stands to: (a) collect on a proof of claim filed in this bankruptcy predicated upon fraudulently induced and fraudulently obtained AmCap Loan Documents, (b) potentially foreclose on the Refinery should confirmation of Trigeants' Plan of Reorganization not occur, regardless of the reason, (c) take over control of Trigeant by reason of BTB's potential exercise of its stock pledge rights provided in conjunction with the fraudulently induced and fraudulently obtained AmCap Loan Documents, (d) attempt to take all of this action notwithstanding Harry's

-38-

under oath admissions in the Al-Saleh Fraud Case trial that IOTC (his alter ego) owes Trigeant the Jet Fuel Payment Inducements, which alone exceeds the amount that BTB (also Harry's alter ego) claims Trigeant owes for payment on the AmCap debt in its proof of claim; (e) inequitably benefit from Harry's continuing pattern of fraud to the detriment and great prejudice of Trigeant; (f) potentially obtain lost profits by reason of its $32 million proof of claim filed in the Trigeant bankruptcy.

110.    Predicated upon the foregoing facts, Trigeant has a right of set off for the amounts it is owed by IOTC that were funneled by Harry and IOTC to BTB to buy the AmCap Loan Documents, notwithstanding Trigeants' actual damages including lost profits caused by Harry, IOTC and BTB exclusive of the non-payment of the Jet Fuel Payment Inducements.

111.    Based upon the facts pled herein, Trigeant also asserts a right of set off against BTB's $7.6 million claim for attorneys fees sought pursuant to Bankruptcy Code §506(b).

112.    BTB should be precluded from being entitled to exercise the remedies of the AmCap Loan Documents to obtain payment of the debt that has effectively been fully paid, satisfied and discharged. It would be inequitable for any of the AmCap Loan Agreements now purportedly held by BTB to be presently enforceable, and indeed, ultimately, after a full trial on the merits, they should all be declared null and void because:

A.    All such agreements were procured as a result of now *two* fraudulent conveyances by BTB, made possible only because Harry, through his two alter ego entities IOTC and BTB, stole Trigeant's share of the Jet Fuel Contract profits and intentionally failed to pay the Jet Fuel Payment Inducements;

B.    Harry was Manager of Trigeant and Trigeant Holdings LLC at the time of the default with AmCap, and he owed Trigeant a fiduciary duty at that time. However, Harry

-39-

formed, controlled and dominated BTB as the instrumentality to illegally take ownership of the Refinery from Trigeant for his own purposes, in breach of that fiduciary duty. This is evidenced by how Harry orchestrated and structured the transaction with BTB buying the AmCap Loan Agreements with money owed by IOTC to Trigeant, instead of simply having IOTC tender the same funds to Trigeant to pay off and satisfy the AmCap debt;

        C.    As described herein, Trigeant has affirmative damage claims against BTB, IOTC and Harry, each of which far exceed the approximate $22 million in debt BTB asserts is owed to it by Trigeant, which supports Trigeants' right to setoff; and

        D.    BTB is not a holder in due course of the AmCap Loan Documents.

113.    Further evidence that BTB in fact has acted in bad faith is established by BTB alleged status whereby it claims to be a lender to Trigeant. Lenders acting in good faith have a goal of getting their debt paid and maintaining the value of their collateral. Commercially reasonable lenders do not take measures that impede a borrower's ability to pay the outstanding debt, or to diminish the value of their collateral. Every act taken by BTB in paragraph 74 was not commercially reasonable and was expressly intended by BTB to damage Trigeant.

114.    Harry's overt statements about ruining Trigeant and the Sargeant family related businesses, and his ongoing and continuing pattern of tortious conduct against Trigeant and the Sargeant family interests, are relevant to this Count brought in equity, as they demonstrate lack of clean hands by Harry and BTB.

115.    There is a bona fide, actual, present practical need for declaration as to the present controversy as to the matters pled herein related to enforcement of the AmCap Loan Documents. The rights of all Trigeant plaintiffs are dependent upon the facts as alleged and related law. The Trigeant plaintiffs have an actual interest in this matter and BTB is adverse to

-40-

that interest and both parties are properly before this Court. The Trigeant plaintiffs are not seeking relief in the form of legal advice.

WHEREFORE, Trigeant, Ltd., Trigeant Holdings, LLC and Trigeant Holdings, Ltd. request (a) that the Court strike and disallow the BTB Claims and in so doing, allow Trigeant to establish their set off damages, and until such time that a final adjudication on the merits of the facts and issues described herein occurs, (b) that the Court reserve the amount of the BTB claim; (c) a declaratory judgment deeming the AmCap Loan Documents and the BTB Loan Documents null and void, so that BTB should be precluded from being entitled to exercise the remedies of the AmCap Loan Documents to obtain payment of the debt that has effectively been fully paid, satisfied and discharged; (d) a declaratory judgment that Trigeant has a right of set off against (i) BTB's $7.6 million claim for attorneys fees sought pursuant to Bankruptcy Code §506(b) and (ii) BTB's $32 million lost profits claim, and until such time that a final adjudication on the merits of the facts and issues described herein occurs, that the Court reserve the amount of that attorneys fee claim; (e) a declaratory judgment that Harry and Mustafa were the alter egos of BTB, IOTC and SMSA, (f) granting all such other relief as the Court deems just and appropriate.

## COUNT III
### CLAIM BY TRIGEANT AGAINST HARRY AND IOTC
### FOR FRAUD RELATED TO THE JET FUEL CONTRACTS

116.    Plaintiff realleges and incorporates paragraphs 1- 43 above into this paragraph 116, as if fully stated herein.

117.    At all times pertinent to entry into and performance of the Jet Fuel Contracts, Harry managed all affairs of Trigeant. Accordingly, through this position, Harry had both superior knowledge and unfettered control over all business, financial and legal matters related to Trigeant, including every aspect of the Jet Fuel Contracts.

-41-

## ᴸ BERGER SINGERMAN

118.    Harry's position as Manager of Trigeant, as well as his direct and exclusive involvement in handling the Jet Fuel Contracts, provided him with a full understanding of the scope, extent and potential profitability of the Jet Fuel Contracts that Harry Sr., Dan and Jim did not have.

119.    After Trigeant lost money on the first Jet Fuel Contract, Harry represented to Harry Sr. and Dan that he wanted to branch off away from the family business into the jet fuel business. Harry described to his father and brother the general nature of the Jet Fuel Contracts and that they involved dangerous work transporting jet fuel across Middle East borders during war time. He specifically also represented that the Jet Fuel Contracts had a limited range of profitability. Notwithstanding, Harry stated that he wanted to try something new in business and while it was a gamble, he could make some profit in the jet fuel business. Harry's representations about the expected limited profitability of the Jet Fuel Contracts were false and known by him to be false at the time they were made.

120.    Harry failed to disclose the truth to Harry Sr. and Dan, that he had learned much from working on the first Jet Fuel Contract, as to how to make the business profitable and that he had a plan to do so. Harry failed to disclose that he and Mustafa understood that profits from future Jet Fuel Contracts would be enormous, especially since they were bringing Al-Saleh into the business to not only arrange with the Jordanian government the passage route guarantees needed to assure the approval of the DESC contract, but that this arrangement would virtually monopolize the Jet Fuel Contract business. Harry also did not disclose that, upon information and belief, somehow he had caused the DESC to transfer Trigeant's interest in the Jet Fuel Contracts to IOTC.

-42-

121.    Notwithstanding Harry's misrepresentations and omissions about the Jet Fuel Contracts above, Harry affirmatively represented to Harry Sr. and Dan his commitment to have IOTC pay Trigeant the Jet Fuel Payment Inducements being the $7 million it lost on the first Jet Fuel Contract, before he or his business would take any profit, and $11.00 per ton for any jet fuel sold, irrespective of whether IOTC made money or not.

122.    Harry intended that Trigeant rely on his misrepresentations.    Had Harry disclosed the material omissions of fact and not misrepresented to Harry Sr. and Dan (as representatives of Trigeant), the actual scope and his expectations of financial profitability of the Jet Fuel Contracts, Harry Sr. and Dan would have insisted that Trigeant continue with the Jet Fuel Contracts.    Alternatively, if Harry converted the Jet Fuel Contracts to IOTC notwithstanding any informed protest, Trigeant would have been in a position to legally challenge that action derivatively through its owners.

123.    Harry had superior knowledge of the facts about the Jet Fuel Contracts which he gained while in serving in a fiduciary capacity to Trigeant as its Manager, including Harry having an understanding of the enormous profits to be gained by the Jet Fuel Contracts.

124.    Harry acted with scienter at all times relevant hereto in making his foregoing misrepresentations and omissions of material fact. This is best evidenced by the facts that (a) the Jet Fuel Contracts were almost instantly hugely profitable, (b) Harry never caused IOTC to pay back any money whatsoever to Trigeant in the form of the Jet Fuel Payment Inducements although IOTC had the clear capability to make the payments, and (c) years later, when testifying in the Al-Saleh fraud trial, Harry clearly recounted that the Jet Fuel Payment Inducements were due and owing to Trigeant.

-43-

125.    At all times pertinent hereto, although Harry was serving in a fiduciary capacity as Manager of Trigeant, he was also acting with authority as Manager and on behalf of Harry and Mustafa's company, IOTC, which is therefore liable for the fraud committed upon Trigeant under principles of agency law and *respondeat superior*.

126.    Trigeant did not learn and could not have known about the true facts and omissions about the Jet Fuel Contracts complained of above, and the non-payment of the Jet Fuel Payment Inducements until following the trial in the Al-Saleh fraud case at the earliest, and in the exercise of due diligence, Trigeant could not have learned of them sooner.

127.    As a result of Harry's misrepresentations and fraudulent inducement, Trigeant abandoned pursuing its continued involvement with the Jet Fuel Contracts to allow Harry to pursue them through IOTC.

128.    In the course of performing the Jet Fuel Contracts, IOTC made material profits. Had Trigeant performed the Jet Fuel Contracts, and had Harry and Mustafa conducted themselves lawfully by not defrauding al-Saleh, Trigeant would have received 2/3 of the profit with Al-Saleh receiving the other 1/3 share. Trigeant pleads its lost profits and special damages. At a minimum, by Harry's under oath admissions in the Al-Saleh Fraud Case trial and taking into account the Pentagon audit on the Jet Fuel Contracts, Trigeant is entitled to $7 million for its loss on the first Jet Fuel Contract, plus the $11.00 per ton for any jet fuel sold by IOTC which approximates $40 million.

129.    Harry's conduct was at all times willful and wanton, demonstrated by the broad scope of the events pled above demonstrating his fraud committed upon Trigeant, combined with the multi-year period in which he committed his ongoing fraud which he overtly hid it from Trigeant and his family members. This conduct justifies an award of punitive damages.

-44-

WHEREFORE, Plaintiff Trigeant, Ltd. prays for judgment in its favor and against the defendants Harry Sargeant III and IOTC for damages of $7 million plus $11.00 per ton of jet fuel sold, plus lost profit special damages, punitive damages, costs of suit, the right to setoff Trigeant's damages against IOTC's proof of claim filed in the Trigeant bankruptcy and all such other relief as the Court deems just and appropriate.

<div align="center">

**COUNT IV**
**CLAIM BY TRIGEANT AGAINST MUSTAFA AND IOTC**
**FOR AIDING AND ABETTING FRAUD RELATED TO JET FUEL CONTRACTS**

</div>

130.    Plaintiff realleges and incorporates paragraphs 1-43 above into this paragraph 130, as if fully stated herein.

131.    At all times pertinent hereto, Mustafa knew that: (a) the initial DESC Jet Fuel Contract was placed with and in the name of Trigeant, (b) Trigeant had already performed the first Jet Fuel Contract, (c) Harry was the Manager of Trigeant and as such, owed it fiduciary duties, and (d) Harry was misrepresenting facts about the Jet Fuel Contracts to Harry Sr. and Dan to defraud Trigeant and move the Jet Fuel Contracts to Harry and Mustafa's jointly owned entity, IOTC.

132.    Mustafa rendered substantial assistance and encouragement to Harry in committing fraud upon Trigeant by working with Harry to develop the plan to have Trigeant convert the Jet Fuel Contracts to IOTC.

133.    Mustafa knew that his substantial assistance and active participation in this scheme was expressly intended to defraud Trigeant into not pursuing further its continued involvement with the Jet Fuel Contracts, so that IOTC could do so.

134.    Mustafa also knew that his actions would deprive Trigeant of substantial revenue it would have otherwise earned under the Jet Fuel Contracts had Harry not abrogated

<div align="center">

-45-

</div>

his fiduciary duties and common law obligations to Trigeant, for his, Harry's personal benefit, that would inure to them as the alter egos of IOTC.

135.    Mustafa's substantial assistance to Harry's fraud proximately caused Trigeant's damages resulting from this fraud.

136.    In the course of performing the Jet Fuel Contracts, IOTC made significant profits, which were directly filtered to Harry and Mustafa, as the alter ego of IOTC. Had Trigeant performed the Jet Fuel Contracts, and had Harry and Mustafa conducted themselves lawfully by not defrauding al-Saleh, Trigeant would have received 2/3 of the profit gained on the Jet Fuel Contracts, which sum Trigeant pleads as lost profits and special damages. At a minimum, by Harry's under oath admissions in the Al-Saleh Fraud Case trial and based upon the Pentagon's audit, Trigeant is entitled to $7 million for its loss on the first Jet Fuel Contract, plus the $11.00 per ton for any jet fuel sold, approximating $40 million in loss.

137.    Mustafa's conduct was at all times willful and wanton, demonstrated by the scope of the events pled above demonstrating the fraud committed upon Trigeant, and his aiding and abetting conduct in assisting Harry, combined with the multi-year period in which he committed this ongoing fraud and overtly hid it from Trigeant. Trigeant seeks punitive damages against Mustafa and IOTC for the conduct as pled herein.

WHEREFORE, Plaintiff Trigeant, Ltd. prays for judgment in its favor and against the defendants Mustafa Abu-Naba'a and IOTC for damages, lost profit special damages, punitive damages, the right to setoff Trigeant's damages against IOTC's proof of claim filed in Trigeant's bankruptcy, costs of suit and all such other relief as the Court deems just and appropriate.

-46-

## COUNT V
## CLAIM BY TRIGEANT, LTD. AGAINST IOTC
## FOR BREACH OF CONTRACT RELATED TO JET FUEL CONTRACTS

138.     Plaintiff Trigeant, Ltd. realleges and incorporates paragraphs 1- 43 above into this paragraph 138, as if fully stated herein.

139.     IOTC, through Harry, orally offered Trigeant, Ltd. to pay it $7 million representing its loss on the first Jet Fuel Contract, plus $11.00 per ton for any jet fuel sold by IOTC, if Trigeant, Ltd. agreed to surrender its rights to and under the Jet Fuel Contracts to IOTC.

140.     Trigeant accepted IOTC's offer and relinquished its rights under the Jet Fuel Contracts to IOTC.

141.     The exchange of promises between Trigeant and IOTC constituted good and lawful consideration.

142.     IOTC materially breached the contract by not making any payments to Trigeant as due under the contract.

143.     Trigeant  has suffered damages as a direct and proximate result of this breach of contract.

WHEREFORE, Plaintiff, Trigeant, Ltd. seeks judgment in its favor and against Defendants International Oil Trading, LLC and International Oil Trading, LLC for lost profits as special damages, consequential damages, prejudgment interest, costs of suit and all such other relief as this court deems just and appropriate.

≦ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

## COUNT VI
## CLAIM BY TRIGEANT AGAINST HARRY FOR BREACH OF FIDUCIARY DUTY

144.    Plaintiff realleges and incorporates paragraphs 1-78 above into this paragraph 144, as if fully stated herein.

145.    As Manager of Trigeant, Harry owed it common law fiduciary duties of good faith, fair dealing, full disclosure and loyalty.

146.    While serving as Manager of Trigeant, Harry breached his fiduciary duty to Trigeant by engaging in certain systematic and continuing self-serving actions, conflicts of interest, deliberate and malicious conduct and usurpation of corporate opportunities, all of which were intended to and did benefit himself and business entities such as IOTC and BTB, both of which he was their alter ego, and all of such conduct which was directly contrary to the interests of Trigeant. Harry's breaches of fiduciary duty include, but are not limited to:

(a)    Misrepresenting or failing to disclose to Harry Sr. and Dan critical facts about the Jet Fuel Contracts, including but not limited to: (i) that he had learned much from working on the first Jet Fuel Contract, as to how to make the business profitable and that he had a plan to do so, (ii) that he and Mustafa understood the profits from the future Jet Fuel Contracts would be enormous, especially since they were bringing Al-Saleh into the business to not only arrange with the Jordanian government the passage route guarantees needed to assure the approval of the DESC contract, but that this arrangement would virtually monopolize the Jet Fuel Contract business, (iii) that he had taken steps to transfer all of Trigeant's interest in the Jet Fuel Contracts to IOTC, and (iv) his promise that IOTC would pay Trigeant its $7 million loss on the first Jet Fuel Contract, plus the $11.00 per ton of jet fuel sold, prior to BTB taking any profits.

-48-

(b)    effectively stealing multi-millions of dollars in asphalt from PDVSA leading to entry of PDVSA's First Arbitration Award against Trigeant in the amount of $17 million;

(c)    selling the aforementioned PDVSA asphalt and instead of paying PDVSA, investing the proceeds from the sale of the asphalt into Trigeant EP which then lost $30 million;

(d)    fully mortgaging Trigeant's Corpus Christi property by obtaining a loan from AmCap to pay off the grossly mismanaged PDVSA First Arbitration Award, which next led to the $35 million unsatisfied Second Arbitration Award against Trigeant;

(e)    refusing to negotiate in good faith a modification to the TARCO processing Agreement, which resulted in TARCO terminating the agreement and Trigeant losing all of its $21.6 million a year cash flow from the contract, which funds could and would have been used to pay either PDVSA or AmCap;

(f)    fraudulently transferring the Corpus Christi refinery from Trigeant to BTB;

(g)    allowing a $4.1 million judgment to be entered against Trigeant, arising out of the TARCO transaction;

(h)    making no effort to resolve the PDVSA Second Arbitration Award, evidenced by the fact Harry paid none of it down with proceeds generated from the TARCO contract, or from other sources, including the substantial profits from the IOTC Jet Fuel Contracts, when substantial sums of Jet Fuel Projects were owed to Trigeant;

(i)    in the time frame of 18 months after having engaged in substantial fraudulent conduct, having two fraud-based judgments entered against Harry that establishes a

-49-

lack of moral character and in violation of Harry's duty of good faith and fair dealing, involving approximately $60 million in claims.

    (j)  By personally directing all of the actions complained of above.

  147. The foregoing breaches of fiduciary duty were a systematic, continuing tort committed by Harry against Trigeant, which started with his aforementioned fraudulent conduct regarding the Jet Fuel Contracts, and were elucidated by and culminated in the Al-Saleh Fraud Case and the Fraudulent Transfer Judgment, and which have continued non-stop and systematically to this day.

  148. As a result of Harry's breaches of fiduciary duties, Trigeant has suffered lost profits and other special damages such as reputational damage resulting from the extreme negative publicity suffered by Trigeant after the two judgments were entered. Further, at a minimum, by Harry's under oath admissions in the Al-Saleh Fraud Case trial and predicated on the Pentagon audit, Trigeant is entitled to $7 million for its loss on the first Jet Fuel Contract, plus the $11.00 per ton for any jet fuel sold, which approximates $40 million. Trigeant also seeks a presently undetermined amount of other consequential damages to be determined from an accounting of other Trigeant profits earned but never paid to its members, including a reassessment of all funds paid or transferred by Trigeant to any source during Harry's tenure as Manager of Trigeant.

  149. Harry's conduct was at all times willful and wanton, demonstrated by the scope of the events pled above demonstrating his fraud committed upon Trigeant, combined with the multi-year period in which he committed this ongoing fraud and overtly hid it from Trigeant. Trigeant seeks punitive damages against Harry for the conduct as pled herein.

-50-

WHEREFORE, Plaintiff Trigeant, Ltd. prays for judgment in his favor and against the defendant Harry Sargeant III, for damages, special damages in the form of lost profits, punitive damages, the right to setoff Trigeant's damages against IOTC and BTB's proof of claim filed in Trigeants' bankruptcy, costs of suit and all such other relief as the Court deems just and appropriate.

## COUNT VII
## CLAIM BY TRIGEANT AGAINST MUSTAFA FOR
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

150.    Plaintiff realleges and incorporates paragraphs 1-78 above into this paragraph 150, as if fully stated herein.

151.    At all times pertinent hereto, Mustafa knew that Harry was the Manager of Trigeant and that Harry owed Trigeant fiduciary duties.

152.    At all times pertinent hereto, Mustafa knew that: (a) the initial DESC Jet Fuel Contract was placed with and in the name of Trigeant, (b) Harry was misrepresenting facts about the Jet Fuel Contracts to Harry Sr. and Dan to defraud Trigeant and move and convert the Jet Fuel Contracts to Harry and Mustafa's jointly owned entity, IOTC.

153.    Mustafa rendered substantial assistance and encouragement to Harry in breaching his fiduciary duty owed to Trigeant by working with Harry to develop the plan to convert the Jet Fuel Contracts to IOTC from Trigeant. Further, on information and belief, Mustafa had actual knowledge and discussed with Harry and approved each of the items pled in paragraph 62 above.

154.    Mustafa knew that his substantial assistance and active participation in this scheme was expressly intended to assist Harry in breaching his fiduciary duty to Trigeant into not pursuing further its continued involvement with the Jet Fuel Contracts.

-51-

## ≡ BERGER SINGERMAN

155.   Mustafa also knew that his actions would deprive Trigeant of substantial revenue it would have otherwise earned under the Jet Fuel Contracts had Harry not begun his pattern of breaching his fiduciary duties to Trigeant for his and Mustafa's own benefit, that would inure to them as the alter egos of IOTC.

156.   Mustafa's substantial assistance also benefitted IOTC, and proximately caused Trigeant's damages resulting from Harry's breach of fiduciary duty.

157.   In the course of performing the Jet Fuel Contracts, IOTC made substantial profits which were filtered to Harry and Mustafa, as the alter egos of IOTC. Had Trigeant performed the Jet Fuel Contracts, and had Harry and Mustafa conducted themselves lawfully by not defrauding al-Saleh, Trigeant would have received 2/3 of the profit which Trigeant pleads as lost profits and special damages. At a minimum, by Harry's under oath admissions in the Al-Saleh Fraud Case trial and predicated upon the Pentagon audit, Trigeant is entitled to $7 million for its loss on the first Jet Fuel Contract, plus the $11.00 per ton for any jet fuel sold, which approximates $40 million in damages.

158.   Mustafa's conduct was at all times willful and wanton, demonstrated by the scope of the events pled above demonstrating the breach of fiduciary duty committed upon Trigeant, and his aiding and abetting conduct in assisting Harry. Trigeant seeks punitive damages against Mustafa for the conduct as pled herein.

WHEREFORE, Plaintiff Trigeant Ltd. prays for judgment in his favor and against the defendant Mustafa Abu-Naba'a for damages, lost profit special damages, punitive damages, the right to set off Trigeant's damages against BTB and IOTC's proof of claims filed in the Trigeant bankruptcy, costs of suit and all such other relief as the Court deems just and appropriate.

-52-

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301 Telephone 954-525-9900 Facsimile 954-523-2872

## COUNT VIII
## CLAIM BY TRIGEANT AGAINST BTB FOR BREACH OF DUTY OF GOOD FAITH

159. Trigeant realleges and incorporates paragraphs 1-78 above into this paragraph 159, as if fully stated herein.

160. Trigeant seeks damages against BTB for its conduct which occurred while BTB was (a) allegedly a lender to Trigeant arising out of the AmCap transaction and (b) a tenant of Trigeant, Ltd.'s at the Refinery. Prior to and during the pendency of the appeal in the Fraudulent Transfer Case and during the first Chapter 11 bankruptcy proceeding, Harry and BTB engaged in a systematic, bad faith course of conduct deliberately intended to permanently damage and destroy Trigeant, consistent with Harry's openly stated pledge to do just that. During this time period, BTB was a tenant of Trigeant's at the Refinery, given that Trigeant was (and dispositively still is) owner of the Refinery. Further, technically, BTB also was a lender to Trigeant, though Trigeant disputes the enforceability of the AmCap Loan Agreements now allegedly held by BTB. Notwithstanding, both BTB's tenant and lender relationships imposed duties upon BTB to act in good faith towards Trigeant, in addition to the fiduciary duties imposed upon Harry as Manager of Trigeant, until his involuntary removal from that position.

161. Harry, acting on behalf of BTB and as its alter ego, engaged in numerous bad faith acts intended to damage Trigeant by both destroying the value of the Refinery and Trigeant's ability to operate the Refinery. Harry and BTB's goal was to assure Trigeant's inability to service the alleged debt owed to BTB arising out of the AmCap transaction, and ultimately, to regain control and ownership of the Refinery. These acts include, but are not limited to:

-53-

### BERGER SINGERMAN

(a)     Purchasing the AmCap Loan Agreements with IOTC funds owed to Trigeant, rather than simply paying off the AmCap debt.

(b)     Failing to conduct routine maintenance at the Refinery, allowing it to fall into great disrepair, diminishing the Refinery's value and creating a large expense for Trigeant to perform necessary repairs.

(c)     Intentionally failing to pay BTB trade creditors who believed that Trigeant and BTB were effectively one and the same party, thus (i) making it difficult to reestablish trade creditor business connections and (ii) leading certain of BTB's creditors to file a proof of claim in the pending Trigeant bankruptcy.

(d)     Landing the roofs on the asphalt tanks, contrary to standard practice in the oil industry, knowing that doing so would create for Trigeant both an environmental problem and a material cost issue related to subsequent cleaning and refilling of the tanks.

(e)     Failing to turnover proceeds from an agreement with Freepoint Commodities Trading and Marketing ("Freepoint") to Trigeant, Ltd., in violation of a federal court order entered in the Fraudulent Transfer Case on April 4, 2013, which was effectively a conversion of those funds by BTB. The following amounts were sent by Freepoint to BTB and not remitted to Trigeant's escrow account as required by the court order: (i) 6/21/13 - $76,399.27, (ii) 11/05/13 - $187,713.87, (iii) 11/13/13 - $6543.75, (iv) 11/28/13- $124,775, (v) 12/06/13 - $288,038.67, (vi) 12/14/13 – $339,969.02  for a subtotal of $1,023,439.58, less a payment received on November 15, 2013 of $24,213.72, for a total unremitted amount of $999,225.86. This resulted in leaving Trigeant without funds to pay creditors pursuant to the court order and creditors filing larger proof of claims in the pending Trigeant bankruptcy than otherwise would have occurred. A copy of the court order is attached as Exhibit C.

-54-

(f)     Notwithstanding certain BTB lien rights, BTB removed all mechanical type personalty from the Refinery to prevent Trigeant from using or renting such property, although BTB had absolutely no use for the personalty, and indeed never did use it after its removal from the Refinery.

(g)     Notwithstanding certain BTB lien rights, BTB removed all Refinery related industry, regulatory and environmental records to prevent Trigeant from using or having access to such records, although BTB had absolutely no use for the records and could never use them for any business purpose outside of Refinery operations.

(h)     Intentionally leaving behind at the Refinery hazardous waste sludge, so that Trigeant would have to deal with its expensive clean up.

(i)     After BTB vacated the Refinery, it prohibited Trigeant from utilizing the dock at the premises, which was necessary and essential for the conduct of Trigeant business, including BTB using intimidation by hiring armed guards who threatened Trigeant employees.

(j)     Attempting to sabotage transactions Trigeant was working on by going directly to parties that Trigeant was developing relationships with.

(k)     Refusing to sign perfunctory permits and applications to enable Trigeant to operate the Refinery.

(l)     Committing the fraudulent transfers and the fraud described above with respect to the Jet Fuel Payment Inducements.

162.    The proof that the foregoing acts were committed in bad faith is established by BTB alleged status whereby it claims to be a lender to Trigeant.  Lenders acting in good faith have a goal of getting their debt paid and maintaining the value of their collateral. Commercially reasonable lenders do not take measures that impede a borrower's ability to pay

-55-

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301 Telephone 954-525-9900 Facsimile 954-523-2872

the outstanding debt, or to diminish the value of their collateral. Every act taken by BTB as pled above was not commercially reasonable or in good faith and was expressly intended by BTB to damage Trigeant.

163.    Harry's overt statements about ruining Trigeant and the Sargeant family related businesses and his ongoing and continuing pattern of detrimental conduct against Trigeant, are relevant to a punitive damage award against BTB, given that at all relevant times, Harry was the alter ego and authorized agent of BTB. Trigeant seeks punitive damages for this conduct.

WHEREFORE, Plaintiff Trigeant, Ltd. prays for judgment in his favor and against the defendant BTB Corp for damages, lost profit special damages, punitive damages, the right to setoff Trigeants' damages against  the BTB proof of claim filed in the Trigeant bankruptcy, costs of suit and all such other relief as the Court deems just and appropriate.

<div align="center">

**COUNT IX**
**CLAIM BY TRIGEANT FOR EQUITABLE LIEN ON IOTC AND BTB ASSETS**

</div>

164.    Trigeant realleges and incorporates paragraphs 1-78 above into this paragraph 164, as if fully stated herein.

165.    IOTC was formed for the improper purpose of defrauding Trigeant out of the Jet Fuel Contracts, as pled above.

166.    BTB was formed for the improper purpose of defrauding Trigeant with respect to BTB's acquisition of the AmCap Loan Documents and to gain control over the Refinery. BTB was capitalized by profits obtained through the Jet Fuel Contracts, a significant portion of which were clearly specially earmarked and designated funds payable to Trigeant.

167.    Harry and Mustafa, using their alter ego entities IOTC and BTB, orchestrated in conspiracy the foregoing fraud against Trigeant on the Jet Fuel Contracts, and became LLC

<div align="center">

-56-

</div>

owner/members of IOTC through the commission of their fraud, and as a result, they profited greatly to the detriment of Trigeant.

168.    Subsequently, when Harry formed BTB with Mustafa, proceeds directly traceable from IOTC and the Jet Fuel Contracts were used to pay off the AmCap loans.

169.    Both IOTC and BTB's business derived purely due to the illegal acts of Harry and Mustafa. The Jet Fuel Contracts, which were the property of Trigeant and were effectively stolen from it by Harry, became IOTC's source of revenue and its business operation. The formation of BTB and its intended operation of the Refinery, was funded directly from the proceeds IOTC derived from the Jet Fuel Contracts where proceeds were diverted from Trigeant by Harry and Mustafa using IOTC funds. BTB was formed specifically to orchestrate a fraudulent transfer, as found in the Fraudulent Transfer case, being to assure that BTB to the detriment of Trigeant, would become and remain owner of the Refinery.  BTB had no other business.

170.    Given that there is a tracing of Trigeant assets and money that caused the creation and existence of both IOTC and BTB, Trigeant should be granted an equitable lien on all assets of IOTC and BTB.

171.    Further, given that Harry and Mustafa in conspiracy orchestrated the fraud against Trigeant as to the Jet Fuel Contracts that gave rise to IOTC and BTB, Trigeant also asserts an equitable lien on any ownership interests that Harry and Mustafa may each own in IOTC and BTB.

WHEREFORE, Trigeant prays this Court grant it an equitable lien (i) on all assets of IOTC and BTB and (ii) on any ownership interests that Harry and Mustafa may each own in IOTC and BTB, and (iii) all such other relief as this court deems just and appropriate.

-57-

## COUNT IX – BREACH OF PARTNERSHIP AGREEMENT

172. Plaintiffs reallege and incorporate paragraphs 1- 78 into this paragraph 172 as if full set forth herein.

173. The Trigeant Holdings Ltd. Partnership Agreement, attached hereto as Exhibit C, provides at Section 5.6 that:

> Each General Partner and Limited Partner may have other business interest and may engage in other activities in addition to those relating to the Partnership, although neither the Limited Partners nor the General Partners may engage in the following businesses: asphalt refining, asphalt trading, and any other business in which the Partnership is engaged. (emphasis added).

174. By entering into the PDVSA Settlement and acquiring the PDVSA Claim for the purpose of credit bidding that claim to obtain the Refinery, Harry, through his alter ego BTB, has breached the Trigeant Holdings, Ltd. Partnership Agreement, because Harry's goal, in part, was and remains to acquire the Refinery, which violates Section 5.6 of the Trigeant Holdings Ltd. Partnership Agreement.

175. Specifically, Harry through his alter ego BTB, is competing with the business of Trigeant Holdings, Ltd., namely its ultimate beneficial ownership of the Refinery.

176. Additionally, Harry through SMSA, also pled above as Harry's alter ego, is presently engaged in and openly asserts that he intends to be and remain in the asphalt refining business.

177. Both of these activities are in direct violation of the partnership agreement.

WHEREFORE, the Plaintiffs request that the Court (a) enter judgment against Harry and his alter egos BTB and SMSA, finding them to have breached the Trigeant Holdings Ltd. Partnership Agreement; (b) allow the Trigeant entities under the Plan the right to pay PDVSA

-58-

the $18.5 million "strike price" under the PDVSA Settlement; (c) other than payment of the strike price, eliminate the PDVSA Claim to the extent that any payment above $18.5 million would be directed to BTB, Silca or Harry; (d) provide Trigeant the right to set off Trigeants' damages against BTB against its proof of claim filed in this bankruptcy, and (e) award any such additional actual damages in the form of lost profits and special other relief as may be had under applicable law.

## COUNT XI – FOR SET OFF ON BTB'S AND SILCA'S CLAIM TO AN INTEREST IN THE PDVSA SETTLEMENT

178.    Plaintiffs reallege and incorporate paragraphs 1-78 into this paragraph 178 as if full set forth herein.

179.    As an insider of Trigeant, Ltd., and through his interest in BTB, which was created to defraud Trigeant, and exists in violation of the Trigeant Holdings, Ltd. Partnership Agreement, Harry, using his alter egos Silca and BTB has positioned those companies with the right to settle the PDVSA Claim for $18.5 million and enable BTB and Silca to receive approximately $21.5 million that would otherwise be an asset of Trigeant Holdings, Ltd. Upon confirmation of Trigeant's Plan of Reorganization, this $21.5 million would be distributed to Trigeants' owners, after all creditors are paid in full. Equally important, Trigeant has numerous affirmative damage claims pled against BTB and Harry above. Further, Trigeant has pled that Harry and Mustafa are the alter egos of BTB, IOTC, SMSA and Silca.

180.    This complaint explicates at length the various breaches of fiduciary duty committed by Harry while serving as Manager of Trigeant, and especially, as it pertains to (a) the creation of the PDVSA debt, (b) Harry's repeated failure during the time that he served as Manager to pay PDVSA, when he, through his alter ego IOTC, had cash available from the Jet

-59-

Fuel Contracts to make such payments, (c) if Harry had paid the Jet Fuel Payment Inducements to Trigeant, there would be no PDVSA judgment to pay in the first place, and (d) Harry, while serving as Manager and fiduciary to Trigeant controlled the decisions on every aspect of Trigeants' business issues with PDVSA and then used his knowledge gained while a fiduciary to position BTB and Silca to benefit from the PDVSA settlement.

181.    These actions have caused Trigeant substantial damage. It would be inequitable and contrary to public policy that BTB and Harry's tortious conduct pled above as it directly relates to PDVSA, should again put Harry, through his alter ego entities, in the position to profit to the detriment of Trigeant. This is especially the case given that Trigeant has setoff damages against BTB.

182.    Trigeant, Ltd. has the wherewithal to and wishes to make the full $18.5 payment to PDVSA upon the sale of the CPU. The Trigeant entities Plan provides that claims such as this can and should be reserved in full for resolution by the Court, post-confirmation.

183.    BTB is 100% owned by Harry. Its manager, Kevin Kirkeide, takes all direction from Harry.

184.    BTB's affairs are comingled with many of the other entities that Harry owns and/or controls.

185.    Harry commingles and moves money in and out of BTB at his own discretion for his own purposes and without regard to the BTB corporate form.

186.    Further, BTB has been and is used to accomplish Harry's own interests and is being used to perpetrate a wrongful act to the detriment of the Trigeant entities.

187.    For all intents and purposes, Harry so dominates the activities and affairs of BTB that it is his alter ego and the corporate form of BTB must be disregarded.

-60-

188.    There is a bona fide, actual, present practical need for declaration as to the present controversy as to the matters pled herein and below, declaring Harry to be the alter ego of BTB. The rights of Trigeant are dependent upon the facts as alleged and related law. Trigeant has an actual interest in this matter and Harry and BTB are adverse to that interest and both parties are properly before this Court. Trigeant is not seeking relief in the form of legal advice.

189.    Upon information and belief, Silca is also the alter ego of Harry. The Plaintiffs reserve their right to conduct discovery on this issue and amend this Complaint accordingly without prejudice to their rights.

190.    WHEREFORE, the Consenting Owners request that this Court enter judgment determining that BTB is the alter ego of Harry Sargeant III.

WHEREFORE the Plaintiffs request that this Court enter judgment against Harry and his alter ego, BTB, determining that: (a) they have acted inequitably by Harry settling the PDVSA claim to the detriment of Trigeant and should not recover any proceeds in excess of $18.5 million while Trigeant's damage claims are pending, and which give rise to setoff; (b) that such intentional act was a violation of the Partnership Agreement; (c) upon confirmation of the Trigeant Plan, PDVSA should forthwith be paid directly the $18.5 million strike price under the PDVSA Settlement; (d) after all other creditors of Trigeant are paid in full on their claims, the balance of the PDVSA claim above $18.5 million be paid pro rata to the equity owners of Trigeant or that such sums otherwise be reserved for future payment; (e) all such other relief as this Court deems just and appropriate.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL CAUSES OF ACTION SO TRIABLE BY A JURY.**

-61-

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via CM/ECF upon all parties listed on the attached Electronic Notice List, on the 23rd day of March, 2015.

Dated: March 23, 2015        Respectfully submitted,

BERGER SINGERMAN LLP
*Proposed Special Counsel to Plaintiffs Trigeant, Ltd., Trigeant Holdings, LLC and Trigeant Holdings, LLC*
350 E. Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL 33301
Telephone: (954 ) 525-9900
Facsimile: (305) 714-4340

By:   */s/ Charles H. Lichtman*
      **Charles H. Lichtman, Esq.**
      Clichtman@bergersingerman.com
      Direct Line (954) 712-5138
      Florida Bar No. 501050
      **Jordi Guso, Esq.**
      Jguso@bergersingerman.com
      Direct Line (305) 714-4375
      Florida Bar No. 863580
      **Jeffrey Wertman, Esq.**
      Jwertman@bergersingerman.com
      Direct Line (954) 712-5137
      Florida Bar No. 003093
      **Isaac M. Marcushamer, Esq.**
      imarcushamer@bergersingerman.com
      Direct Line (305) 712-4376
      Florida Bar No. 060373

6279043-2

-62-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| PDVSA PETROLEO S.A., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-09-38 |
| | § | |
| TRIGEANT, LTD., *et al*, | § | |
| | § | |
| Defendants. | § | |

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

This suit arose out of the transfer of an asphalt refinery located in Corpus Christi, Texas from Defendant Trigeant, Ltd. to Defendant BTB Refining, LLC. (BTB) through a foreclosure sale on March 4, 2008. Plaintiff alleges that the transfer was constructively and actually fraudulent under the Texas Uniform Fraudulent Transfer Act (TUFTA). This cause proceeded to a bench trial, which concluded on May 21, 2012. Pursuant to FED. R. CIV. P. 52(a), after hearing all the evidence, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

A. Parties

1.  Plaintiff PDVSA Petroleo S.A. is a business entity formed and existing under the laws of the Bolivarian Republic of Venezuela, with its principal place of business in Caracas, Venezuela. Its principal business activities include producing, supplying, and selling crude oil and other petroleum products around the world.

2.  Trigeant, Ltd. is a limited partnership. It has a single general partner, Trigeant, LLC. Steve Roos served as the manager of Trigeant, LLC and was also in charge of operations at Trigeant, Ltd.'s Corpus Christi refinery.



EXHIBIT

A

3.  From March 6, 2007 through April 13, 2008, Trigeant Holdings, Ltd. owned 98.9% of Trigeant, LLC. Trigeant Holdings, Ltd. was 99% owned by Harry Sargeant, III, James Sargeant, Daniel Sargeant, and Harry Sargeant, II.

4.  Trigeant Holdings, LLC was the general partner of, and therefore, in control of Trigeant Holdings, Ltd. Harry Sargeant, III was the manager of Trigeant Holdings, LLC.

5.  From March 6, 2007 through April 13, 2008, Harry Sargeant, III, Daniel Sargeant, and Harry Sargeant, II each owned 29.25% of Trigeant Holdings, LLC and James Sargeant owned 12.25%.

6.  BTB was formed on December 10, 2007. Harry Sargeant, III is the 100% owner and sole member of BTB. Harry Sargeant, III exercises exclusive control over BTB.

## B.  First and Second Arbitration Proceedings

7.  In December 2002, Plaintiff and Trigeant, Ltd. entered into a Supply Agreement for the supply of crude oil to Trigeant, Ltd.'s Corpus Christi refinery.

8.  Soon after, the Supply Agreement was suspended when a strike in Venezuela caused Plaintiff to invoke the agreement's force majeure clause.

9.  During the period of time when the Supply Agreement's force majeure clause was invoked, Plaintiff sold Trigeant, Ltd. three shipments of crude oil on the spot market. In other words, the shipments of crude were not purchased pursuant to the Supply Agreement, but through an open commodities exchange.

10. In April 2003, a dispute arose between the parties over the price to be paid for shipments of crude purchased under the Supply Agreement.

11. On September 10, 2004, Plaintiff initiated arbitration proceedings against Trigeant, Ltd. (First Arbitration Proceedings) pursuant to the terms of the Supply Agreement.

12. On March 10, 2006, Plaintiff obtained an arbitration award (First Arbitration Award) against Trigeant, Ltd. for approximately $17 million. This First Arbitration Award resolved the parties' dispute with regard to the shipments of crude purchased pursuant to the Supply Agreement.

13. Disputes remained, however, with regard to the three shipments of crude oil

2 / 22

purchased from Plaintiff on the spot market. Plaintiff demanded payment for the shipments, and Trigeant, Ltd. claimed Plaintiff had committed antitrust violations.

14. On August 29, 2007, Plaintiff initiated the Second Arbitration Proceedings against Trigeant, Ltd.

15. On August 24, 2008, Plaintiff obtained a Second Arbitration Award against Trigeant, Ltd. for approximately $35 million. (P47.) As of April 2012, the total amount owed by Trigeant, Ltd. on the Second Arbitration Award, including interest and costs, was approximately $47 million.

## C.  AmCap Loan

16. In the Fall of 2006, Trigeant, Ltd. utilized a mortgage broker, Blossom Street Capital, to find potential financing sources for an asset-backed loan which could be secured by a mortgage on its refinery.

17. In December 2006, American Capital Financial Services, Inc. (AmCap) agreed to loan Trigeant, Ltd. $22 million in exchange for a lien on substantially all of Trigeant Ltd.'s assets, including a deed of trust on the refinery. (D12.)

18. The refinery constituted Trigeant Ltd.'s primary asset.

19. At this time, AmCap determined that the refinery alone had a liquidation value of $30 million. AmCap believed the refinery and its assets were worth considerably more if properly marketed and sold at fair market value; however, if the refinery had to be foreclosed upon and sold at public auction, as a whole or in pieces, AmCap felt it could easily obtain $30 million.

20. On December 15, 2006, Trigeant, Ltd. and AmCap signed a Credit Agreement memorializing the terms of the loan. (D13.)

21. Trigeant, Ltd. was solvent at the time it executed the Credit Agreement, and the Credit Agreement did not cause it to become insolvent.

22. The AmCap lien and deed of trust on the refinery was effective against the holder of any judicial lien subsequently obtained against Trigeant, Ltd.

23. The proceeds from the loan helped Trigeant, Ltd. finance its payment of the First Arbitration Award, and on December 29, 2006, Trigeant, Ltd. paid Plaintiff $17,204,573 in full satisfaction of the First Arbitration Award.

24.    Trigeant, Ltd. and Plaintiff signed a Release and Satisfaction with regard to the
       First Arbitration Award. (D25.)

**D.    Trigeant, Ltd.'s Default on the AmCap Loan**

25.    On May 19, 2006, prior to entering into the AmCap loan agreement, Trigeant, Ltd.
       executed a Processing Agreement with Texas Asphalt Refining Company
       (TARCO).

26.    The Processing Agreement required that TARCO pay a fixed per barrel rate for
       processing crude at the refinery, and it required a minimum monthly quota which
       had to be paid regardless of whether any crude oil was processed. This "take or
       pay" arrangement guaranteed Trigeant, Ltd. minimum annual revenue of $21.6
       million.

27.    The TARCO Processing Agreement expired in May 2007.

28.    Trigeant, Ltd. continued to process crude for TARCO pursuant to the Processing
       Agreement and sought an extension of the agreement. However, in the Fall of
       2007, TARCO indicated that it would not renew the Processing Agreement
       because market forces had driven down profit margins to unacceptable levels.
       There were also allegations that Trigeant, Ltd. soured the relationship by
       attempting to charge TARCO for capital improvements at the refinery. At this
       point, Trigeant, Ltd. no longer had a secured revenue stream.

29.    As of result, Trigeant, Ltd. breached one of its financial covenants with AmCap.
       This breach constituted an "event of default" under the Credit Agreement.

30.    By the third quarter of 2007, Trigeant, Ltd.'s financial picture had become
       unacceptable to AmCap.

31.    Steve Roos negotiated a cure to Trigeant, Ltd.'s loan default, but Trigeant Ltd.'s
       equity holders were unwilling to invest additional money in the business.
       Therefore, Trigeant, Ltd. was unable to meet AmCap's requirements for the
       proposed debt restructuring.

32.    On October 9, 2007, AmCap formally notified Trigeant, Ltd. that the loan was in
       default and threatened foreclosure. (D35.)

33.    On November 8, 2007, AmCap formally notified Trigeant, Ltd. that it would
       accelerate the debt under the terms of the Credit Agreement. (D39.)

34.   On November 20, 2007, AmCap gave Trigeant, Ltd. notice that it intended to foreclose on the refinery. (D40.)

E.    **BTB's Purchase of the AmCap Loan and Lien**

35.   Following AmCap's notice of default in October 2007, Harry Sargeant, III approached the other Trigeant, Ltd. equity holders (James Sargeant, Dan Sargeant, and Harry Sargeant, II) to request permission to put together a deal on his own to take control of the refinery. The equity holders granted Harry Sargeant, III permission to do so.

36.   Harry Sargeant, III approached his longtime business associate, Mustafa Abu Naba, about financing a NewCo to serve as an acquisition vehicle to purchase the refinery out of foreclosure.

37.   Mr. Abu Naba was a dominant purveyor of asphalt throughout the Caribbean, and the refinery would enhance the vertical integration of his businesses. His businesses relied on third-party suppliers of asphalt, and he desired a preferred business relationship with an asphalt refinery on the Texas Gulf Coast.

38.   The refinery also provided vertical integration for Harry Sargeant, III's asphalt and crude oil shipping businesses which could increase profits.

39.   Control over the refinery permitted Harry Sargeant, III and his affiliated entities to obtain a preferred price from third-party asphalt suppliers. With the ability to turn the refinery on and off, Harry Sargeant, III and his affiliated entities could influence market prices. Asphalt suppliers would be willing to supply them with asphalt at a reduced price if they agreed not to produce.

40.   In October 2007, Harry Sargeant, III met with Myung Yi of AmCap to discuss the possibility of purchasing the refinery (after foreclosure by AmCap) through an entity either wholly or partially owned by Harry Sargeant, III.

41.   Kevin Kirkeide, who Harry Sargeant, III selected to manage the NewCo, also attended the meeting with Myung Yi.

42.   By November 19, 2007, the parties had reached a tentative agreement on the sale of the refinery. The plan was for an entity controlled by Harry Sargeant, III to purchase the refinery from AmCap for the total outstanding balance of the loan following a publicly held foreclosure sale at which AmCap would enter a credit bid equal to all amounts due and owing under the loan at that time. (P82.)

43.   On December 10, 2007, BTB was formed to serve as the acquisition vehicle for the refinery purchase. Harry Sargeant, III was named the sole owner and member and had full control over the company's operations.

44.   That same day, AmCap and BTB executed an Agreement Regarding Sale of Property and BTB deposited $8 million into an escrow account as a deposit on the refinery. (P99.)

45.   Pursuant to the Agreement Regarding Sale of Property, AmCap agreed to foreclose on the property and enter a credit bid at the foreclosure sale. If AmCap's credit bid constituted the highest bid at the foreclosure sale, AmCap agreed to designate BTB as the entity to take title to the refinery at closing.

46.   BTB requested that the foreclosure sale be held on January 1, 2008 because it believed there would be less chance of other bidders on that day.

47.   AmCap was only concerned about recouping its investment. It had no interest in maximizing the sale price of the refinery. Because it had a guaranteed buyer, AmCap agreed to hold the sale on January 1, 2008.

48.   AmCap no longer viewed Trigeant, Ltd. as a going concern because of the expiration of the TARCO agreement. Nevertheless, AmCap still considered the refinery's liquidation value to be between $27.6 and $30 million. AmCap believed it could obtain this amount through a forced sale of the refinery, either as a whole or broken up and sold off in its component pieces. AmCap was confident that it could recoup the outstanding loan balance of approximately $22 million, with or without BTB. (P7.)

49.   In the event that AmCap was not the highest bidder on January 1, 2008, the Agreement Regarding Sale of Property required AmCap to return the $8 million deposit to BTB.

50.   Given the possibility that AmCap might be outbid at the public auction, BTB's strategy changed from purchasing the refinery to purchasing the loan and lien from AmCap. By substituting itself as the foreclosing creditor, BTB would have more control over the foreclosure process and the outcome.

51.   In early December 2007, BTB brought the idea of a note purchase to AmCap. AmCap felt that this was the cleanest way for it to get paid so it agreed to the change in plan.

52.   BTB and AmCap negotiated an Assignment and Acceptance Agreement through which AmCap would transfer the loan and lien to BTB.

53.    In exchange for AmCap's assignment of its rights and obligations under the Credit Agreement and Deed of Trust, BTB agreed to pay AmCap the outstanding loan balance ($22,364,562.06), less the amount of any interest payments made by Trigeant, Ltd. (P100.)

54.    On December 23, 2007, Harry Sargeant, III gave the go ahead for the note purchase. (P8, D129.)

55.    On December 27, 2007, Steve Roos of Trigeant, Ltd. made an interest payment to AmCap in the amount of $521,143.41. (P86.) This resulted in a direct reduction of the purchase price of the AmCap loan for BTB.

56.    On December 28, 2007, BTB and AmCap executed the Assignment and Acceptance Agreement (P100), which superseded the Agreement Regarding Sale of Property, and BTB paid AmCap $21,828,446.65, which represented the outstanding balance on the note.

57.    BTB then cancelled the previously scheduled January 1, 2008 foreclosure sale.

F.    **BTB's Foreclosure on the Refinery**

58.    Following the sale of the AmCap loan and lien to BTB, Trigeant, Ltd. continued in default under the Credit Agreement.

59.    BTB did not offer Trigeant, Ltd. an opportunity to cure the default, nor did Trigeant, Ltd. propose any cure.

60.    There were never any discussions or negotiations between BTB and Trigeant, Ltd. regarding a rehabilitation plan.

61.    BTB never planned to rehabilitate Trigeant, Ltd.; rather, it intended to take control of the refinery through foreclosure.

62.    Harry Sargeant, III believed that once the TARCO processing agreement expired, Trigeant, Ltd. was essentially dead.

63.    Harry Sargeant, III and the other Trigeant, Ltd. equity holders were not interested in putting more money into Trigeant, Ltd.

64.    BTB initially rescheduled the foreclosure sale for February 5, 2008, the first Tuesday in February. (D190, D200.)

65. BTB then rescheduled the foreclosure sale for March 4, 2008, the first Tuesday in March. (D193, D201.)

66. On February 12, 2008, Skip Henkel, the substitute trustee, gave written notice to Trigeant, Ltd. that a non-judicial foreclosure sale would be conducted on March 4, 2008. (D193.)

67. Notice of the public foreclosure sale was posted at the Nueces County Courthouse. (D207.)

68. Notice of the foreclosure sale was published in the Coastal Bend Daily Legal & Business News on February 15, 2008. (D201.)

69. Trigeant, Ltd. made no effort to maximize the sale price of the refinery: it did not retain a broker, it did not contact other interested buyers, and it did not advertise the sale.

70. It was not in BTB's interest to publicize the sale because it wished to buy the refinery at the lowest possible price.

71. On March 4, 2008, the substitute trustee conducted a public auction on the steps of the Nueces County Courthouse.

72. BTB was the only bidder present at the sale.

73. BTB placed a credit bid of $22,565,193.55, equal to all amounts due and owing under the loan at that time.

74. The foreclosure sale was conducted in accordance with the provisions of the Texas Property Code, Section 51.002.

75. Plaintiff did not learn about the foreclosure sale until after it occurred.

76. BTB, Trigeant, Ltd., and Harry Sargeant, III initially concealed the foreclosure sale and the relationship between BTB and Harry Sargeant, III.

77. The Port Authority of Corpus Christi did not learn of the sale until November 2008, when it received notice from U.S. Customs and Border Control.

78. The neighboring Citgo refinery (a subsidiary of Plaintiff), which leased storage tanks from Trigeant, Ltd., did not learn about the change in ownership until January 2009 when there was an issue with its employees' access badges for the Trigeant, Ltd. refinery.

8 / 22

79.   On May 26, 2008, at the Second Arbitration Proceedings before the International
      Court of Arbitration, Harry Sargeant, III testified that he did not have any interest
      in, control over, or connection to BTB, either directly or indirectly. (P90.)

80.   At the time of the transfer of the refinery, Trigeant, Ltd. was insolvent, meaning
      that the sum of its debts was greater than all of its assets at a fair valuation.

### G.   The Transition Agreement

81.   After BTB's purchase of the refinery on March 4, 2008, Trigeant, Ltd. and BTB
      negotiated a Transition Agreement by which Trigeant, Ltd. operated the refinery
      on behalf of BTB for an administrative fee equal to 10% of the cost of the
      employees' compensation and benefits. (D58, D59, D60, D62, D64, D65, D69,
      D72, P162.)  BTB was also required to reimburse Trigeant, Ltd. for any
      expenditures incurred to maintain, improve, lease, and insure the land. (P162.)

82.   Trigeant, Ltd. maintained its same employees, and there was little or no change in
      the management and operation of the refinery.

83.   Trigeant, Ltd. refined its own petroleum stocks at the refinery during the transition
      period and fulfilled its existing contracts. (D45, D45a.)

84.   BTB's Kevin Kirkeide managed any new contracts and new business.

85.   The Transition Agreement expired on June 30, 2008, but Trigeant, Ltd. continued
      operating the refinery for BTB until September 8, 2008, when BTB foreclosed on
      all of Trigeant, Ltd.'s remaining property at the refinery.

86.   After September 8, 2008, Trigeant, Ltd.'s employees were offered employment
      with BTB.  Steve Roos continued to serve as the manager of Trigeant, LLC, but
      was no longer in charge of the refinery's operations.

### H.   BTB's Foreclosure on Trigeant's Remaining Assets

87.   On February 7, 2008 (before the foreclosure on the refinery), Trigeant, Ltd. and
      BTB entered into an amendment to the Credit Agreement that granted Trigeant,
      Ltd. a $16 million line of credit secured by the same Trigeant, Ltd. assets as in the
      original Credit Agreement. (D48, D49.)

88.   BTB loaned Trigeant, Ltd. $3,950,000 for operating expenses and capital
      improvements at the refinery.

89.   The capital improvements at the refinery included the installation of a new gas meter, the completion of a railcar unloading rack, and ongoing work on a truck loading rack. (P40.)

90.   After the March 4, 2008 foreclosure sale, Trigeant, Ltd. continued to own personal property located at the refinery, including equipment, accounts, contracts and the permits necessary to operate the refinery.

91.   On June 25, 2008, BTB proposed that Trigeant, Ltd. turn over all its remaining personal property and intangibles secured by the Amended Credit Agreement in full satisfaction of Trigeant Ltd.'s remaining debts and obligations to BTB. (D63, D66, D67.)

92.   Trigeant, Ltd. failed to respond to BTB's proposal.

93.   BTB gave Trigeant, Ltd. notice of its intent to foreclose on Trigeant Ltd.'s remaining assets. (D68, D73.)

94.   On September 8, 2008, BTB held a public auction at which it entered a credit bid for all of Trigeant, Ltd.'s remaining personal property and intangibles at the refinery. (D71.)

I.   Value of the Refinery at the Time of the Transfer

95.   The Court received evidence of a wide range of values for the refinery.

96.   As a going concern and assuming the completion of certain capital improvements that were under way at the time of the transfer, the refinery was potentially worth $160 million.

97.   In 2006, Trigeant, Ltd. estimated the fair market value of the refinery at $68 million.

98,   On December 10, 2007, AmCap's Blacktop Report placed the break-up/liquidation value of the refinery at $27.6 million; the orderly liquidation value of the refinery at $30–40 million, depending on market conditions; the fair market value at $45 million; and the replacement cost at $74.6 million.

99.   The considerable variations in the estimates of the refinery's value are due to the variability of the factors considered—such as current market conditions, the time of the year, whether the refinery was being marketed as a going concern, whether the sale was voluntary or involuntary, and whether the refinery was intact and operational or shuttered and being sold off in pieces.

100.  The Court finds the testimony of AmCap's corporate representative, Myung Yi, and the AmCap Blacktop Report credible and persuasive with regard to valuation. AmCap's decision to loan Trigeant, Ltd. $22 million was based primarily on its ability to recover its investment, if needed, through a forced sale of the refinery. In other words, AmCap had a strong incentive to provide an accurate, albeit conservative, valuation of the refinery.

101.  Because Trigeant, Ltd. was in default on its loan and the refinery was in foreclosure, the Court finds that the proper valuation of the refinery at the time of the transfer was its liquidation value, not its fair market value.

102.  The Court finds that, at the time of the transfer, the refinery had a value in excess of the lien.

J.     Insider Status

103.  Harry Sargeant, III holds a 29.5% ownership interest in Trigeant Holdings, LLC.

104.  Harry Sargeant, III's immediate family members (James Sargeant - brother, Daniel Sargeant - brother, and Harry Sargeant, II - father) hold the remaining ownership interest in Trigeant Holdings, LLC.

105.  At the time of the transfer of the refinery, Harry Sargeant, III served as the manager of Trigeant Holdings, LLC. (D22.)

106.  Trigeant Holdings, LLC is the general partner of and exerts full control over Trigeant Holdings, Ltd.

107.  At the time of the transfer, Trigeant Holdings, Ltd. was 99% owned by Harry Sargeant, III and his immediate family members (James Sargeant, Daniel Sargeant, and Harry Sargeant, II).

108.  At the time of the transfer, Trigeant Holdings, Ltd. owned 98.9% of Trigeant, LLC. Accordingly, Trigeant Holdings, Ltd. controlled Trigeant, LLC.

109.  Trigeant, LLC is the general partner of Trigeant, Ltd. Accordingly, Trigeant, LLC exercised 100% control over Trigeant, Ltd.

110.  In sum, Trigeant Holdings, LLC exerted control over Trigeant Holdings, Ltd., which in turn controlled Trigeant, LLC, which in turn controlled Trigeant, Ltd.

111.   The Trigeant, Ltd. equity holders, which consisted of Harry Sargeant, III, James
       Sargeant, Daniel Sargeant, and Harry Sargeant, II, were related, shared the same
       small office, and worked very closely together.

112.   The other Trigeant, Ltd. equity holders deferred to Harry Sargeant, III on issues
       regarding Trigeant, Ltd.'s management.  They had little interest in the operations
       of Trigeant, Ltd. and were not active in its management.

113.   Harry Sargeant, III had ultimate managerial responsibility for Trigeant, Ltd.'s
       operations and thus exerted control over Trigeant, Ltd. (P49.)

114.   Harry Sargeant, III possessed intimate knowledge of Trigeant, Ltd.'s business and
       financial affairs.

115.   Harry Sargeant, III was the 100% owner and sole member of BTB.

116.   Kevin Kirkeide served as BTB's manager and handled the company's day-to-day
       operations; however, Harry Sargeant, III had ultimate managerial control over
       BTB and directed Mr. Kirkeide with regard to BTB's important business
       decisions.

117.   Harry Sargeant, III sat on both sides of the transaction involving the transfer of the
       refinery from Trigeant, Ltd. to BTB.

## CONCLUSIONS OF LAW

A.    **The Court Has Personal Jurisdiction over Harry Sargeant, III**

1.    The Court concludes that it has specific jurisdiction over Harry Sargeant, III.

2.    In determining whether it may exercise personal jurisdiction over a defendant, a Court must consider (1) whether the defendant has sufficient minimum contacts with the forum state, and (2) whether the exercise of jurisdiction would offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945); *see also Alpine View Co. Ltd v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).

3.    For specific jurisdiction, minimum contacts may be established by demonstrating that the defendant purposefully directed his activities at the forum state and the plaintiff's cause of action arises out of these activities. *See Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 413–14 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

4.    Harry Sargeant, III purposefully directed his activities at Texas, and this litigation results from damages that arise out of those activities:  he came up with the plan to purchase the Texas refinery after a foreclosure sale by AmCap (FF 35, 36, 40, 42, 44, 45); he formed BTB to purchase the refinery (FF 43); he then negotiated and ordered the purchase of the loan and lien from AmCap (FF 50, 51-54); and he controlled the foreclosure on the refinery through BTB (FF 58-65, 71-73).  The transfer of the refinery to BTB prevented Plaintiff from collecting on its Second Arbitration Award against Trigeant, Ltd.  Accordingly, Plaintiff has demonstrated that Harry Sargeant, III has sufficient minimum contacts with Texas. *See Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 728 (Tex. App. Houston [1st Dist.] 2005).

5.    Once a plaintiff establishes minimum contacts, the burden shifts to the nonresident defendant to show that asserting jurisdiction would not offend traditional notions of fair play and substantial justice. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 245 (5th Cir. 2008); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999).  "In conducting the fairness inquiry, [courts] examine (1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006); *Wien Air Alaska*, 195 F.3d at 215.

6. Texas has a significant interest in the subject matter of the litigation (the refinery), and bringing all defendants together in one action leads to a more efficient resolution of the controversies. There is a burden on Harry Sargeant, III to litigate in Texas; however, the balance of interests favors this Court's exercise of jurisdiction over Harry Sargeant, III.

7. The fiduciary shield doctrine does not apply in this case. The Fifth Circuit has concluded that when an individual exerts such domination and control over a company that in reality they are the same, the exercise of jurisdiction over the individual is appropriate. *See Stuart v. Spademan*, 772 F.2d 1185, 1198 (5th Cir. 1985). Additionally, where an individual acts in his own self-interest, rather than that of the corporation, he is not entitled to the protection of the fiduciary shield doctrine. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 902–03 (2d Cir. 1981). Harry Sargeant, III was the 100% owner and sole member of BTB. He had full control over BTB's operations and directed and controlled its decisions. Additionally, he acted in his own interest in facilitating and directing the transfer of the refinery to BTB (FF 6, 39-40, 42-46, 50-56, 114, 116).

8. Accordingly Harry Sargeant, III's Motion for Judgment on Partial Findings (D.E. 232) is DENIED.

**B.    The March 4, 2008 Foreclosure Sale Constituted a Transfer of an Asset**

9. TUFTA Section 24.002 provides definitions for several statutory terms which are relevant to the Court's inquiry into whether the March 4, 2008 foreclosure sale constituted a transfer of an asset.

> Transfer: "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance. § 24.002(12)
> Asset: "property of a debtor, but the term does not include . . . property to the extent it is     encumbered by a valid lien . . . ." § 24.002 (2).
> Valid Lien: "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." § 24.002(13)

10. An alleged fraudulent transfer of property is exempt from TUFTA "to the extent that such property is encumbered by a security interest that would be effective against a subsequent judicial lien." *Mullins v. Testamerica, Inc.*, 564 F.3d 386, 414 (5th Cir. 2009).

11. When only part of a property's value is encumbered by a valid lien, the value the debtor maintains in the encumbered property in excess of the encumbering lien (the debtor's equity) constitutes an asset subject to TUFTA's anti-fraud provisions. *Telephone Equipment Network, Inc. v. TAS/Westchase Place, Ltd.*, 80 S.W.3d 601, 610, n.6 (Tex. Ct. App. 2002) (collecting cases).

12. In determining whether property constitutes an asset, the Court considers the property's value at the time of the transfer. *See, e.g., United States ex. rel. Small Business Admin. v. Comm. Tech., Inc.,* 354 F.3d 378, 387 (5th Cir. 2003).

13. Because the refinery was in foreclosure at the time of the transfer, in determining its value, the Court considers the property's liquidation value, not its fair market value.

14. The Court found that, at the time of the transfer, the refinery had a liquidation value in excess of the lien (FF 102). Therefore, the entire value of the refinery was not encumbered by a valid lien.

15. The Court does not need to determine whether the debtor received less than reasonably equivalent value for the asset, as the TUFTA definitions of "transfer" and "asset" do not include the term reasonably equivalent value. §§ 24.002(2)&(12).

16. The omission of reasonably equivalent value from the definitions of "transfer" and "asset" cannot be considered an accident. *See Chicago v. Envtl. Defense Fund*, 511 U.S. 328, 338 (1994) ("it is generally presumed that [a legislature] acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another" (quotations omitted)); *Laidlaw Waste Systems (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 659 (Tex. 1995) ("It is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose. Likewise, we believe every word excluded from a statute must also be presumed to have been excluded for a purpose." (quotations and citations omitted)).

17. The Court concludes that the foreclosure sale constituted a transfer of an asset.

## C.   Section 24.006(b):  Constructive Fraud - Insider Preference

18. TUFTA Section 24.006(b) prohibits a category of fraudulent transfers known as "insider preferences."

19.  To establish a claim for constructive fraud under Section 24.006(b), a creditor
     must demonstrate the following elements:
              (1)    a transfer;
              (2)    to an insider;
              (3)    for an antecedent debt;
              (4)    insolvency of the debtor at the time of the transfer; and
              (5)    insider had reasonable cause to believe that the debtor
                     was insolvent.

20.  For Plaintiff to establish a claim for constructive fraud under Section 24.006(b), it
     must demonstrate that BTB was an insider of Trigeant, Ltd.

21.  The test for determining insider status is to look at (1) the closeness of the
     relationship between the transferee (BTB) and debtor (Trigeant, Ltd.), and
     (2) whether the transfer constituted an arm's length transaction. *In re Holloway*,
     955 F.2d 1008, 1010 (5th Cir. 1992); *Jackson Law Office, P.C. v. Chappell*, 37
     S.W.3d 15, 25 (Tex. App. – Tyler 2000, no pet.).

22.  The Court first considers Harry Sargeant, III's relationship with Trigeant, Ltd.  A
     person who exercises control over the debtor is always considered an insider. §
     24.002(7)(C)(v).  Harry Sargeant, III exercised control over Trigeant, Ltd. (FF
     103-114).

23.  A person's intimate knowledge of a partnership's business affairs is highly
     probative of an insider relationship. *See In re Wren Alexander Investments, LLC*,
     No. 08-52914-RBK, 2011 WL 748131, at *9–10 (Bankr. W.D. Tex. Feb. 23,
     2011) (citing *Putman v. Stephenson*, 805 S.W.2d 16, 19 (Tex. App. Dallas 1991)).
     Harry Sargeant, III had intimate knowledge of Trigeant, Ltd.'s business and
     financial affairs (FF 114).

24.  Another indicator of an insider relationship is when a person is a relative of the
     general partner or other person in control of the debtor. § 24.002(7)(C)(ii).  In the
     case at hand, the Sargeant family owned Trigeant, Ltd.  Harry Sargeant, III was
     not only an equity partner and in control of Trigeant, Ltd., but he was related to
     the other equity partners.

25.  An arm's length transaction is a transaction between two unrelated and
     unaffiliated parties.  *Black's Law Dictionary* 1635 (9th ed. 2009).  In this case,
     Harry Sargeant, III sat on both sides of the transaction (FF 118) so the transfer of
     the refinery was between related and affiliated parties and thus not at arm's length.

26.  Therefore, the Court concludes that Harry Sargeant, III was an insider of Trigeant,
     Ltd.

     16 / 22

27. The Court next considers BTB's relationship with Trigeant, Ltd. BTB had a close relationship with Trigeant, Ltd. because its 100% owner and sole member was an insider of Trigeant, Ltd. Harry Sargeant, III was in control of both BTB and Trigeant, Ltd. (FF 113-116). BTB thus had intimate knowledge of Trigeant Ltd.'s business and financial affairs. As stated above, the transfer of the refinery was not at arm's length. Accordingly, the Court concludes that BTB was an insider of Trigeant, Ltd.

28. The other constructive fraud factors—that the transfer was for an antecedent debt, that the debtor was insolvent at the time of the transfer, and that the insider had reasonable cause to believe the debtor was insolvent—were uncontested by Defendants.

29. Plaintiff established by a preponderance of the evidence all the elements for a claim of constructive fraud under TUFTA Section 24.006(b).

**D.   Section 24.010(a)(3):  One-Year Statute of Limitations for Insider Preference**

30. Under TUFTA, an action for constructive fraud under Section 24.006(b) "is extinguished unless action is brought . . . within one year after the transfer was made." § 24.010(a)(3).

31. The foreclosure sale occurred on March 4, 2008. Plaintiff did not file its Third Amended Complaint naming Harry Sargeant, III as a Defendant until July 23, 2010 (D.E. 120). Thus, Plaintiff's constructive fraud claim against Harry Sargeant, III under Section 24.006(b) is untimely, unless Plaintiff can show that it relates back to the Original Complaint.

32. Under FED. R. CIV. P. 15(c)(1)(C), a plaintiff who files suit within the limitations period may amend the complaint to change a defendant's name or substitute a correctly named defendant for one named by mistake, so long as (1) the amended complaint asserts a claim or defense arising out of the same conduct, transaction, or occurrence set out—or attempted to be set out—in the original complaint; (2) the newly named defendant had notice of the suit during the period for service of process under FED. R. CIV. P. 4(m); and (3) the newly named defendant knew or should have known that, but for a mistake, he would have been named within the applicable limitations period. *Krupski v. Costa Crociere S. p. A.*, --- U.S. ----, 130 S.Ct. 2485, 2496 (2010); *Jacobsen v. Osborne*, 133 F.3d 315, 319 (5th Cir. 1998).

33. Plaintiff cannot satisfy the third element. "Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing [its] original

17 / 22

complaint." *Krupski*, 130 S. Ct. at 2493. In the case at hand, there is no evidence that Harry Sargeant, III knew or should have known that Plaintiff was targeting him as a defendant, or that he would have been named as a defendant but for a case of mistaken identity.

34.    Plaintiff's constructive fraud claim against Harry Sargeant, III under Section 24.006(b) is dismissed for failure to comply with the applicable statute of limitations.

E.    Sections 24.005(a)(2) and 24.006(a):  Constructive Fraud

35.    To establish a claim for constructive fraud under Sections 24.005(a)(2) and 24.006(a), a creditor must prove the following elements for each transaction:
    (1)    the transaction constituted a transfer;
    (2)    the debtor received less than reasonably equivalent value in exchange for the transfer; and
    (3)    one of the following:
        (i)    the debtor was insolvent at the time of the transfer or as a result of the transfer;
        (ii)    the debtor was left with unreasonably small capital after the transfer; or
        (iii)    at the time of the transfer, the debtor intended to incur debts beyond its ability to pay.

36.    Under TUFTA, "a person gives reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, non-collusive foreclosure sale . . . ." § 24.004(b); *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994).

37.    A debtor receives reasonably equivalent value for its property transferred through a foreclosure sale if the value received falls "within the range of values for which the transferor would have sold the assets in an arm's length transaction." § 24.004(d).

38.    Even if the foreclosure sale was collusive, the transfer of the refinery was for a value within the range of values for which the refinery would have sold in an arm's length transaction pursuant to § 24.004(d).

39.    The lowest price at which the refinery would have sold in a regularly conducted, non-collusive foreclosure sale is the outstanding loan balance of approximately $22.5 million. In the foreclosure sale context, it is not uncommon for a foreclosing creditor to enter a "credit bid" equal to the outstanding balance of the

loan. Thus, $22.5 million establishes the bottom end of the range of what would be considered a reasonably equivalent value for the refinery.

40.   Accordingly, Plaintiff's constructive fraud claim under TUFTA Sections 24.005(a)(2) and 24.006(a) fails.

### F.   Section 24.005(a)(1) and (b):  Actual Fraud

41.   To establish actual fraud under Section 24.005(a)(1), the creditor must prove by a preponderance of the evidence that the debtor made the allegedly fraudulent transfer with the "actual intent to hinder, delay, or defraud any creditor of the debtor."

42.   Section 24.005(b) provides a list of eleven nonexclusive badges of fraud that the Court may consider in determining whether the debtor acted with actual intent to defraud:
   (1) the transfer or obligation was to an insider;
   (2) the debtor retained possession or control of the property transferred after the transfer;
   (3) the transfer or obligation was concealed;
   (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
   (5) the transfer was of substantially all the debtor's assets;
   (6) the debtor absconded;
   (7) the debtor removed or concealed assets;
   (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
   (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
   (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
   (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

43.   The existence of several badges of fraud has been found to constitute an inference of fraud, a strong case of fraud, or to even shift the burden of proof to the defendant. *See, e.g., Kelly v. Armstrong*, 141 F.3d 799, 802–03 (8th Cir. 1998) (holding that the presence of multiple badges of fraud shifts the burden to defendant to show by a preponderance of the evidence that it had a legitimate purpose in making the transfer); *Tex. Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299, 313 (Tex. App. 2009) ("An individual badge of fraud is not conclusive, but a concurrence of many badges in the same case will always make out a strong case

of fraud." (internal quotations and brackets omitted)); *In re SMTC Mfg. of Texas*, 421 B.R. 251, 300 (W.D. Tex. 2009) ("Proof of four to five badges of fraud has been found sufficient in several reported cases.").

44.    In the case at hand, the evidence supports a finding of at least seven of the statutory badges of fraud: the transfer was to an insider (FF 103–118, CL 27); the debtor retained possession or control over the property after the transfer for a period of time (FF 81-86); the transfer was concealed (FF 69, 70, 72, 75-79); before the transfer was made, the debtor had been sued or threatened with suit (FF 14); the transfer of the refinery constituted substantially all of the debtor's assets (FF 18); the debtor was insolvent or became insolvent shortly after the transfer was made (FF 80); and the transfer occurred shortly before a substantial debt (the Second Arbitration Award) was incurred (FF 15).

45.    The Court concludes that the debtor, Trigeant, Ltd., acted with actual intent to hinder, delay, or defraud Plaintiff.

### G.    Section 24.009(a):  Good Faith Defense

46.    Under Section 24.005(a)(1), a transfer is not voidable against someone who took the property in good faith and for reasonably equivalent value. *See, e.g., Phillips v. B.R. Brick and Masonry, Inc.*, 2010 WL 3564820, at *4 (Tex. App., 1st Dist. Houston, Sept. 10, 2010); *In re IFS Financial Corp.*, 417 B.R. 419, 441 (Bankr. S.D. Tex. 2009).

47.    BTB did not carry its burden with regard to the good faith element.  Consequently, BTB may not invoke the good faith defense.

### H.    TUFTA Remedies

48.    TUFTA Section 24.008 provides the following remedies for creditors who have been defrauded under the Act:

> (1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
> (2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings; or
> (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure:
>> (A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other

property;
(B) appointment of a receiver to take charge of the asset
transferred or of other property of the transferee; or
(C) any other relief the circumstances may require.

49.　"TUFTA was designed to prevent a debtor from defrauding its creditors by
moving assets out of reach. To accomplish that end, TUFTA permits a creditor,
under certain circumstances, to set aside a debtor's fraudulent transfer of assets."
*Wohlstein v. Aliezer*, 321 S.W.3d 765, 776 (Tex. App. Houston [14th Dist.] 2004)
(internal citation omitted).

50.　"Setting aside a fraudulent transfer is an equitable remedy." *Jackson Law Office v.
Chappell*, 37 S.W.3d 15, 26 (Tex. App. Tyler 2000).  A district court exercising its
equitable powers must weigh the interests of the parties and the public in
determining whether equitable relief should be granted. *Wenner v. Texas Lottery
Comm'n*, 123 F.3d 321, 325 (5th Cir. 1998).

51.　The Court concludes that avoidance of the transfer is the most appropriate remedy
in this case.  The Court is concerned about the effects of unwinding the transfer
after more than four years.  However, given the evidence regarding the wide range
of values for the refinery in a foreclosure situation, it would be speculative to set a
value on the refinery at the time of the transfer.  Thus, a money judgment is not
appropriate.

52.　The setting aside of a fraudulent transfer restores the debtor and creditor to their
respective positions as they existed before the transfer and permits the creditor to
enforce its legal rights against the debtor, as if no conveyance had ever been made.
*First Nat. Bank of Detroit v. Skidmore*, 267 S.W. 1051, 1055 (Tex. App.
Texarkana 1924).  Before the transfer, BTB had a lien on the refinery.  Plaintiff
requests that BTB's lien be equitably subordinated to its claim.

53.　Equitable subordination elevates the status of the creditor against other claimants
above what its position was at the time of the transfer.  The Fifth Circuit has
enunciated a four-prong test for determining when equitable subordination is
appropriate:

(1) the claimant [BTB] must have engaged in inequitable conduct;
(2) the misconduct must have resulted in injury to the creditors of
the bankrupt [Plaintiff] or conferred an unfair advantage on the
claimant [BTB]; (3) equitable subordination of the claim must not be
inconsistent with the provisions of [TUFTA]; and (4) a claim should
be subordinated only to the extent necessary to offset the harm

which the debtor or its creditors have suffered as a result of the
inequitable conduct.

*In re SI Restructuring, Inc.*, 532 F.3d 355, 360 (5th Cir. 2008); *In the Matter of
Cajun Elec. Power Co-op, Inc.*, 119 F.3d 349, 357 (5th Cir. 1997); *In re Mobile
Steel Corp.*, 563 F.2d 692, 700 (5th Cir. 1977) (internal citations omitted).

54.     At the time BTB purchased the loan and lien from AmCap, AmCap was in the
        process of foreclosing on the refinery. Had BTB not purchased the loan from
        AmCap, AmCap would have foreclosed on the refinery and any recovery by
        Plaintiff on the Second Arbitration Award would have been limited to the value
        received by AmCap in excess of the outstanding loan balance at the time of the
        foreclosure sale. Because a claim should be subordinated only to the extent
        necessary to offset the harm which the creditor suffered, the Court concludes that
        Plaintiff is not entitled to the equitable subordination of BTB's lien on the
        refinery.

55.     The Court declines to consider Plaintiff's sham to perpetrate a fraud claim, which
        sought to impose joint and several liability on all Defendants for the entire amount
        of the Second Arbitration Award, because the Court has concluded that a money
        judgment is not appropriate in this case.

## CONCLUSION

For the reasons stated above, the Court concludes that the transfer of Trigeant,
Ltd.'s Corpus Christi refinery to BTB violated TUFTA, and Plaintiff is entitled to entry
of judgment in its favor. The Court orders that the fraudulent transfer be set aside and
ownership of the refinery be returned to Trigeant, Ltd. The Court will set a hearing to
address attorney fees.

ORDERED this 7th day of August, 2012.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE

EXECUTION COPY

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release ("Agreement") is made and entered into as of May 31, 2014 (the "Effective Date"), by and among PDVSA Petroleo, S.A. ("PDVSA"), BTB Refining, LLC ("BTB"), Harry Sargeant, III ("Sargeant") and Silex Investments, Ltd. ("Silex") (each a "Party", and together, the "Parties").

WHEREAS, on December 15, 2006, Trigeant Ltd. ("Trigeant") entered into a credit agreement under which the Trigeant borrowed approximately $22 million from American Capital Financial Services, Inc. ("AmCap") secured by substantially all of Trigeant's assets, including a refinery located at 6600 Up River Road, Corpus Christi, TX 78409 (the "Refinery");

WHEREAS, on December 28, 2007, BTB and AmCap entered into an Assignment and Acceptance Agreement under which BTB purchased AmCap's rights and obligations with respect to Trigeant in exchange for BTB's payment of approximately $21.8 million to AmCap;

WHEREAS, on March 4, 2008, BTB obtained ownership of the Refinery through a nonjudicial foreclosure under Texas law;

WHEREAS, on September 8, 2008, BTB obtained ownership of certain of Trigeant's personal property through a nonjudicial foreclosure under Texas law;

WHEREAS, on September 24, 2008, the International Chamber of Commerce International Court of Arbitration issued an award in the case *PDVSA Petroleo, S.A. vs. Trigeant, Ltd.*, Case No. 15146/JRF in PDVSA's favor against Trigeant Ltd. (the "Arbitration Award"), which was confirmed by the United States District Court for the Southern District of Florida on November 5, 2009, as evidenced by the Abstract of Judgment recorded February 12, 2013 under document number 2013005677 in the Official Public Records of Nueces County, Texas (the "Abstract");



tabbies®

EXHIBIT

B

WHEREAS, on March 2, 2009, PDVSA commenced an action against Trigeant and BTB (and later, Sargeant) in the United States District Court for the Southern District of Texas, Corpus Christi Division (the "Texas District Court") styled *PDVSA Petróleo, S.A. v. Trigeant, Ltd., BTB Refining, LLC, and Harry Sargeant, III,* Civil Case No. 2:09-cv-00038 (the "Lawsuit") seeking to avoid the March 2008 foreclosure sale of the Refinery and certain related relief;

WHEREAS, on January 14, 2013, the Texas District Court entered a Final Judgment (the "Final Judgment"), which, among other things, (i) voided the March 2008 foreclosure sale of the Refinery to BTB (thus returning ownership of the Refinery to Trigeant), (ii) reinstated BTB's credit agreement and liens purchased from Amcap, and (iii) fixed the amount owing by Trigeant to BTB at $22,565,193.55 (such amount, the "First Lien Claim");

WHEREAS, the Final Judgment is currently on appeal in the United States Court of Appeals for the Fifth Circuit (the "Fifth Circuit"), styled *PDVSA Petróleo, S.A., Plaintiff-Appellee Cross-Appellant v. Trigeant, Limited; Harry Sargeant, III, Defendants-Cross-Appellees v. BTB Refining, LLC, Defendant-Appellant Cross-Appellee,* Case No. 13-40652 (the "Appeal"); and

WHEREAS, without any admission of liability, PDVSA and BTB and Sargeant desire to resolve and settle all claims between them that were or could have been asserted by any of them in the Lawsuit and the Appeal in the manner described in this Agreement.

NOW, THEREFORE, for and in consideration of the obligations and releases set forth in this Agreement and/or any agreements or documents ancillary to this Agreement, including without limitation those attached hereto as exhibits (this Agreement and such ancillary agreements or documents shall be referred to collectively as the "Settlement Documents"), and

-2-

BTB 01970

other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties AGREE as follows:

    1.    Dismissal of Appeal. Immediately upon execution of this Agreement, BTB, PDVSA and Sargeant shall seek dismissal of the Appeal in accordance with the Stipulation attached hereto as Exhibit A. Dismissal of the Appeal by the Fifth Circuit is a condition precedent to the terms and conditions of this Agreement.

    2.    Option to Purchase Arbitration Award and Related Claims. Effective upon dismissal of the Appeal, PDVSA hereby grants Silca and BTB the exclusive option (the "Option") to purchase, pursuant to the form attached hereto as Exhibit B (the "Claims Assignment Agreement"), (i) the Arbitration Award and the Abstract (and the judgment evidenced thereby), and all liens related thereto and (ii) all other claims or causes of action PDVSA has against Trigeant, Ltd., Trigeant, L.L.C., Trigeant Holdings Ltd., Trigeant Holdings, L.L.C. and their respective officers, managers, members and shareholders, arising from or related to the Lawsuit (but not including the Arbitration Award and the Abstract (and the judgment evidenced thereby), and all liens related thereto) (collectively, the "PDVSA Second Lien Claim").

    3.    Option Strike Price. The price payable to PDVSA to exercise the Option shall be US$18,500,000, plus interest accruing at 7% per annum (compounding annually) from and after the Effective Date through the payment date (the "Strike Price"). The Strike Price shall be paid net to PDVSA, with no U.S. withholdings, retentions, or deductions made of any kind.

    4.    Option Term. The Option shall expire and become of no further force or effect at 11:59 p.m. (ET) on the date that is three calendar years from the Effective Date (the "Option Expiration Date"). BTB and/or Silca may exercise the Option by giving notice to

BTB 01971

PDVSA at any time prior to the Option Expiration Date, and provided that, PDVSA receives payment of the Strike Price within five (5) business days of such notice PDVSA will take all actions necessary to fully and completely transfer the PDVSA Second Lien Claim to BTB and/or Sitca immediately upon payment.

5.      **Method of Payment.** Payment of the Strike Price shall be made by wire transfer of immediately available funds to counsel for PDVSA, Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis"), in accordance with the following wire transfer instructions:

| | |
|---|---|
| Bank: | Citibank |
| Address: | 399 Park Ave. |
| | New York, NY 10043 |
| ABA Routing No.: | 021-000-089 |
| Account No.: | 40585074 |
| Account Title: | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Client Name: | PDVSA Petróleo, S.A. |

6.      **No Foreclosure or Sale Without Consent.**   The Parties agree that until after the Option Expiration Date, they shall not, without all Parties' prior written consent (i) commence foreclosure proceedings with respect to the Refinery, (ii) accept ownership of the Refinery in lieu of foreclosure, or (iii) consent to the sale of the Refinery under section 363 of title 11 of the United States Code, as amended (the "Bankruptcy Code") or otherwise under a plan pursuant to section 1129 of the Bankruptcy Code.  The Parties further agree to take all actions reasonably requested by any other Party in furtherance of the foregoing.  This paragraph 6 shall be of no further force or effect if BTB or Sitca acquire the Refinery pursuant to paragraph 5.

7.      **No Challenge to Claims.**   The Parties agree that none of them shall assert any challenge or defense applicable to the First Lien Claim or the PDVSA Second Lien Claim in any respect (including without limitation with respect to validity, extent, amount, priority,

-4-

BTB 01972

voidability or enforceability) and will contest any such challenges or defenses asserted by third parties, except as otherwise provided in this Agreement.

8. Cooperation. If, prior to the Option Expiration Date, Trigeant becomes the subject of a voluntary or involuntary bankruptcy case, the Parties will use reasonable best efforts to either dismiss the case or cause the trustee or debtor-in-possession to defer the sale (under a plan or under Section 363 of the Bankruptcy Code or otherwise) of the Refinery until such time as the sale value of the Refinery can be maximized, in the reasonable and good faith business judgment of the Parties. The Parties shall cooperate in a Trigeant bankruptcy case in all other respects to implement the provisions of this Settlement Agreement.

9. Sale or Foreclosure Obligations. If, prior to the Option Expiration Date, a sale of the Refinery is scheduled either (i) in Trigeant's bankruptcy case (under a plan or under Section 363 of the Bankruptcy Code or otherwise) or (ii) in a foreclosure sale, then PDVSA shall assign its claim to BTB and/or Silca and BTB and/or Silca shall credit bid both the First Lien Claim and the PDVSA Second Lien Claim at such sale, for BTB's account. If BTB and/or Silca is the successful bidder at such sale, BTB and/or Silca shall become jointly and severally obligated to PDVSA in the amount of the PDVSA Second Lien Claim (secured by the liens, security interests and mortgages set forth in Section 10 of this Agreement), as the purchase price for the PDVSA Second Lien Claim ("Second Lien Purchase Price") which amount shall become due and payable on the Option Expiration Date; provided, however, that during the period prior to the Option Expiration Date, BTB and/or Silca will retain the right to satisfy the Second Lien Purchase Price and all liens held by PDVSA that secure payment of the Second Lien Purchase Price by paying PDVSA the Strike Price. In the event that BTB and/or Silca is not the successful purchaser of the Refinery, then any funds paid to or for the benefit of BTB or Silca as holder of

-5-

BTB 01973

the PDVSA Second Lien Claim shall be placed in an interest-bearing escrow account established with a third party for the benefit of PDVSA prior to the Option Expiration Date; if BTB and/or Silca does not pay the Strike Price to PDVSA prior to the Option Expiration Date, then PDVSA shall be entitled to the escrowed funds. If BTB and/or Silca pay the Strike Price to PDVSA prior to the Option Expiration Date, then BTB and/or Silca shall be entitled to the escrowed funds. A condition precedent of the assignment shall be the formation of a third party escrow account that is mutually acceptable to the parties. Such assignment by PDVSA may be rescinded by PDVSA upon cancellation of the proposed sale of the Refinery.

10. Collateral. To secure the payment and performance obligations of BTB and Silca to PDVSA arising upon this Agreement, (i) BTB and Silca hereby grant PDVSA a first priority lien on all of BTB/Silca's right, title and interest in the Refinery, whether now owned or hereafter acquired, and on any other of their real property, to secure BTB and Silca's obligations to PDVSA pursuant to and subject to the terms and conditions of a Deed of Trust attached hereto as Exhibit C, (ii) BTB hereby grants PDVSA a first priority security interest in substantially all of its personal property (excluding however, BTB's accounts and inventory and the proceeds and products thereof), but including the First Lien Claim, the PDVSA Second Lien Claim and any proceeds thereof (including without limitation the Refinery), pursuant to and subject to the terms and conditions of a Security Agreement attached hereto as Exhibit D, (iii) Silca hereby grants PDVSA a first priority security interest in substantially all of their personal property, but including the First Lien Claim, the PDVSA Second Lien Claim and any proceeds thereof (including without limitation the Refinery), pursuant to and subject to the terms and conditions of a Security Agreement attached hereto as Exhibit E, and (iv) the owner or owners of the all of the equity interests of Silca shall grant PDVSA a first equitable mortgage in the equity of Silca

pursuant to the terms of an Equitable Share Mortgage governed by the laws of the British Virgin Islands and attached hereto as **Exhibit F**. Such liens, security interests and mortgages shall be granted and perfected immediately upon execution of this Agreement. BTB and Silca further agree that they shall not sell, assign, pledge, encumber, hypothecate, transfer or otherwise voluntarily dispose of their interest in the Refinery (whether contingent or otherwise) until (i) payment of the Strike Price following exercise of the option to purchase the PDVSA Second Lien Claim prior to the Option Expiration Date or (ii) satisfaction of the obligation of BTB and Silca owing to PDVSA arising under Section 9 of this Agreement.

11.    Personal Guarantee. Sargeant hereby personally guarantees payment of the Second Lien Purchase Price, pursuant to and subject to the terms and conditions of a Guaranty attached hereto as **Exhibit G**, (a) in the event that PDVSA is adjudged by a court of competent jurisdiction not to hold a valid and enforceable first priority lien on any of the assets, including the Refinery, held by BTB or Silca following BTB's and/or Silca's taking ownership of the Refinery; or (b) in the event BTB and/or Silca sell, assign, pledge, encumber, hypothecate, transfer or otherwise voluntarily dispose of their interest in the First Lien Claim, the PDVSA Second Lien Claim or the Refinery, in each case other than as provided for in this Agreement.

12.    Exclusive Option. Except as otherwise provided by this Agreement, PDVSA agrees that until after the Option Expiration Date, it shall not sell, assign, pledge, encumber, hypothecate, transfer or otherwise voluntarily dispose of the PDVSA Second Lien Claim or its interest therein to any party other than BTB or Silca. BTB and Silca agree that until after the Option Expiration Date, they shall not sell, assign, pledge, encumber, hypothecate, transfer or otherwise voluntarily dispose of the First Lien Claim or the PDVSA Second Lien Claim to the extent they have an interest in it.

BTB 01975

13.   **Indemnification of PDVSA.** BTB, Sargeant, and Slios, on behalf of themselves as well as on behalf of their respective heirs, successors and assigns agree for and in consideration of the agreements and releases set forth herein, to unconditionally and fully indemnify and hold harmless PDVSA against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages, or liabilities of any nature whatsoever, incurred in connection with any claim, action, suit, proceeding or investigation arising out of or pertaining to the Settlement Documents.

14.   **Further Assurances.** Each Party agrees, promptly upon request of any other Party, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignments, transfers, certificates, assurances and other instruments as may be reasonably required from time to time in order to (A) carry out more effectively the purposes of the Settlement Documents, (B) to the fullest extent permitted by applicable law, subject to any Party's properties, assets, rights or interests to the liens or security interests now or hereafter intended to be covered by any of the Settlement Documents, (C) perfect and maintain the validity, effectiveness and priority of any of the liens or security interests now or hereafter intended to be covered by any of the Settlement Documents, (D) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto any Party the rights granted or now or hereafter intended to be granted to such Party under the Settlement Documents, and (E) correct any material defect or error that may be discovered in the Settlement Documents or in the execution, acknowledgement, filing or recordation thereof.

-8-

BTB 01976

15.    Release of Claims by PDVSA.  Effective upon dismissal of the Appeal, PDVSA forever releases, acquits and discharges BTB, Silca and Sargeant, and each of their respective past, present and future agents, heirs, executors, administrators, conservators, successors, assigns, participants, co-participants, direct and indirect parents, principals, subsidiaries, affiliates, related companies, shareholders, interest holders, investors, members, partners (including general and limited partners), managers, representatives, contractors, service providers, receivers, attorneys and beneficiaries from any and all claims, demands, defenses, controversies, actions, debts, or causes of action of whatever nature or character, whether asserted or unasserted, known or unknown, arising from or relating to the events, circumstances and transactions at issue in the Lawsuit and the Appeal, except for obligations and claims arising from the Settlement Documents or relating to the enforcement of the Settlement Documents;

16.    Release by BTB, Silca and Sargeant.  Effective upon dismissal of the Appeal, BTB, Silca and Sargeant forever release, acquit and discharge PDVSA and its past, present and future agents, heirs, executors, administrators, conservators, successors, assigns, participants, co-participants, direct and indirect parents, principals, subsidiaries, affiliates, related companies, shareholders, interest holders, investors, members, partners (including general and limited partners), managers, representatives, contractors, service providers, receivers, attorneys and beneficiaries and its past, present and future officers, directors, and employees from any and all claims, demands, defenses, controversies, actions, debts, or causes of action of whatever nature or character, whether asserted or unasserted, known or unknown, arising from or relating to the events, circumstances and transactions at issue in the Lawsuit and the Appeal, except for obligations and claims arising from the Settlement Documents or relating to the enforcement of the Settlement Documents.

-9-

BTB 01977

17.    Counterparts. This Agreement may be signed in any number of counterparts, each of which shall be deemed an original, and all of which shall be treated as if they were the same instrument. An executed copy of this Agreement delivered by facsimile or electronic communication capable of producing a printed copy shall be treated in all respects as an original executed copy of this Agreement.

18.    Successors and Assigns. All covenants, promises and agreements by or on behalf of a Party contained in this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of that respective Party.

19.    No Assignment. The Parties shall not be permitted to assign any of their rights or obligations under the Settlement Documents, except that Silea shall be permitted to assign all, or any portion of the PDVSA Second Lien Claim to BTB. Any assignment not permitted under this Agreement shall be deemed null and void.

20.    Termination Upon Change in Control. PDVSA shall have the right to immediately terminate this Agreement upon a change of control of BTB or Silea. For purposes of this Section 20, change in control shall not include the heirs, beneficiaries, executors, trustees or guardians of Sargeant.

21.    Governing Law and Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law principles that would result in application of the laws of any other jurisdiction. Any action arising under or relating to this Agreement may be brought in any State or Federal Court located in the State of New York ("New York Courts"), and each Party consents to and confers personal jurisdiction over it at the address set forth in this Agreement, and in any action hereunder each of the Parties also hereby irrevocably waives: (a) trial by jury; (b) any defense of

-10-

BTB 01978

improper venue; or (e) forum non conveniens, to any such action brought in New York Courts. The Parties consent to service of process by certified mail at the addresses listed for notices herein.

        22.    <u>Notices</u>. Any notices under this Agreement shall be given at the following addresses:

If to PDVSA:

> Isaias Medina
> Coordinator of Litigation and Claims
> Management of International Matters
> General Counsel's Office
> Petróleos de Venezuela, S.A.
> Av. Libertador, Torre Este Piso 1, Oficina 10-90
> Consultoria Jurídica, La Campina
> Caracas, Venezuela 1050

With a copy to (which shall not constitute notice):

> Steven J. Reisman, Esq.
> Jonathan J. Walsh, Esq.
> CURTIS, MALLET-PREVOST,
>   COLT & MOSLE LLP
> 101 Park Avenue
> New York, NY 10178-0061

If to BTB:

> Kevin Kirkeide
> Manager
> BTB Refining, LLC
> 4232 Beacon Street
> Corpus Christi, TX 78405

With a copy to (which shall not constitute notice):

> Deirdre B. Ruckman, Esq.
> Gardere Wynne Sewell LLP
> 1601 Elm Street, Suite 3000
> Dallas, TX 75201

If to Silca:

-11-

BTB 01979

Elkas Investments, Ltd.
c/o Global Corporate Consultants Group, Inc.
PO Box 4493
Road Town, Tortola, BVI
Attn.: Ramon Antzola, Esq.

With a copy to (which shall not constitute notice):

Deirdre B. Ruckman, Esq.
Gardere Wynne Sewell LLP
1601 Elm Street, Suite 3000
Dallas, TX 75201

If to Sargeant:

Harry Sargeant III
1420 N. Ocean Blvd
Gulf Stream, FL 33483

With a copy to (which shall not constitute notice):

Deirdre B. Ruckman, Esq.
Gardere Wynne Sewell LLP
1601 Elm Street, Suite 3000
Dallas, TX 75201

23.     **Entire Agreement.** This Agreement, together with the Settlement
Documents, constitutes the entire agreement between the Parties regarding the subject matter
covered herein, and supersedes all previous communications, agreements and understandings
between them regarding the covered subject matter.

24.     **No Oral Modification or Waiver.** This Agreement shall not be
modified, altered, amended, or changed in any way except as specifically set forth in a written
agreement specifically referring to this Agreement and executed by each of the Parties. No right
or remedy of any Party under this Agreement can be waived except by writing specifically
referring to this Agreement and executed by the Party specifically waiving that right or remedy.
No course of dealing or performance, failure or delay by any Party in exercising, in whole or in

-12-

BTB 01980

part, any right or remedy under this Agreement shall waive or impair such or any other right or remedy under this Agreement, or in any manner preclude its additional or future exercise.

      25.    <u>Authority</u>. All persons executing this Agreement warrant and represent that they have the full authority to do so and that they have the authority to take appropriate action required or permitted to be taken pursuant to this Agreement to effectuate its terms.

*[Remainder of Page Intentionally Left Blank.]*

-13-

BTB 01981

IN WITNESS WHEREOF, the Parties hereby acknowledge their agreement and consent to the terms and conditions set forth above through their respective signatures as set forth below.

PDVSA Petróleo, S.A.

By: _____
    Its _____

BTB Refining, LLC

By: _____
    Its _____

Harry Sargeant III

By: _____
    Harry Sargeant III

Silca Investments, Ltd.

By: _____
    Its _____



IN WITNESS WHEREOF, the Parties hereby acknowledge their agreement and consent to the terms and conditions set forth above through their respective signatures as set forth below.

PDVSA Petróleo, S.A.

BTB Refining, LLC

By: _____
   Its _____

By: _____
   Its _____

Harry Sargeant III

By: _____
   Harry Sargeant III

Silca Investments, Ltd.

By: _____
   Its _____

BTB 01983

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| PDVSA PETROLEO, S.A., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:09-CV-00038 |
| | § | |
| TRIGEANT, LTD., | § | |
| BTB REFINING, L.L.C., and | § | |
| HARRY SARGEANT, III, | § | |
| | § | |
| Defendants. | § | |

**ORDER DENYING BTB REFINING, LLC'S EMERGENCY MOTION FOR STAY AND
MODIFYING ORDER ON TRIGEANT, LTD'S MOTION TO ENFORCE JUDGMENT**

On the 2nd day of April, 2013, the Court considered BTB Refining, LLC's Emergency Motion for Stay. (D.E. 335.) After considering the motion and the arguments of counsel, the motion is DENIED, and the Court's Order Granting Trigeant, Ltd.'s Motion to Enforce Judgment (D.E. 308) is MODIFIED AS FOLLOWS:

It is ORDERED that:

1.     During the pendency of this cause on appeal, Trigeant, Ltd. ("Trigeant") shall remain in possession of all property foreclosed upon in the March 4, 2008 foreclosure sale. Notwithstanding, BTB shall have the non-exclusive right to use, occupy and have access to the foreclosed property for the sole purpose of fulfilling all of its rights and contractual obligations under the Tank Lease Agreement dated December 1, 2012 entered between BTB as Lessor and Freepoint Commodities Trading and Marketing, LLC ("Freepoint") as Lessee.



EXHIBIT

C

2.    BTB shall immediately deposit any and all funds received from Freepoint which
      currently remain in its possession, as well as any and all future funds received
      from Freepoint immediately after their receipt into an operating account ("Escrow
      Account") established by and in the name of Trigeant. This Escrow Account shall
      be used solely for refinery operating expenses arising out of the Tank Lease
      Agreement as specified below, without setoff or payment of any funds by BTB
      for any purpose, prior to the deposit of such funds into the Escrow Account. The
      Escrow Account shall also be exempt from any state or federal garnishment, or
      levy or execution proceeding.

|                  |                                |
|------------------|--------------------------------|
| Bank Name:       | International Bank of Commerce  |
| Bank Address:    | 1200 San Bernardo Ave.         |
|                  | Laredo, Texas 78042            |
| ABA #:           | XXXXX2528                      |
| SWIFT Code:      | XXXXUS44                       |
| Account #:       | XXXXXX4535                     |
| Account Name:    | **Trigeant, Ltd.**             |

3.    All necessary and reasonable costs associated solely with fulfilling BTB's
      contractual rights and obligations under the Tank Lease Agreement shall be paid
      by Trigeant from the Escrow Account to any appropriate vendor or payee, which
      may include BTB. Trigeant shall make all such payments from the Escrow
      Account within 5 business days of the presentation of an invoice and all
      supporting documents by BTB to Trigeant that details said costs and expenses.

4.    The funds held in the Escrow Account shall be paid only for employee salaries
      and related taxes and withholding obligations, and for operating expenses, safety,
      maintenance, insurance, utilities, regulatory compliance, and other applicable

2

local, state or federal taxes, and capital improvements at the facility, and solely as they pertain to or arise from the Tank Lease Agreement.

5.    Trigeant shall maintain a detailed accounting of the funds received from BTB and the operating expenses paid, including the supporting documentation provided to Trigeant by BTB, and provide such accounting to BTB and Freepoint by the 15th day of each month.

ORDERED this 4th day of April 2013.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE

3